1    BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
     Alan R. Plutzik (Bar No. 077785)
2    L. Timothy Fisher (Bar No. 191626)
     Kathryn A. Schofield (Bar No. 202939)
3    2125 Oak Grove Road, Suite 120
     Walnut Creek, California  94598
4    Telephone:  (925) 945-0200
     Facsimile:  (925) 945-0200
5

6    SCHIFFRIN & BARROWAY LLP
     Eric L. Zagar
7    Eric Lechtzin
     Tara P. Kao
8    280 King of Prussia Road
     Radnor, PA  19087
9    Telephone:  (610) 667-7706
     Facsimile:  (610) 667-7056

10    Attorneys for Plaintiff

11

12            UNITED STATES DISTRICT COURT

13            NORTHERN DISTRICT OF CALIFORNIA

14               SAN JOSE DIVISION

15    MARVIN STEGER, Derivatively on Behalf of    Case No. **C06-06699 RL**
     Nominal Defendant MIPS TECHNOLOGIES,
16    INC.,                           **SHAREHOLDER DERIVATIVE**
                                        **COMPLAINT**
17                   Plaintiff,

18         v.

19    JOHN E. BOURGOIN, JACK BROWNE,
     KENNETH L. COLEMAN, SANDY
20    CREIGHTON, KEVIN C. EICHLER, FRED M.
     GIBBONS, ANTHONY B. HOLBROOK,
21    WILLIAM M. KELLY, LAVI LEV, AND
     KEREK MEYER,,

22                 Defendants,         **JURY TRIAL DEMANDED**

23          and,

24    MIPS TECHNOLOGIES, INC.,

25             Nominal Defendant.

26

27

28
   SHAREHOLDER DERIVATIVE COMPLAINT
   CASE NO.
   49133

Plaintiff Marvin Steger, by the undersigned attorneys, submits this Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder's derivative action brought for the benefit of nominal defendant MIPS Technologies, Inc. ("MIPS" or the "Company") against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, statutory violations, and other violations of law.

2.      On September 6, 2006, the United States Senate Committee on Finance held a hearing, "Executive Compensation: Backdating to the Future/Oversight of current issues regarding executive compensation including backdating of stock options; and tax treatment of executive compensation, retirement and benefits."

3.      At the Senate Finance Committee Hearing, the Senate Finance Committee Chairman, Senator Chuck Grassley, in his opening statement, stated: "[Options backdating] is behavior that, to put it bluntly, is disgusting and repulsive.  It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm going to get mine.' . . . [S]hareholders and rank-and-file employees were ripped off by senior executives who rigged stock option programs – through a process called 'back-dating' – to further enrich themselves.  And as we have found far too often in corporate scandals of recent years, boards of directors were either asleep at the switch, or in some cases, willing accomplices themselves. . . ."

4.      At the Senate Finance Committee Hearing, the Chairman of the Securities Exchange Commission, Christopher Cox, stated, "Rather obviously, this fact pattern [of backdating options] results in a violation of the SEC's disclosure rules, a violation of accounting rules, and also a violation of the tax laws."  The Commissioner of the IRS Mark Everson agreed and further stated, "Picking a date on which the stock price was low in comparison with the current price gives the employee the largest potential for gain on the option and makes it possible for the employee to benefit from corporate performance that occurred before the option was granted."

5.      In his statement before the Senate Finance Committee, Deputy Attorney General Paul J. McNulty described the practice of stock option backdating "as a brazen abuse of corporate power to artificially inflate the salaries of corporate wrongdoers at the expense of shareholders," and said "For some of those companies that have now disclosed backdated grants, corporate reputations have been tarnished and shareholder value has diminished substantially. . . ."

6.      On September 6, 2006, MarketWatch, in an article titled "SEC Probing more than 100 firms on options: Cox," quoted the Senate Banking Committee Chairman, Senator Richard Shelby, saying that manipulation of options grant dates "appears to be a black-and-white example of securities fraud," and "Corporate officers and directors engaging in this practice are cheating the owners of the company and should be held accountable to the fullest extent possible."

7.      On July 22, 2006, *The San Francisco Chronicle* recounted SEC Chairman Christopher Cox's announcement in San Francisco on July 20, 2006 where he said, "[backdating in many cases] makes a hash of (companies') financial statements . . . [and is] poisonous [to efficient markets]. . . . It is securities fraud if you falsify books and records. It is securities fraud if you present financial statements to the SEC that do not comply with generally accepted accounting principles. There is no requirement that (the defendant) personally profit [to prove that a crime occurred.]"

8.      On June 18, 2006, in an article titled, "Options Scandal Brewing in Corporate World," SEC Chairman Christopher Cox was quoted, saying "[Backdating options] isn't a question about 'Whoops, I may have (accidentally) crossed a line here' . . . It's a question of knowingly betting on a race that's already been run."

9.      On May 26, 2006, *Forbes*, in an article titled, "The Next Big Scandal," quoted Former Securities and Exchange Commission ("SEC") Chairman Harvey L. Pitt, saying "What's so terrible about backdating options grants? For one thing, it likely renders a company's proxy materials false and misleading. Proxies typically indicate that options are granted at fair market value. But if the grant is backdated, the options value isn't fair – at least not from the vantage point of the company and its shareholders."

10. MIPS has *admitted* that its officers and directors committed this egregious misconduct denounced by these government officials. Specifically, in an October 25, 2006 press release, MIPS admitted that "*different measurement dates should have been used for computing compensation costs for certain historic stock option grants than those used in the preparation of the Company's historical financial statements.*"

11. As alleged herein, in gross breach of their fiduciary duties as officers and/or directors of MIPS, the Individual Defendants (as defined herein) colluded with one another to:

(a) improperly backdate many grants of MIPS stock options to MIPS President and Chief Executive Officer John E. Bourgoin and several other MIPS executives including six of seven current members of the Board of Directors, in violation of the Company's shareholder-approved stock option plans;

(b) improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles ("GAAP");

(c) improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"); and

(d) produce and disseminate false financial statements and other false SEC filings to MIPS shareholders and the market that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options.

12. As a result of the Individual Defendants' egregious misconduct, MIPS has sustained millions of dollars in damages, and John E. Bourgoin and the other recipients of the backdated stock options have garnered millions of dollars in unlawful profits.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

14.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

15.     Plaintiff Marvin Steger is, and was at all relevant times, a shareholder of nominal defendant MIPS.

16.     Nominal defendant MIPS is a Delaware corporation with its principal executive offices located at 1225 Charleston Road, Mountain View, California 94043-1353.  According to its public filings, MIPS is a leading developer of embedded processors and related intellectual property for use in markets such as digital consumer, wired and wireless communications (including broadband access), office automation, security, and automotive.  MIPS has had more than 500 shareholders of record at all times relevant hereto.

### Option Recipient Defendants

17.     Defendant John E. Bourgoin ("Bourgoin") has served as the Company's Chief Executive Officer since February 1998, as President since September 1996, and as a director since May 1997.

18.     Defendant Jack Browne ("Browne") has served as MIPS' Vice President of Marketing since early 2006 and previously served as Vice President of Worldwide Sales from August 2002 to 2006 and as Director of Market Development from December 2001 to August 2002.

19.     Defendant Kenneth L. Coleman ("Coleman") has served as a director of the Company and as Chairman of the Compensation Committee of the Board, previously combined with the Options Administration Committee and later renamed the Compensation and Nominating Committee (the "Compensation Committee") since January 1998.

20.     Defendant Sandy Creighton ("Creighton") has served as the Company's Vice President of Human Resources and Corporate Administration since February 2006 and previously served as the Company's Vice President, General Counsel, and Corporate Secretary from June 1998 to February 2006.

21.     Defendant Kevin C. Eichler ("Eichler") served as the Company's Vice President, Chief Financial Officer, and Treasurer from May 1998 to early 2006.

22.     Defendant Fred M. Gibbons ("Gibbons") has served as a director of the Company and has also served as a member of the Compensation Committee and as a member of the Audit and Corporate Governance Committee of the Board, previously named the Audit Committee (the "Audit Corporate Governance Committee") since 1998.

23.     Defendant Anthony B. Holbrook ("Holbrook") has served as the Company's Chairman of the Board since August 2003, as a director of the Company since July 1998, and as a member of the Audit and Corporate Governance Committee since 1999.  He also served as a member of the Compensation Committee from 1998 to 2002.

24.     Defendant William M. Kelly ("Kelly") has served as a director of the Company since January 1998 and as Chairman of the Audit and Corporate Governance Committee since 1998.

25.     Defendant Lavi Lev ("Lev") served as the Company's Senior Vice President of Engineering from 1998 to 2001 and as Vice President, Engineering of Silicon Graphics from 1996 to 1998.

26.     Defendant Derek Meyer ("Meyer") served as the Company's Vice President of Worldwide Field Operations from September 1999 to June 2002, as Vice President, Sales and Marketing from March 1998 to September 1999, and as Director of Worldwide Marketing and Sales from May 1996 to March 1998.

27.     Collectively, defendants Bourgoin, Browne, Coleman, Creighton, Eichler, Gibbons, Holbrook, Kelly, Lev and Meyer are referred to herein as the "Option Recipient Defendants."

/     /     /

/     /     /

**Director Defendants**

28.    Collectively, defendants Bourgoin, Coleman, Gibbons, Holbrook, and Kelly are referred to herein as the "Director Defendants." The following table summarizes the positions held by the Director Defendants during the relevant period:

| Director Name | Recipient of Backdated Option Grant(s) | Member of Compensation Committee during relevant period | Member of Audit and Corporate Governance Committee during relevant period |
|---|---|---|---|
| Bourgoin | x | | |
| Coleman | x | x | |
| Gibbons | x | x | x |
| Holbrook | x | x | x |
| Kelly | x | | x |

**Individual Defendants**

29.    Collectively, the Option Recipient Defendants and the Director Defendants are referred to herein as the "Individual Defendants."

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

30.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

31. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

(b) exercise good faith in ensuring that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, including acting only within the scope of its legal authority;

(c) exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports, or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

(d) exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

(e) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

33. The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

(1)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

    (a)    transactions are executed in accordance with management's general or specific authorization; and

    (b)    transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

34.    MIPS' Audit and Corporate Governance Committee Charter provides that the Audit and Corporate Governance Committee shall be responsible for, among other things:

    (a)    prior to the release of the Company's unaudited quarterly financial statements, review the results with management and the independent accountants, considering reports from senior finance management as to major accounting matters and any material deviations from prior practice, and consultations with the Company's independent accountants;

    (b)    ensure that the independent accountants conduct a SAS 71 ("Interim Financial Information") review prior to the filing of the Company's Form 10-Q;

    (c)    prior to the release of the Company's fiscal year end operating results, review and discuss with Company management and the independent accountants the audited financial results for the fiscal year, including their judgment about the quality, not just the acceptability, of accounting principles, the reasonableness of significant judgments, and the clarity of the disclosures in the financial statements;

    (d)    at least annually, discuss with the independent accountants the matters described in SAS 61 ("Communications with Audit Committees");

    (e)    review with management and the independent accountants the Company's critical accounting policies and the disclosure regarding those policies in the

Company's periodic filings with the Securities and Exchange Commission ("SEC");

(f)    review and discuss the audited financial statements with management and, if necessary, the independent accountants, prior to recommending the inclusion of the audited financial statements in the Company's Annual Report on Form 10-K; and

(g)    report annually in the Company's proxy statements such information as may be required by the rules and regulations of the SEC.

### FACTUAL ALLEGATIONS

### Backdating of Stock Option Grants to the Option Recipient Defendants

35.    At all times relevant hereto, the Compensation Committee's responsibilities included "administering [the Company's] equity compensation plans, reviewing and approving grants under [its] equity compensation plans and approving other performance-based compensation, . . . reviewing and recommending the salary, bonus and stock incentive compensation of [its] Chief Executive Officer, reviewing the salaries, bonuses and stock incentive compensation of [the Company's] other officers as proposed by [its] Chief Executive Officer . . . ."

36.    From 1998 through 2001, the Compensation Committee backdated the following MIPS stock options to the Option Recipient Defendants:

| Purported Grant Date | Name | Exercise Price | Number of Options[1] |
|---|---|---|---|
| 07/06/98 | Holbrook | $11.3800 | at least 40,000 |
| | Gibbons | $11.3800 | at least 30,000 |
| 08/06/99 | Bourgoin | $34.3125 | 150,000 |
| | Lev | $34.3125 | 75,000 |
| | Eichler | $34.3125 | 55,000 |
| | Meyer | $34.3125 | 50,000 |
| | Creighton | $34.3125 | 55,000 |
| 10/28/99 | Holbrook | $27.4400 | at least 10,000 |

---

[1] Where the total number of options is unknown, *i.e.* where the phrase "at least" is utilized, the stock option grant did not appear in any proxy statements filed by the Company but was first disclosed in Form 4 filings, which only included the number of options pursuant to the grant that were exercised and left unexercised on the transaction date.

| | | | |
|---|---|---|---|
| | Gibbons | $27.4400 | at least 20,000 |
| 06/21/00 | Coleman | $33.8800 | at least 40,000 |
| | Kelly | $33.8800 | at least 80,000 |
| 07/11/00 | Bourgoin | $36.5000 | 20,000 |
| | Creighton | $36.5000 | 70,000 |
| | Eichler | $36.5000 | 70,000 |
| | Meyer | $36.5000 | 70,000 |
| | Lev | $36.5000 | 70,000 |
| 01/05/01 | Meyer | $26.3750 | 21,000 |
| 11/14/01 | Coleman | $8.7100 | at least 10,000 |
| | Holbrook | $8.7100 | at least 10,000 |
| | Gibbons | $8.7100 | at least 20,000 |
| | Kelly | $8.7100 | at least 20,000 |
| 12/20/01 | Browne | $9.4000 | at least 40,000 |

37.     Pursuant to the terms of the Company's shareholder-approved stock option plans, including the 1998 Long-Term Incentive Plan, the exercise price of options may not "be less than the Fair Market Value per share on the date of award," and fair market value is defined as "the closing selling price of a share of Common Stock . . . on the valuation date."

38.     Pursuant to APB 25, the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the Company must recognize the difference as an expense.

39.     Pursuant to Section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

40.     In a striking pattern that could not have been the result of chance, each and every one of the foregoing stock option grants was dated just before a substantial rise in MIPS stock

price, and almost all of the stock option grants were dated just after a sharp drop in MIPS stock price, as demonstrated in the following charts:

(a)     Summary of Option Grants and Surrounding Stock Price Performance

| Purported Grant Date | Exercise Prices | Stock Price 15 Trading Days Before Purported Grant Date | Stock Price 15 Trading Days After Purported Grant Date | % Rise After Purported Grant Date |
|---|---|---|---|---|
| 07/06/98 | $11.3800 | $13.44 | $18.38 | 61.51% |
| 08/06/99 | $34.3125 | $43.75 | $36.00 | 4.92% |
| 10/28/99 | $27.4400 | $33.38 | $40.75 | 48.51% |
| 06/21/00 | $33.8800 | $18.38 | $53.38 | 57.56% |
| 07/11/00 | $36.5000 | $36.50 | $47.00 | 28.77% |
| 01/05/01 | $26.3750 | $36.62 | $32.06 | 21.55% |
| 11/14/01 | $8.7100 | $9.30 | $11.16 | 28.13% |
| 12/20/01 | $9.4000 | $9.84 | $12.20 | 29.79% |

(b)     Stock Price Performance Surrounding Options Purportedly Granted 07/06/98[2]



---

[2] MIPS went public on June 30, 1998, so there are no historical prices before that date.

SHAREHOLDER DERIVATIVE COMPLAINT
49133

11

(c)     Stock Price Performance Surrounding Options Purportedly Granted 08/06/99



(d)     Stock Price Performance Surrounding Options Purportedly Granted 10/28/99



(e)    Stock Price Performance Surrounding Options Purportedly Granted 06/21/00



(f)    Stock Price Performance Surrounding Options Purportedly Granted 07/11/00



(g)    Stock Price Performance Surrounding Options Purportedly Granted 01/05/01



SHAREHOLDER DERIVATIVE COMPLAINT
49133

13

(h)    Stock Price Performance Surrounding Options Purportedly Granted 11/14/01



(i)    Stock Price Performance Surrounding Options Purportedly Granted 12/20/01



41.    The reason for the extraordinary pattern set forth in the preceding paragraph is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made. Rather, at the behest of the Option Recipient Defendants, the Director Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of MIPS stock was lower than the market price on the actual grant dates. This improper backdating, which violated the terms of the Company's shareholder-approved stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to the Option Recipient Defendants and improperly reduced the amounts the Option Recipient Defendants had to pay the Company upon exercise of the options.

42.     The Individual Defendants' backdating of stock options coincided with some of MIPS' lowest stock prices for certain fiscal quarters, as demonstrated in the following charts:

(a)     Stock Price Performance in the First Fiscal Quarter of Fiscal 1999



(b)     Stock Price Performance in the Second Fiscal Quarter of Fiscal 2000



/      /      /

/      /      /

/      /      /

/      /      /

/      /      /

/      /      /

SHAREHOLDER DERIVATIVE COMPLAINT
49133

15

(c)  Stock Price Performance in the First Fiscal Quarter of Fiscal 2001



**MIPS' Admissions**

43.  MIPS eventually admitted that the option grants were in fact backdated.

44.  On October 25, 2006, MIPS issued a press release announcing an expected restatement of its historical financial statements and ***admitting to actual backdating of past option grants***:

>  MIPS Technologies, Inc. (NASDAQ: MIPS), a leading provider of industry-standard processor architectures and cores for digital consumer, networking, personal entertainment, communications and business applications, today reported revenue results for its first quarter of fiscal 2007, ended Sept. 30, 2006 and also provided an update on the investigation of historical stock-based compensation practices by a special committee of independent directors. . . .

>  As previously announced, MIPS formed a special committee of independent members of its Board of Directors to review the Company's historical option grant practices and the Company's accounting for its option grants. Due to the continuing internal investigation, MIPS is not releasing first quarter fiscal 2007 earnings at this time. . . .

>  **Stock Option Investigation Update and Expected Restatement** Though the investigation by the special committee remains ongoing, the special committee has reached a determination that, ***different measurement dates should have been used for computing compensation costs for certain historic stock option grants than those used in the preparation of the Company's historical financial statements.*** The special committee has not yet completed its investigation to allow for the final determination of the proper measurement dates, and, therefore, the Company has not determined the amount of additional compensation expenses that will be recorded. Nonetheless, the Company has determined that its historical financial statements included in reports that it has previously filed with the Securities

SHAREHOLDER DERIVATIVE COMPLAINT
49133

16

1   and Exchange Commission ("SEC") *will need to be restated*. Consequently,
    such financial statements, and the Company's earnings releases reporting
2   periodic operating results and financial conditions for such periods should no
    longer be relied upon. To date, there is no basis to conclude that there was
3   any intentional misconduct by current management.

4   The Company has not filed its Annual Report on Form 10-K for the year
    ended June 30, 2006, pending the completion of the special committee's
5   investigation. The Company plans to file the Annual Report as soon as
    practicable after the investigation is completed. The Company voluntarily
6   contacted the SEC to inform them about the ongoing review, and the SEC
    has recently requested that the Company provide them with certain
7   information relating to the Company's stock option practices.

8   MIPS Technologies issued a press release on September 19, 2006 that the
    Company will request a hearing before the NASDAQ Listing Qualifications
9   Panel in response to the receipt of a NASDAQ Staff Determination letter
    that the Company is not in compliance with the filing requirements for
10  continued listing as set forth in Marketplace Rule 4310(c)(14). The notice
    was issued in accordance with standard NASDAQ procedures due to the
11  delayed filing of the Company's Annual Report on Form 10-K for the fiscal
    year ended June 30, 2006. Pending a decision of the Panel, the Company's
12  shares will continue to be listed on the NASDAQ Global Market. The
    Company has since requested and was granted a hearing which is scheduled
13  for November 9, 2006, in which the Company's management will present in
    person its plan to regain compliance with NASDAQ's filing requirements.
14  There can be no assurance that the hearing panel will grant the Company's
    request for an extension that would allow the continued listing of the
15  Company's common stock on the NASDAQ Global Market.  (emphasis
    added).

16  **The Individual Defendants' Dissemination of False Financial Statements**

17      45.    As a result of the improper backdating of stock options, the Company, with the

18  knowledge, approval, and participation of each of the Individual Defendants,

19          (a)    violated the terms of the Company's shareholder-approved stock option plans by

20          granting stock options with exercise prices less than the fair market value of the

21          stock on the actual date of grant;

22          (b)    violated APB 25 by failing to recognize compensation expenses incurred when the

23          improperly backdated options were granted;

24          (c)    violated Section 162(m) by taking tax deductions based on stock option grants that

25          were not payable solely on account of the attainment of one or more performance

26          goals and violated the terms of the Company's shareholder-approved stock option

27          plans; and

28

SHAREHOLDER DERIVATIVE COMPLAINT                                                    17
49133

(d)     produced and disseminated false financial statements and other false SEC filings to MIPS shareholders and the market that improperly recorded and accounted for the backdated option grants, and thereby understated compensation expenses and overstated net income.

46.     The Company, with the knowledge, approval, and participation of each of the Individual Defendants, disseminated its false financial statements in, *inter alia*, the following Form 10-K filings:

(a)     Form 10-K for fiscal year ended June 30, 2000, filed with the SEC on September 22, 2000 and signed by defendants Bourgoin, Eichler, Gibbons, Kelly and Holbrook;

(b)     Form 10-K405 for fiscal year ended June 30, 2001, filed with the SEC on September 24, 2001 and signed by defendants Bourgoin, Eichler, Gibbons, Kelly, Holbrook and Coleman;

(c)     Form 10-K for fiscal year ended June 30, 2002, filed with the SEC on September 25, 2002 and signed by defendants Bourgoin, Eichler, Coleman, Gibbons, Holbrook, and Kelly;

(d)     Form 10-K for fiscal year ended June 30, 2003, filed with the SEC on September 24, 2003 and signed by defendants Bourgoin, Eichler, Coleman, Gibbons, Kelly, and Holbrook;

(e)     Form 10-K for fiscal year ended June 30, 2004, filed with the SEC on September 8, 2004 and signed by defendants Bourgoin, Eichler, Coleman, Gibbons, Holbrook, and Kelly; and

(f)     Form 10-K for fiscal year ended June 30, 2005, filed with the SEC on September 9, 2005 and signed by defendants Bourgoin, Eichler, Coleman, Gibbons, Holbrook, and Kelly.

## The Individual Defendants' Concealment of Their Misconduct

47.     Furthermore, from 2000 to 2001, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing

the improper option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Option Recipient Defendants and falsely stated that the exercise price of the options granted to the Option Recipient Defendants "equal to the fair market value on the date of grant," as follows:

(a)     MIPS' proxy statement filed with the SEC on September 26, 2000 falsely reported that options granted to Bourgoin, Lev, Eichler, Meyer, and Creighton were granted August 6, 1999 and falsely stated that the exercise price of the options were "equal to the fair market value on the date of grant," and

(b)     MIPS' proxy statement filed with the SEC on September 24, 2001 falsely reported that options granted to Bourgoin, Creighton, Eichler, Meyer, and Lev were granted on July 11, 2000 and falsely stated that the exercise price of the options were "equal to the fair market value on the date of grant."

48.     From 2002 to 2003, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper option backdating, filed with the SEC Form 4's that falsely reported the dates of stock option grants to the Option Recipient Defendants, as follows:

(a)     Coleman's Form 4 filed with the SEC on November 14, 2002 falsely reported that options granted to Coleman had been granted on June 21, 2000;

(b)     Gibbons' Form 4 filed with the SEC on November 14, 2002 falsely reported that options granted to Gibbons had been granted on July 06, 1998, October 28, 1999, and November 14, 2001;

(c)     Holbrook's Form 4 filed with the SEC on November 14, 2002 falsely reported that options granted to Holbrook had been granted on July 06, 1998, October 28, 1999, and November 14, 2001;

(d)     Kelly's Form 4 filed with the SEC on November 14, 2002 falsely reported that options granted to Kelly had been granted on June 21, 2000 and November 14, 2001;

(e) Gibbons' Form 4 filed with the SEC on January 31, 2003 falsely reported that options granted to Gibbons had been granted on July 06, 1998, October 28, 1999, and November 14, 2001;

(f) Kelly's Form 4 filed with the SEC on February 10, 2003 falsely reported that options granted to Kelly had been granted on June 21, 2000 and November 14, 2001; and

(g) Browne's Form 4 filed with the SEC on February 25, 2003 falsely reported that options granted to Browne had been granted on December 20, 2001.

49. The Individual Defendants continued to conceal their foregoing misconduct until August 30, 2006, when the Company issued a press release announcing the formation of a special committee to review the Company's historical stock-based compensation practices and related accounting:

> MIPS Technologies, Inc. announced today that following a company initiated voluntary review of historical stock-based compensation practices and related potential accounting impact, its board of directors has formed a special committee, consisting of independent directors, to review the Company's historical option grant practices and the Company's accounting for its option grants. The committee is retaining independent outside legal counsel to assist it in its review.

> MIPS' annual report on Form 10-K for its fiscal year ended June 30, 2006 is due to be filed with the Securities and Exchange Commission on or before September 13, 2006. While the committee is working to complete its review as quickly as possible, MIPS believes it is likely that the process will not be completed in a manner that will allow the annual report on Form 10-K to be filed by that date.

50. On September 19, 2006, MIPS issued a press release announcing receipt of notice from NASDAQ and disclosing an SEC investigation into the Company's stock option practices:

> MIPS Technologies, Inc. (NASDAQ: MIPS), today announced that the Company will request a hearing before the NASDAQ Listing Qualifications Panel in response to the receipt of a NASDAQ Staff Determination letter today that the Company is not in compliance with the filing requirements for continued listing as set forth in Marketplace Rule 4310(c)(14). The notice was issued in accordance with standard NASDAQ procedures due to the delayed filing of the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2006. Pending a decision of the Panel, the Company's shares will continue to be listed on the NASDAQ Global Market.

On August 30, 2006, MIPS Technologies announced that following a company-initiated voluntary review of historical stock-based compensation practices and related potential accounting impact, its board of directors had formed a special committee, consisting of independent directors, to review the Company's historical option grant practices and the accounting for its option grants. MIPS Technologies intends to file the Form 10-K as soon as practicable after the review is completed, but has determined it will not complete the review by September 28, 2006-the extended deadline for the Form 10-K. The Company voluntarily contacted the Securities and Exchange Commission staff ("SEC") to inform them about the on-going review, and the SEC has recently requested that the Company provide them with certain information relating to the Company's stock option practices.

51.     On October 25, 2006, MIPS issued a press release announcing that its special committee review has established *actual backdating of MIPS option grants* and expects to restate historical financial statements.

### The Individual Defendants' Insider Selling

52.     During the relevant period, certain of the Individual Defendants (collectively, the "Insider Selling Defendants"), while in possession of materially adverse non-public information regarding the backdating of stock options and the false financial statements resulting therefrom, sold more than $3 million in MIPS stock, a significant portion of which was obtained through the exercise of improperly backdated stock options, as demonstrated below:

| NAME | TRANSACTION DATE | SHARES DISPOSED | PRICE/SHARE | PROCEEDS |
|------|-----------------|-----------------|-------------|----------|
| Bourgoin | 01/27/05 | 50,000 | $11.37 | $568,300.00 |
| | | | Total Proceeds = | $568,300.00 |
| Browne | 02/25/03 | 1,120 | $2.15 | $2,408.00 |
| | 02/25/04 | 300 | $5.63 | $1,689.00 |
| | 02/25/04 | 310 | $5.62 | $1,742.20 |
| | 10/26/04 | 6,000 | $6.95 | $41,700.00 |
| | 10/26/04 | 50,000 | $6.95 | $347,500.00 |
| | 08/05/05 | 1,788 | $7.19 | $12,855.72 |
| | 08/09/05 | 1,250 | $7.22 | $9,025.00 |
| | 08/09/05 | 1,300 | $7.17 | $9,321.00 |
| | 08/09/05 | 400 | $7.20 | $2,880.00 |
| | 08/09/05 | 286 | $7.21 | $2,062.06 |
| | 08/09/05 | 835 | $7.22 | $6,028.70 |
| | 08/10/05 | 4,800 | $7.20 | $34,560.00 |
| | 08/11/05 | 1,900 | $7.17 | $13,623.00 |
| | 08/11/05 | 3,499 | $7.18 | $25,122.82 |

| | | | |
|---|---|---|---|
| 08/11/05 | 100 | $7.14 | $714.00 |
| 08/11/05 | 1,400 | $7.12 | $9,968.00 |
| 08/11/05 | 4,000 | $7.11 | $28,440.00 |
| 08/11/05 | 1,940 | $7.10 | $13,774.00 |
| 08/15/05 | 10,247 | $6.85 | $70,191.95 |
| 08/15/05 | 2,740 | $6.85 | $18,769.00 |
| 08/16/05 | 1,820 | $6.85 | $12,467.00 |
| 08/17/05 | 1,730 | $6.85 | $11,850.50 |
| 02/08/06 | 100 | $8.41 | $841.00 |
| 02/08/06 | 9,500 | $8.35 | $79,325.00 |
| 02/08/06 | 3,860 | $8.57 | $33,080.20 |
| 02/08/06 | 2,100 | $8.53 | $17,913.00 |
| 02/08/06 | 100 | $8.54 | $854.00 |
| 02/08/06 | 600 | $8.55 | $5,130.00 |
| 02/08/06 | 2,200 | $8.52 | $18,744.00 |
| 02/08/06 | 1,200 | $8.51 | $10,212.00 |
| 02/08/06 | 200 | $8.50 | $1,700.00 |
| 02/08/06 | 1,100 | $8.47 | $9,317.00 |
| 02/08/06 | 4,007 | $8.48 | $33,979.36 |
| 02/08/06 | 7,643 | $8.46 | $64,659.78 |
| 02/08/06 | 250 | $8.45 | $2,112.50 |
| 02/08/06 | 6,740 | $8.44 | $56,885.60 |
| 02/08/06 | 3,157 | $8.43 | $26,613.51 |
| 02/08/06 | 10,700 | $8.42 | $90,094.00 |
| 02/08/06 | 6,543 | $8.40 | $54,961.20 |
| | | **Total Proceeds =** | **$1,183,114.10** |
| Eichler | 01/24/05 | 78,200 | $11.62 | $908,965.52 |
| | 01/24/05 | 31,681 | $11.62 | $368,247.27 |
| | 01/25/05 | 11,819 | $11.70 | $138,333.12 |
| | | | **Total Proceeds =** | **$1,415,545.91** |
| Holtzinger | 11/03/05 | 2,613 | $5.74 | $14,998.62 |
| | 02/07/06 | 7,000 | $8.81 | $61,670.00 |
| | 02/17/06 | 480 | $8.66 | $4,156.80 |
| | | | **Total Proceeds =** | **$80,825.42** |
| | | | **GRAND TOTAL =** | **$3,247,785.43** |

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

53.    In a misguided effort to attract and retain employees in a competitive environment, the Individual Defendants exceeded the bounds of the law and legitimate business judgment by perpetrating their backdating scheme. The Individual Defendants' misconduct was unjustifiable and constituted a gross breach of their fiduciary duties by:

(a)    colluding with each other to backdate stock option grants;

(b)    colluding with each other to violate GAAP and Section 162(m);

(c)    colluding each other to produce and disseminate false financial statements to MIPS shareholders and the market that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

(d)    colluding with each other to file false proxy statements, false financial statements, and false Form 4's in order to conceal the improper backdating of stock options.

54.    The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Option Recipient Defendants at the expense of the Company.

55.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company will be required to incur, loss of funds paid to the Company upon exercise of options, costs and expenses incurred in connection with the Company's internal investigation, and costs and expenses incurred in connection with the SEC's investigation.

56.    As alleged herein, the Option Recipient Defendants have exercised a significant amount of backdated options at improperly low prices and have then sold the shares for millions in proceeds. Consequently, the Option Recipient Defendants have been unjustly enriched by garnering millions of dollars in illicit profits and depriving the Company of millions of dollars in payments that the Company should have received upon exercise of the options.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

57.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties, unjust enrichment, statutory violations and other violations of law.

58.    Plaintiff is an owner of MIPS common stock and was an owner of MIPS common stock at all times relevant hereto.

1   59.   Plaintiff will adequately and fairly represent the interests of the Company and its

2   shareholders in enforcing and prosecuting its rights.

3   60.   As a result of the facts set forth herein, Plaintiff has not made any demand on the

4   MIPS Board of Directors to institute this action against the Individual Defendants.  Such demand

5   would be a futile and useless act because the Board is incapable of making an independent and

6   disinterested decision to institute and vigorously prosecute this action.

7   61.   The Board currently consists of seven directors: defendants Bourgoin, Coleman,

8   Gibbons, Holbrook, and Kelly, and directors Robert R. Herb and Benjamin A. Horowitz.  The

9   following directors are incapable of independently and disinterestedly considering a demand to

10   commence and vigorously prosecute this action:

11   (a)   Bourgoin, because as an Option Recipient Defendant, he is directly interested in the

12   improperly backdated stock option grants complained of herein.  Also, his principal

13   professional occupation is his position as President and Chief Executive Officer of

14   the Company.  In his position as President and Chief Executive Officer, Bourgoin

15   stands to earn hundreds of thousands of dollars in annual salary, bonuses, and other

16   compensation, all of which must be approved by defendants Coleman, Gibbons and

17   Horowitz, who currently serve as members of the Compensation Committee.

18   Accordingly, Bourgoin is incapable of independently and disinterestedly

19   considering a demand to commence and vigorously prosecute this action against the

20   Individual Defendants;

21   (b)   Coleman, because as an Option Recipient Defendant, he is directly interested in the

22   improperly backdated stock option grants complained of herein.  Also, as a member

23   of the Compensation Committee, Coleman directly participated in and approved the

24   improper backdating of stock options, as alleged herein, and as a director, he

25   directly participated in and approved the Company's filing of false financial

26   statements and other false SEC filings, as alleged herein, and therefore is

27   substantially likely to be held liable for the misconduct complained of herein.

28   Moreover, by colluding with the other Option Recipient Defendants and others, as

1       alleged herein, Coleman has demonstrated that he is unable or unwilling to act

2       independently of the other Option Recipient Defendants;

3   (c)   Gibbons, because as an Option Recipient Defendant, he is directly interested in the

4       improperly backdated stock option grants complained of herein.  Also, as a member

5       of the Compensation Committee, Gibbons directly participated in and approved the

6       improper backdating of stock options, as alleged herein, and as a member of the

7       Audit and Corporate Governance Committee, he directly participated in and

8       knowingly approved the filing of false financial statements and other false SEC

9       filings as alleged herein and directly participated in and approved the Company's

10      violations of GAAP and Section 162(m), as alleged herein.  Therefore, Gibbons is

11      substantially likely to be held liable for the misconduct complained of herein.

12      Moreover, by colluding with the other Option Recipient Defendants and others, as

13      alleged herein, Gibbons has demonstrated that he is unable or unwilling to act

14      independently of the other Option Recipient Defendants;

15  (d)   Holbrook, because as an Option Recipient Defendant, he is directly interested in the

16      improperly backdated stock option grants complained of herein.  Also, as a member

17      of the Compensation Committee, Holbrook directly participated in and approved the

18      improper backdating of stock options, as alleged herein, and as a member of the

19      Audit and Corporate Governance Committee, he directly participated in and

20      knowingly approved the filing of false financial statements and other false SEC

21      filings as alleged herein and directly participated in and approved the Company's

22      violations of GAAP and Section 162(m), as alleged herein.  Therefore, Holbrook is

23      substantially likely to be held liable for the misconduct complained of herein.

24      Moreover, by colluding with the other Option Recipient Defendants and others, as

25      alleged herein, Holbrook has demonstrated that he is unable or unwilling to act

26      independently of the other Option Recipient Defendants; and

27  (e)   Kelly, because as an Option Recipient Defendant, he is directly interested in the

28      improperly backdated stock option grants complained of herein.  Also, as a member

1   |   of the Audit and Corporate Governance Committee, Kelly directly participated in

2   |   and knowingly approved the filing of false financial statements and other false SEC

3   |   filings as alleged herein and directly participated in and approved the Company's

4   |   violations of GAAP and Section 162(m), as alleged herein, and therefore is

5   |   substantially likely to be held liable for the misconduct complained of herein.

6   |   Moreover, by colluding with the other Option Recipient Defendants and others, as

7   |   alleged herein, Kelly has demonstrated that he is unable or unwilling to act

8   |   independently of the other Option Recipient Defendants.

9   62.   Furthermore, demand is excused because the misconduct complained of herein was

10   not, and could not have been, an exercise of good faith business judgment. As represented in

11   MIPS' proxy statements, the stated purpose of the Company's shareholder-approved stock option

12   plans is to motivate employees by providing compensation that reflects the financial performance

13   of the Company and "align the interests of executives with the long-term interests of the

14   stockholders." However, by granting options with backdated exercise prices, the Individual

15   Defendants undermined the purpose of the Company's shareholder-approved stock option plans by

16   awarding employees compensation that had intrinsic value regardless of MIPS' financial

17   performance. In effect, this practice was nothing more than secret handouts to executives and

18   employees at the expense of unsuspecting shareholders and the Company.

19   63.   The Individual Defendants could have achieved the stated purpose of motivating

20   employees by granting them additional options under their incentive plans, or by granting options

21   at a price less than the fair market value on the date of the grant and simply disclosing and

22   expensing these grants. Instead, the Individual Defendants motivated MIPS' employees by

23   backdating option grants in violation of the Company's shareholder-approved stock option plans

24   and improperly reporting these grants in their financial disclosures to improve their bottom line.

25   64.   The practice of backdating stock options cannot be a valid exercise of business

26   judgment because it has subjected MIPS to potentially massive liability. MIPS is currently

27   conducting an internal investigation, and the SEC has also initiated their own investigation into the

28   Company's historical option grants. MIPS will likely suffer tax liabilities for the additional

compensation it will have to expense, and it has tarnished its reputation in the investment community through this deliberate and calculated conduct.

## COUNT I

### Against the Individual Defendants for
### Violations of § 10(b) and Rule 10b-5 of the Securities Exchange Act

65.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

66.     Throughout the relevant period, the Individual Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, intentionally or recklessly employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Company.

67.     The Individual Defendants, as top executive officers and/or directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers and/or directors of the Company, each of the Individual Defendants was able to and did control the conduct complained of herein.

68.     The Individual Defendants acted with scienter in that they either had actual knowledge of the fraud set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were among the senior management and directors of the Company and were therefore directly responsible for the fraud alleged herein.

69.     The Company relied upon the Individual Defendants' fraud in granting the Option Recipient Defendants options to purchase shares of the Company's common stock, as alleged herein.

70.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company will be required to incur, loss of funds paid to the Company upon exercise of options, costs and expenses incurred in

---

SHAREHOLDER DERIVATIVE COMPLAINT                                                     27
49133

connection with the Company's internal investigation, and costs and expenses incurred in connection with the SEC's investigation.

## COUNT II

### Against the Individual Defendants for
### Violations of §14(a) of the Securities Exchange Act

71.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

72.    Rule 14-A-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14-A-9.

73.    The proxy statements described herein violated §14(a) and Rule 14-A-9 because they omitted material facts, including the fact that the Individual Defendants were causing the Company to engage in an option backdating scheme, a fact which the Individual Defendants were aware of and participated in from at least 1998 to 2003.

74.    In the exercise of reasonable care, the Individual Defendants should have known that the proxy statements were materially false and misleading.

75.    The misrepresentation and omissions in the proxy statements were material.  The proxy statements were an essential link in the accomplishment of the continuation of the Individual Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation, and the Company's compensation policies.

76.    The Company was damaged as a result of the material misrepresentations and omissions in the proxy statements.

/      /      /

/      /      /

/      /      /

## COUNT III

### Against Eichler and the Director Defendants for
### Violations of §20(a) of the Securities Exchange Act

77.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

78.     Eichler and the Director Defendants, by virtue of their positions with the Company and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of the Company within the meaning of §20(a) of the Exchange Act.  They had the power and influence and exercised the same to cause the Company to engage in the illegal conduct and practices complained of herein.

## COUNT IV

### Against the Individual Defendants for Accounting

79.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

80.     As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

81.     As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to themselves and/or certain other officers and directors of the Company and cover up their misconduct.

82.     The Individual Defendants possess complete and unfettered control over the improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants.

83.     As a result of the Individual Defendants' misconduct, the Company has been damaged financially and is entitled to a recovery as a result thereof.

84.     Plaintiff demands an accounting be made of all stock option grants made to any of the Option Recipient Defendants, including, but not limited to, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the dates the options were

exercised, as well as the disposition of any proceeds received by any of the Option Recipient Defendants via sale or other exercise of the grants.

## COUNT V

### Against the Individual Defendants for
### Breach of Fiduciary Duty and/or Aiding and Abetting

85.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

86.     As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

87.     As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to themselves and/or certain other officers and directors of the Company and cover up their misconduct.

88.     In breach of their fiduciary duties of loyalty and good faith, the Individual Defendants agreed to and did participate with and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets to themselves and/or other Company insiders.

89.     The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Option Recipient Defendants at the expense of the Company.

90.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company will be required to incur, loss of funds paid to the Company upon exercise of options, costs and expenses incurred in connection with the Company's internal investigation, and costs and expenses incurred in connection with the SEC's investigation.

/     /     /

/     /     /

/     /     /

## COUNT VI
### Against the Option Recipient Defendants for
### Common Law Restitution/Unjust Enrichment

91.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

92.     The Option Recipient Defendants were unjustly enriched by their receipt and retention of backdated stock option grants and the proceeds they received through exercising backdated stock options, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

93.     To remedy the Option Recipient Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

### COUNT VII

### Against the Option Recipient Defendants for Rescission

94.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

95.     As a result of the acts alleged herein, the stock option contracts between Option Recipient Defendants and the Company entered into during the relevant period were obtained through the Individual Defendants' fraud, deceit, and abuse of control.  Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the Company's shareholder-approved stock option plans.

96.     All contracts which provide for stock option grants to the Option Recipient Defendants and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

/     /     /

/     /     /

/     /     /

/     /     /

## COUNT VIII

### Against the Insider Selling Defendants for
### Violation of California Corporation Code §25402

97.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

98.     At the time that the Insider Selling Defendants sold their shares of the Company's common stock as set forth herein, by reason of their high executive and/or directorial positions with the Company, the Insider Selling Defendants had access to highly material information regarding the Company, including the information set forth herein regarding the true adverse facts of the Company's option backdating, improper accounting, and false financial statements.

99.     At the time of such sales, that information was not generally available to the public or the securities markets.  Had such information been generally available, it would have significantly reduced the market price of the Company's shares at that time.

100.    The Insider Selling Defendants, and each of them, had actual knowledge of material, adverse non-public information regarding the Company, and thus sold their shares of the Company's common stock in California in violation of California Corporations Code § 25402.

101.    Pursuant to California Corporations Code § 25502.5, the Insider Selling Defendants, and each of them, are liable to the Company for damages in an amount up to three times the difference between the price at which the stock was sold by these defendants, and each of them, and the market value which the stock would have had at the time of the sale if the information known to these defendants had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' misconduct;

B.      Ordering the Option Recipient Defendants to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options

1    that have been exercised, sold, pledged, or otherwise monetized, and imposing a

2    constructive trust thereover;

3   C.    Awarding the Company treble damages against the Insider Selling Defendants as

4         provided by California Corporations Code § 25502.05;

5   D.    Granting appropriate equitable relief to remedy Individual Defendants' breaches of

6         fiduciary duties;

7   E.    Awarding to Plaintiff the costs and disbursements of the action, including

8         reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

9   F.    Granting such other and further relief as the Court deems just and proper.

10                          **JURY TRIAL DEMANDED**

11   Plaintiff demands a trial by jury.

12              **CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

13   Pursuant to Civil Local Rule 3-16, the Undersigned certifies that as of this date, other than

14   the names parties there is no such interest to report.

15   Dated:  October 27, 2006          BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP

16

17                                    _____
18                                         Alan R. Plutzik

19                                    Alan R. Plutzik
20                                    L. Timothy Fisher
                                      Kathryn A. Schofield
21                                    2125 Oak Grove Road, Suite 120
                                      Walnut Creek, California  94598
22                                    Telephone:  (925) 945-0200
                                      Facsimile:  (925) 945-8792
23
                                      SCHIFFRIN & BARROWAY LLP
24                                    Eric L. Zagar
                                      Eric Lechtzin
25                                    Tara P. Kao
                                      280 King of Prussia Road
26                                    Radnor, PA  19087
                                      Telephone:  (610) 667-7706
27                                    Facsimile:  (610) 667-7056

28                                    Attorneys for Plaintiff

SHAREHOLDER DERIVATIVE COMPLAINT                                               33
49133

**VERIFICATION**

I, Marvin Steger, hereby verify that I have authorized the filing of the attached Shareholder Derivative Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: _10 - 26 - 06_

_Marvin Steger_
MARVIN STEGER