1  LERACH COUGHLIN STOIA GELLER
        RUDMAN & ROBBINS LLP
2  JOHN K. GRANT (169813)
    SHAWN A. WILLIAMS (213113)
3  MONIQUE C. WINKLER (213031)
    AELISH M. BAIG (201279)
4  100 Pine Street, Suite 2600
    San Francisco, CA  94111
5  Telephone:  415/288-4545
    415/288-4534 (fax)
6  johng@lerachlaw.com
    shawnw@lerachlaw.com
7  mwinkler@lerachlaw.com
    abaig@lerachlaw.com
8
    Lead Counsel for Plaintiffs
9
    [Additional counsel appear on signature page.]
10
                    UNITED STATES DISTRICT COURT
11
                 NORTHERN DISTRICT OF CALIFORNIA
12
                         SAN JOSE DIVISION
13

| | |
|---|---|
| 14  In re MIPS TECHNOLOGIES, INC. DERIVATIVE LITIGATION | )  No. C-06-06699-RMW |
| 15  _____ This Document Relates To: | )  CONSOLIDATED SHAREHOLDER ) DERIVATIVE COMPLAINT FOR ) VIOLATION OF THE FEDERAL |
| 16  ALL ACTIONS. | )  SECURITIES LAWS AND STATE LAW ) CLAIMS FOR BREACH OF FIDUCIARY |
| 17  _____ JOSEPH CARCO, Derivatively on Behalf of MIPS TECHNOLOGIES, INC., | )  DUTY, ABUSE OF CONTROL, ) CORPORATE WASTE, UNJUST ) ENRICHMENT, GROSS |
| 18                            Plaintiff, | )  MISMANAGEMENT, ACTION FOR AN ) ACCOUNTING AND VIOLATION OF |
| 19        vs. | )  CALIFORNIA CORPORATIONS CODE ) |
| 20  ANTHONY B. HOLBROOK, JOHN E. BOURGOIN, MERVIN S. KATO, KATE | )  ) |
| 21  HUNT RUNDLE, BRAD HOLTZINGER, MARK TYNDALL, JACK BROWNE, | )  ) |
| 22  SANDY CREIGHTON, LAVI LEV, BRIAN KNOWLES, DEREK MEYER, KEVIN C. | )  ) |
| 23  EICHLER, G. MICHAEL UHLER, ROBERT R. HERB, FRED M. GIBBONS, BENJAMIN | )  ) |
| 24  A. HOROWITZ, KENNETH L. COLEMAN and WILLIAM M. KELLY, | )  ) |
| 25 | ) |
| 26                            Defendants, | )  DEMAND FOR JURY TRIAL ) |
| 27  _____ | |
|   [Caption continued on following page.] | |
| 28 | |

1          – and –                          )
                                            )
2    MIPS TECHNOLOGIES, INC., a Delaware    )
     corporation,                           )
3                                           )
                        Nominal Defendant.  )
4                                           )
                                            )
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**INTRODUCTION AND OVERVIEW**

2      1.      This is a consolidated shareholder derivative action brought derivatively on behalf of

3   MIPS Technologies, Inc. ("MIPS" or the "Company"), against its entire Board of Directors

4   ("Board") and certain current officers and former top officers and/or directors (collectively, the

5   "Individual Defendants").[1]

6      2.      The action seeks to remedy defendants' violations of federal and state law, including

7   the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), §10(b) of the Securities Exchange Act of 1934

8   ("Exchange Act"), §14(a) of the Exchange Act, §20 of the Exchange Act, Cal. Corp. Code §§25400,

9   25402, 25500 and 25502.5, as well as breaches of fiduciary duties, abuse of control, gross

10  mismanagement, waste of corporate assets, and unjust enrichment between 1998-2006 (the

11  "Relevant Period").

12     3.      Plaintiff Joseph Carco ("Carco"), demands an accounting of all stock option grants

13  made to defendants during times relevant hereto, the rescission of all contracts which provide for

14  stock option grants by MIPS to any of the defendants which were entered into during times relevant

15  hereto, and a declaration that the illicit stock options, and all proceeds derived from the exercise

16  thereof, are and have been held in constructive trust for the Company's benefit.

17     4.      Nominal party MIPS is a Delaware corporation with its principal executive offices

18  located at 1225 Charleston Road, Mountain View, California.  MIPS is a leading provider of

19  industry-standard processor architectures and cores for digital consumer, networking, personal

20  entertainment, communications and business applications.

21     5.      During the Relevant Period, the Company's executives, directors and rank-and-file

22  employees were compensated in large part through the issuance of stock options.  A stock option

23

24  [1]      The Individual Defendants are: Anthony B. Holbrook ("Holbrook"), John E. Bourgoin
25  ("Bourgoin"), Mervin S. Kato ("Kato"), Kate Hunt Rundle ("Rundle"), Brad Holtzinger
    ("Holtzinger"), Mark Tyndall ("Tyndall"), Jack Browne ("Browne"), Sandy Creighton
26  ("Creighton"), Lavi Lev ("Lev"), Brian Knowles ("Knowles"), Derek Meyer ("Meyer"), Kevin C.
    Eichler ("Eichler"), G. Michael Uhler ("Uhler"), Robert R. Herb ("Herb"), Fred M. Gibbons
27  ("Gibbons"), Benjamin A. Horowitz ("Horowitz"), Kenneth L. Coleman ("Coleman") and William
    M. Kelly ("Kelly").

28

1  granted to an employee and/or director of a corporation allows the employee and/or director to

2  purchase company stock at a specified price – referred to as the "exercise price," typically the fair

3  market value of the stock on the date the option is granted.  When properly issued, stock options

4  serve as a valuable part of employee and/or director compensation packages as a means to create

5  incentives to boost employee production and corporate profitability.  When the employee and/or

6  director exercises the option, he or she purchases the stock from the company at the exercise price,

7  regardless of the stock's trading price at the time the option is exercised.

8       6.     Dating back to at least 1998, many of the Individual Defendants engaged in a course

9  of conduct designed to manipulate MIPS stock option grant dates so as to secretly maximize profits

10 to themselves and other Company executives at the expense of the Company and its shareholders.

11 Specifically, since 1998, defendants employed a variety of illegal and undisclosed tactics to ensure

12 that stock option grants to MIPS' directors, executives, and rank-and-file employees would be

13 profitable to them regardless of how the Company's stock price performed over the long-term, and

14 regardless of whether MIPS' share price increased at all.  In order to avoid disclosing compensation

15 costs in their financial statements, defendants backdated stock option grants to themselves and other

16 MIPS executives and employees.[2]  This backdating was approved of by the MIPS Board.

17      7.     In particular, the members of the MIPS Board committees which were specifically

18 charged with approving stock options and accounting practices at the Company, violated these duties

19 by approving manipulated stock options grants, as well as the accounting associated with these

20 grants.  These individuals bore ultimate responsibility for ensuring that stock options were granted at

21 fair market value on the date of the grant as well as deciding the grant dates for the options.  These

22 defendants abdicated these duties and breached their fiduciary duties by allowing for options to be

23 manipulated throughout the Relevant Period.

24      8.     "Backdating" is a practice by which a stock option is reported as having been granted

25 on a certain date, but was granted days or months later when, with the benefit of hindsight, a lower

26 

27 ────────────────────

[2]     Plaintiff's use of term "backdated" or "backdating" throughout the complaint may also refer to other forms of related stock option manipulation perpetuated by defendants in this action.

28 

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-06699-RMW          - 2 -

price can be selected for the option grant.  Backdating is a manipulative practice which is designed to allow and does allow company executives and stock option grantees to realize immediate unearned and undisclosed financial gains at the expense of the company and its shareholders. Backdating of stock option grants has been compared to picking lottery numbers on the day after the winning numbers are announced, or betting on a horse after the race has finished.  Arthur Levitt, a former chairman of the Securities and Exchange Commission ("SEC") was quoted as stating that stock option backdating "represents the ultimate in greed."  Further, Levitt stated: "It is stealing, in effect. *It is ripping off shareholders in an unconscionable way*."[3]

9.     MIPS recently issued a partial admission to this conduct, stating that "for options granted in the period October 1998 through October 2000 . . . 20 out of 28 grants coincided with a weekly or monthly low in our stock price during this period."  The Company further said that "*hindsight was likely used*" in the selection of the option dates.  In other words, backdating occurred.

10.     The members of the MIPS Board were aware that the Company was not taking a compensation expense for these backdated options as was required by Accounting Principles Board ("APB") Opinion No. 25.  Specifically, MIPS options plans stated that the MIPS Committee which was responsible for administering the 1998 Long Term Incentive Plan was specifically charged with determining and approving the "valuation methodology" for granting options at MIPS.  Further, MIPS' Forms 10-K, which all the director defendants signed, show that defendants were fully aware of the how to properly expense in-the-market options grants pursuant to APB Opinion No. 25.

11.     In addition to defendants' breaches of fiduciary duty, defendants' manipulation of MIPS' stock option plans resulted in other forms of corporate malfeasance, including the falsification of documents for personal gain.  As former SEC Chairman Harvey Pitt recently stated:

> Many discussions of backdating options start with the observation that backdating is not, per se, illegal.  *That is wrong.  Options backdating frequently involves falsification of records used to gain access to corporate assets*.  That conduct

---

[3]     For all citations, emphasis has been added and citations and quotations omitted, unless otherwise indicated.

violates the Foreign Corrupt Practices Act and its internal controls requirements. If corporate directors were complicit in these efforts, state law fiduciary obligations are violated. ***Backdating is not only illegal and unethical, it points to a lack of integrity in a company's internal controls***.

12.    Furthermore, backdating stock options creates an instant paper gain to grantees who receive them because the options were really priced below the stock's fair market value when they were actually awarded. Under Generally Accepted Accounting Principles ("GAAP"), this instant paper gain is equivalent to paying extra compensation and thus is a cost to MIPS. Accordingly, MIPS was required to record an expense on its financial statements for any options granted below the fair market value on the grant date of the option, or "in the money" options. However, the Individual Defendants did not properly record these known costs on MIPS' financial statements, causing MIPS' financial statements throughout the Relevant Period to be issued in violation of GAAP. Specifically, these financial statements overstated reported earnings and understated reported expenses.

13.    In addition to defendants' clear breach of fiduciary duty and violation of accounting rules, defendants' backdating of stock options may have extremely serious tax consequences for the Company. While stock options generally qualify for favorable tax treatment, options issued at a discount to the market price do not qualify for that treatment. Accordingly, backdated stock options are automatically disqualified from that favorable tax relief, and MIPS may well owe millions of dollars in unpaid taxes.

14.    Most importantly, since 1998, defendants caused MIPS to file false and misleading statements with the SEC, including proxy statements filed with the SEC which stated that the options granted by MIPS carried with them an exercise price that was not less than the fair market value of MIPS stock on the date of grant and issuance, and that solicited shareholder approval for stock option plans without disclosing that defendants were routinely backdating stock option grants.

15.    In fact, defendants were aware that the practices employed by the Board allowed stock option grants to be backdated to dates when the Company's shares were trading at or near the lowest price for that Relevant Period. Defendants' backdating practices yielded stock option grants

1   to the Company's executive officers worth millions of dollars, contributing to their ability to pocket

2   $16 million from the sale of MIPS stock during the Relevant Period.

3          16.    Further, MIPS' quarterly and annual financial results as reported and filed with the

4   SEC were false.  Defendants' misrepresentations and wrongful course of conduct violated the

5   Exchange Act, as well as state law.  By authorizing and/or acquiescing in the stock option

6   backdating and manipulation practices, defendants: (i) caused MIPS to issue false statements; (ii)

7   diverted millions of dollars of corporate asset from MIPS to senior MIPS executives; and (iii)

8   subjected MIPS to potential liability from regulators, including the SEC and the IRS.

9          17.    Defendants' gross mismanagement and malfeasance over the past decade has exposed

10  MIPS and its senior executives to potential criminal and civil liability for issuing false and

11  misleading financial statements.  Specifically, defendants caused or allowed MIPS to issue

12  statements that failed to disclose or misstated the following: (i) the Company had material

13  weaknesses with its internal controls that prevented it from issuing accurate financial reports and

14  projections; (ii) because of improperly recorded stock-based compensation expenses, the Company's

15  financial results violated GAAP; and (iii) the Company's public disclosures presented an inflated

16  view of MIPS' earnings and earnings per share.

17         18.    Through key executives and the Board's Option Administration and/or Compensation

18  and Audit Committees, defendants also falsely assured shareholders that financial statements and

19  associated representations were accurate.  Indeed, defendants each claimed that they had investigated

20  and reviewed the Company's financial statements and internal control processes and authorized their

21  inclusion in the Company's public filings.  Both defendants Bourgoin and Eichler also signed false

22  certifications pursuant to Sarbanes-Oxley §§302 and 906.  For example, defendant Bourgoin's 2003

23  Sarbanes-Oxley certification affirms:

24         I, John E. Bourgoin, certify that:

25         1.  I have reviewed this annual report on Form 10-K of MIPS Technologies, Inc.;

26         2.  Based on my knowledge, this report does not contain any untrue statement of a
           material fact or omit to state a material fact necessary to make the statements made,
27         in light of the circumstances under which such statements were made, not misleading
           with respect to the period covered by this report;

28

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

(b)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusion about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

(a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

19.   For years, the Company's senior executives and Board members engaged in a practice of manipulating MIPS' stock option plans in order to grant options to themselves and to other MIPS executives in a manner designed to create immediate and risk-free profits in direct contravention of the Company's stated and shareholder-approved stock option plans and proxy statements.

20.   Furthermore, defendants knew that because the Company had not taken a compensation expense for backdated options required by APB Opinion No. 25, MIPS' reported

earnings and expenses were false and misleading and not in compliance with GAAP.  Thus, by falsifying the date on which options were granted, defendants materially understated MIPS' expenses, overstated its income and falsely represented that it had not incurred any expenses for option grants.

21.    Defendants' conduct during the Relevant Period has wreaked substantial damage on MIPS.  The Company's senior executives were incentivized to over-pay themselves, to profit from their misconduct by cashing in on under-priced stock options and to issue false financial statements to cover up their misdeeds.  Defendants' breaches of fiduciary duties in the administration of the Company's stock option plans polluted the plans with grant date manipulations so as to undermine the validity of all grants made pursuant to the plans.  Meanwhile, certain of the defendants, who received mispriced stock options and/or were aware of material non-public information regarding MIPS' internal control problems, violated their fiduciary duties to MIPS and its shareholders by selling over $16 million worth of their own MIPS shares at artificially inflated prices during the Relevant Period:

| DEFENDANT | DATES OF SALES | SHARES SOLD | PROCEEDS RECEIVED |
|---|---|---|---|
| EICHLER | 07/28/99–01/25/05 | 236,700 | $6,134,910 |
| BOURGOIN | 07/23/99–01/27/05 | 220,000 | $7,590,190 |
| KATO | 08/22/00 | 10,000 | $550,000 |
| UHLER | 07/30/03–08/22/06 | 139,409 | $1,098,869 |
| BROWNE | 02/25/03–02/08/06 | 155,977 | $1,170,258 |
| GIBBONS | 08/12/99 | 10,000 | $390,600 |
| | | | |
| TOTAL | | 772,806 | $16,934,827 |

22.    This action seeks recovery for MIPS against these so-called fiduciaries, as MIPS' Board, as currently composed, is simply unable and unwilling to do so.

**Illegal Backdating and Suspicious Stock Option Grants at MIPS Revealed**

23.    On May 16, 2006, the Center for Financial Research and Analysis ("CFRA") issued a report: "Options Backdating – Which Companies are at Risk?"  The report identified the risks for companies that have taken part in options backdating:

- SEC investigation risk – The SEC has begun informal investigations at many companies in recent months and has also begun to call for improved disclosure around all areas of executive compensation.

- Accounting restatement risk – Some companies which have admitted backdating options have accompanied those admissions with financial restatements impacting both the balance sheet and earnings.

- Tax/Cash implications – The change in options from the practice of options backdating may force some companies to restate tax positions for the years in question, which could result in an obligation to pay back taxes.

- Management credibility risk – If a reputable management team is found to have repeatedly backdated options, thereby enriching themselves at the expense of shareholders, the reputation of management (and the related stock premium for superior management) could take a hit.

24.    On August 30, 2006, the Company announced that it would be delaying the filing of its Form 10-K for fiscal year 2006 due to an ongoing internal investigation into the Company's past practices related to stock-option grants to officers and directors.

25.    On September 19, 2006, MIPS said the SEC had recently requested that the Company provide it with certain information relating to stock option practices. The Company had previously announced that it launched a voluntary internal review of historical stock-based compensation practices.

26.    On October 25, 2006, MIPS said the probe had found the Company didn't use the correct measurement dates to calculate compensation costs for certain stock option grants in its financial statements. As a result, the Company determined that it would have to restate results.

27.    Thus, contrary to defendants' repeated assertions in SEC filings over the previous eight years to the effect that it was the Company's practice to issue stock options with exercise prices equal to the fair market value of the Company's common stock at the date of grant, defendants admitted that stock options issued by defendants throughout the Relevant Period were misdated or backdated.

28.    On July 2, 2007, MIPS filed their Form 10-K for fiscal year 2006. The Form 10-K contained a partial admission regarding the backdating of options at MIPS:

The Special Committee concluded that hindsight was likely used by the former Vice President of Human Resources in selecting grant dates for options granted in the

period October 1998 through October 2000 and this person had a lack of knowledge of the accounting rules related to the granting of options. While no direct evidence of using hindsight was found, the quantum of circumstantial evidence, coupled with the absence of contemporaneously created electronic documents for the grants, led the Special Committee to reach this conclusion. In particular, this circumstantial evidence included the fact that 20 out of 28 grants coincided with a weekly or monthly low in our stock price during this period. The former Vice President of Human Resources left the Company in June 2003.

29.    The Company did not rule out inappropriate conduct by MIPS' current executives and board members. Rather, the Special Committee cited a lack of "evidence" regarding these individuals "intentional misconduct."

30.    The manipulation of stock options at MIPS will likely cause the Company substantial tax and regulatory liability, and the Company will need to expend significant resources associated with the following:

(a)    costs incurred to carry out internal investigations, including legal fees paid to outside counsel, accounting firms and consultants;

(b)    costs incurred from increased directors' and officers' insurance premiums as a result of the manipulated stock option grants;

(c)    costs incurred from directing manpower to correct MIPS' defective internal controls;

(d)    costs incurred from directing manpower away from other projects in order to restate MIPS' financial results;

(e)    costs associated with the Company's unpaid taxes resulting from the backdating of stock options; and

(f)    costs already incurred and that will continue to be incurred to respond to investigations by the Attorney General and the SEC.

31.    Lead plaintiff has not made a demand on the Company because at the time this action was initiated, the Board consisted of seven directors (defendants Bourgoin, Holbrook, Coleman, Gibbons, Herb, Horowitz and Kelly) all of whom are incapable of independently and disinterestedly considering a demand to prosecute the above-captioned action because, among other reasons detailed herein, they either received manipulated options or were specifically responsible for the

1    administration of the MIPS' options plan, or authorized the manipulation of MIPS' options plans.

2    For these reasons, in addition to those set forth in further detail in ¶¶153-184, any demand on such

3    individuals (all of whom, have substantial conflicts of interest), would have requested that they sue

4    themselves, and would have been futile.

5                              **JURISDICTION AND VENUE**

6    32.    The claims asserted herein arise under §§14(a) and 20(a) of the Exchange Act, and

7    under state law for breach of fiduciary duty, abuse of control, corporate waste, unjust enrichment and

8    gross mismanagement.  In connection with the acts, conduct and other wrongs complained of herein,

9    defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the

10   United States mail and the facilities of a national securities market.

11   33.    This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15

12   U.S.C. §78aa, as well as 28 U.S.C. §§1331 and 1337.  This Court also has supplemental jurisdiction

13   over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

14   34.    This action is not a collusive one to confer jurisdiction on a court of the United States

15   which it would not otherwise have.

16   35.    Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa,

17   as well as 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and

18   dissemination of materially false and misleading information, occurred in substantial part in this

19   District.  MIPS is located in and conducts its business in this District.  Further, defendants conduct

20   business in this District, and certain of the defendants are citizens of California and reside in this

21   District.

22                                    **PARTIES**

23   36.    Lead plaintiff Joseph Carco is, and was during the Relevant Period, a shareholder of

24   nominal defendant MIPS.  Carco acquired MIPS stock on March 21, 2000, and has held MIPS stock

25   continuously to the present, including at the time Carco filed his complaint.

26   37.    Nominal party MIPS is a Delaware corporation with its principal executive offices

27   located at 1225 Charleston Road, Mountain View, California.

28

1    38.    Defendant Anthony B. Holbrook has served as Chairman of the MIPS Board since

2  August 2003 and has served as a director since July 1998.  Holbrook served on the Option

3  Administration Committee from 1998 until 2000, and on the Compensation Committee from 1998

4  until 2002.  Holbrook served on the Audit Committee from 2000 until 2005.  Because of Holbrook's

5  position, he knew the adverse non-public information about the business of MIPS, as well as its

6  finances, markets and present and future business prospects, via access to internal corporate

7  documents, conversations and connections with other corporate officers and employees, attendance

8  at management meetings and via reports and other information provided to him in connection

9  therewith.  During the Relevant Period, Holbrook participated in the issuance of false and/or

10  misleading statements, including the preparation of the false and/or misleading press releases and

11  SEC filings.  As a member of the Audit and Corporate Governance Committee, defendant Holbrook

12  caused or allowed the dissemination of the improper public statements described herein.

13    39.    Defendant John E. Bourgoin has served as President of MIPS since September 1996,

14  as a director of the Company since May 1997 and as Chief Executive Officer ("CEO") since

15  February 1998.  Bourgoin was the recipient of option grants throughout the Relevant Period which

16  MIPS admits were backdating.  Because of Bourgoin's positions, he knew the adverse non-public

17  information about the business of MIPS, as well as its finances, markets and present and future

18  business prospects, via access to internal corporate documents, conversations and connections with

19  other corporate officers and employees, attendance at management and Board meetings and

20  committees thereof and via reports and other information provided to him in connection therewith.

21  During the Relevant Period, Bourgoin participated in the issuance of false and/or misleading

22  statements, including the preparation of the false and/or misleading press releases and SEC filings.

23  Based on his knowledge of material non-public information regarding the Company, defendant

24  Bourgoin violated Cal. Corp. Code §§25402 and 25502.5 by selling 220,000 shares of MIPS stock

25  for proceeds of $7.5 million during the Relevant Period.

26    40.    Defendant Mervin S. Kato has served as Vice President of Finance of MIPS since

27  May 2001 and as Chief Financial Officer ("CFO") since January 2006.  Previously, Kato served as

28  Corporate Controller from May 1998 until his promotion to his current position.  Because of Kato's

1   positions, he knew the adverse non-public information about the business of MIPS, as well as its

2   finances, markets and present and future business prospects, via access to internal corporate

3   documents, conversations and connections with other corporate officers and employees, attendance

4   at management meetings and via reports and other information provided to him in connection

5   therewith.  Defendant Kato, by his specialized financial expertise, was in a unique position to

6   understand the business of MIPS, as well as its finances, markets and present and future business

7   prospects.  During the Relevant Period, Kato participated in the issuance of false and/or misleading

8   statements, including the preparation of the false and/or misleading press releases and SEC filings.

9   Based on his knowledge of material non-public information regarding the Company, defendant Kato

10  violated Cal. Corp. Code §§25402 and 25502.5 by selling 10,000 shares of MIPS stock for proceeds

11  of $550,000 during the Relevant Period.

12      41.    Defendant Kate Hunt Rundle has served as Vice President and General Counsel of

13  MIPS since February 2006.  Because of Rundle's positions, he knew the adverse non-public

14  information about the business of MIPS, as well as its finances, markets and present and future

15  business prospects, via access to internal corporate documents, conversations and connections with

16  other corporate officers and employees, attendance at management meetings and via reports and

17  other information provided to him in connection therewith.  During the Relevant Period, Rundle

18  participated in the issuance of false and/or misleading statements, including the preparation of the

19  false and/or misleading press releases and SEC filings.

20      42.    Defendant Brad Holtzinger has been Vice President of Worldwide Sales of MIPS

21  since November 2005.  Previously, Holtzinger served as Director of Systems Solutions of MIPS

22  from 2001 to 2002 and as Vice President, Sales from 2002 to 2005.  Because of Holtzinger's

23  positions, he knew the adverse non-public information about the business of MIPS, as well as its

24  finances, markets and present and future business prospects, via access to internal corporate

25  documents, conversations and connections with other corporate officers and employees, attendance

26  at management meetings and via reports and other information provided to him in connection

27  therewith.  During the Relevant Period, Holtzinger participated in the issuance of false and/or

28

1  misleading statements, including the preparation of the false and/or misleading press releases and

2  SEC filings.

3      43.    Defendant Mark Tyndall has served as Vice President, Business Development and

4  Corporate Relations of MIPS since June 2006.  Because of Tyndall's positions, he knew the adverse

5  non-public information about the business of MIPS, as well as its finances, markets and present and

6  future business prospects, via access to internal corporate documents, conversations and connections

7  with other corporate officers and employees, attendance at management meetings and via reports and

8  other information provided to him in connection therewith.  During the Relevant Period, Tyndall

9  participated in the issuance of false and/or misleading statements, including the preparation of the

10  false and/or misleading press releases and SEC filings.

11      44.    Defendant Jack Browne has served as Vice President of Worldwide Sales of MIPS

12  since August 2002.  Previously, Browne served as Director of Market Development of the Company

13  from December 2001 to August 2002.  Because of Browne's positions, he knew the adverse non-

14  public information about the business of MIPS, as well as its finances, markets and present and

15  future business prospects, via access to internal corporate documents, conversations and connections

16  with other corporate officers and employees, attendance at management meetings and via reports and

17  other information provided to him in connection therewith.  During the Relevant Period, Browne

18  participated in the issuance of false and/or misleading statements, including the preparation of the

19  false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-

20  public information regarding the Company, defendant Browne violated Cal. Corp. Code §§25402

21  and 25502.5 by selling 155,977 shares of MIPS stock for proceeds of $1.1 million during the

22  Relevant Period.

23      45.    Defendant Sandy Creighton has served as Vice President, Human Resources and

24  Corporate Administration of MIPS since February 2006.  Previously, Creighton served as Vice

25  President, General Counsel and Corporate Secretary for MIPS from June 1998 until February 2006.

26  Because of Creighton's positions, she knew the adverse non-public information about the business of

27  MIPS, as well as its finances, markets and present and future business prospects, via access to

28  internal corporate documents, conversations and connections with other corporate officers and

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-06699-RMW          - 13 -

1    employees, attendance at management meetings and via reports and other information provided to

2    her in connection therewith.  During the Relevant Period, Creighton participated in the issuance of

3    false and/or misleading statements, including the preparation of the false and/or misleading press

4    releases and SEC filings.

5         46.    Defendant Lavi Lev served as the Company's Senior Vice President of Engineering

6    from 1998 to 2001 and as Vice President, Engineering of Silicon Graphics from 1996 to 1998.

7    Because of Lev's positions, he knew the adverse non-public information about the business of MIPS,

8    as well as its finances, markets and present and future business prospects, via access to internal

9    corporate documents, conversations and connections with other corporate officers and employees,

10   attendance at management meetings and via reports and other information provided to him in

11   connection therewith.  During the relevant period, Lev participated in the issuance of false and/or

12   misleading statements, including the preparation of the false and/or misleading press releases and

13   SEC filings.

14        47.    Defendant Brian Knowles served as the Company's Director of European Business

15   Development from December 1998 until October 1999.  From October 1999 until at least 2001,

16   Knowles served as the Company's Vice President of Worldwide Marketing.  Because of Knowles'

17   positions, he knew the adverse non-public information about the business of MIPS, as well as its

18   finances, markets and present and future business prospects, via access to internal corporate

19   documents, conversations and connections with other corporate officers and employees, attendance

20   at management meetings and via reports and other information provided to him in connection

21   therewith.  During the Relevant Period, Knowles participated in the issuance of false and/or

22   misleading statements, including the preparation of the false and/or misleading press releases and

23   SEC filings.

24        48.    Defendant Derek Meyer served as the Company's Vice President of Worldwide Field

25   Operations from September 1999 to June 2002, as Vice President, Sales and Marketing from March

26   1998 to September 1999, and as Director of Worldwide Marketing and Sales from May 1996 to

27   March 1998.  Because of Meyer's positions, he knew the adverse non-public information about the

28   business of MIPS, as well as its finances, markets and present and future business prospects, via

1   access to internal corporate documents, conversations and connections with other corporate officers

2   and employees, attendance at management meetings and via reports and other information provided

3   to him in connection therewith.  During the Relevant Period, Meyer participated in the issuance of

4   false and/or misleading statements, including the preparation of the false and/or misleading press

5   releases and SEC filings.

6           49.    Defendant Kevin C. Eichler had been CFO and Vice President of Finance of MIPS

7   from May 1998 until January 2006.  Because of Eichler's positions, he knew the adverse non-public

8   information about the business of MIPS, as well as its finances, markets and present and future

9   business prospects, via access to internal corporate documents, conversations and connections with

10  other corporate officers and employees, attendance at management meetings and via reports and

11  other information provided to him in connection therewith.  Defendant Eichler, by his specialized

12  financial expertise, was in a unique position to understand the business of MIPS, as well as its

13  finances, markets and present and future business prospects.  During the Relevant Period, Eichler

14  participated in the issuance of false and/or misleading statements, including the preparation of the

15  false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-

16  public information regarding the Company, defendant Eichler violated Cal. Corp. Code §§25402 and

17  25502.5 by selling 236,700 shares of MIPS stock for proceeds of $6.1 million during the Relevant

18  Period.

19          50.    Defendant G. Michael Uhler has served as Chief Technology Officer since May 2003.

20  Previously, Uhler served in various engineering management positions from 1994 to 2001, and as

21  Vice President of Architecture and Software Products from October 2001 to May 2003.  Because of

22  Uhler's positions, he knew the adverse non-public information about the business of MIPS, as well

23  as its finances, markets and present and future business prospects, via access to internal corporate

24  documents, conversations and connections with other corporate officers and employees, attendance

25  at management meetings and via reports and other information provided to him in connection

26  therewith.  During the Relevant Period, Uhler participated in the issuance of false and/or misleading

27  statements, including the preparation of the false and/or misleading press releases and SEC filings.

28  Based on his knowledge of material non-public information regarding the Company, defendant

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-06699-RMW          - 15 -

1  Browne violated Cal. Corp. Code §§25402 and 25502.5 by selling 139,409 shares of MIPS stock for

2  proceeds of $1.09 million during the Relevant Period.

3       51.    Defendant Robert R. Herb has been a director of MIPS since January 2005.  Because

4  of Herb's position, he knew the adverse non-public information about the business of MIPS, as well

5  as its finances, markets and present and future business prospects, via access to internal corporate

6  documents, conversations and connections with other corporate officers and employees, attendance

7  at Board meetings and committees thereof and via reports and other information provided to him in

8  connection therewith.  As a member of the Compensation and Nominating Committee, defendant

9  Herb controlled the other defendants' stock option awards.  During the Relevant Period, Herb

10  participated in the issuance of false and/or misleading statements, including the preparation of the

11  false and/or misleading press releases and SEC filings.

12       52.    Defendant Fred M. Gibbons has been a director of MIPS since 1998.  Gibbons served

13  on the Option Administration Committee from 1998 until 2000, and on the Compensation

14  Committee from 1999 until the present.  Gibbons served on the Audit Committee from 1999 until

15  2005.  Because of Gibbons' position, he knew the adverse non-public information about the business

16  of MIPS, as well as its finances, markets and present and future business prospects, via access to

17  internal corporate documents, conversations and connections with other corporate officers and

18  employees, attendance at Board meetings and committees thereof and via reports and other

19  information provided to him in connection therewith.  During the Relevant Period, Gibbons

20  participated in the issuance of false and/or misleading statements, including the preparation of the

21  false and/or misleading press releases and SEC filings.  As a member of the Compensation and

22  Nominating Committee, defendant Gibbons controlled the other defendants' stock option awards.

23  As a member of the Audit and Corporate Governance Committee, defendant Gibbons caused or

24  allowed the dissemination of the improper public statements described herein.  Based on his

25  knowledge of material non-public information regarding the Company, defendant Gibbons violated

26  Cal. Corp. Code §§25402 and 25502.5 by selling 10,000 shares of MIPS stock for proceeds of

27  $390,600 during the Relevant Period.

28

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-06699-RMW     - 16 -

1    53.    Defendant Benjamin A. Horowitz has been a director of MIPS since 2001.  Horowitz

2    served on the Compensation Committee from 2003 until the present.  Because of Horowitz's

3    position, he knew the adverse non-public information about the business of MIPS, as well as its

4    finances, markets and present and future business prospects, via access to internal corporate

5    documents, conversations and connections with other corporate officers and employees, attendance

6    at Board meetings and committees thereof and via reports and other information provided to him in

7    connection therewith.  During the Relevant Period, Horowitz participated in the issuance of false

8    and/or misleading statements, including the preparation of the false and/or misleading press releases

9    and SEC filings.   As a member of the Compensation and Nominating Committee, defendant

10   Horowitz controlled the other defendants' stock option awards.

11    54.    Defendant Kenneth L. Coleman has been a director of MIPS since 1998.  Coleman

12   served on the Compensation Committee from 1999 until present.  Because of Coleman's position, he

13   knew the adverse non-public information about the business of MIPS, as well as its finances,

14   markets and present and future business prospects, via access to internal corporate documents,

15   conversations and connections with other corporate officers and employees, attendance at Board

16   meetings and committees thereof and via reports and other information provided to him in

17   connection therewith.  During the Relevant Period, Coleman participated in the issuance of false

18   and/or misleading statements, including the preparation of the false and/or misleading press releases

19   and SEC filings.  As the Chairperson of the Compensation and Nominating Committee, defendant

20   Coleman controlled the other defendants' stock option awards.

21    55.    Defendant William M. Kelly has been a director of MIPS since 1998.  Kelly served

22   on the Audit Committee from 1999 until present.  Because of Kelly's position, he knew the adverse

23   non-public information about the business of MIPS, as well as its finances, markets and present and

24   future business prospects, via access to internal corporate documents, conversations and connections

25   with other corporate officers and employees, attendance at Board meetings and committees thereof

26   and via reports and other information provided to him in connection therewith.  During the Relevant

27   Period, Kelly participated in the issuance of false and/or misleading statements, including the

28   preparation of the false and/or misleading press releases and SEC filings.  As the Chairperson of the

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-06699-RMW         - 17 -

Audit and Corporate Governance Committee, defendant Kelly caused or allowed the dissemination of the improper public statements described herein.

**DEFENDANTS WERE CONTROL PERSONS
WITH FIDUCIARY DUTIES TO MIPS**

56.    Each officer and director of MIPS named herein owed the Company and MIPS shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  Contrary to these duties, the conduct of MIPS' directors and officers complained of herein involves knowing, intentional and culpable violations of their obligations as officers and directors of MIPS.  Further, the misconduct of MIPS' officers has been ratified by MIPS' Board, which has failed to take any legal action on behalf of the Company against them.

57.    By reason of their positions as officers, directors and fiduciaries of MIPS, and because of their ability to control the business and corporate affairs of the Company, defendants owed MIPS and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage MIPS in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of MIPS and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  In addition, as officers and/or directors of a publicly held company, defendants had a duty to refrain from utilizing their control over MIPS to divert assets to themselves via improper and/or unlawful practices. Defendants also had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, earnings and compensation practices.

58.    Because of their positions of control and authority as directors or officers of MIPS, each of the defendants was able to and did, directly and indirectly, control the wrongful acts complained of herein.  As to the director defendants, these acts include: (i) agreement to and/or acquiescence in defendants' options manipulation; and (ii) willingness to cause MIPS to disseminate false proxy statements for 1999-2006, which proxy statements failed to disclose defendants' option backdating and manipulation practices and omitted the fact that executive officers were engaged in stock option grants in order to manipulate the strike price of the stock options granted to themselves

1  and other MIPS employees. Because of their positions with MIPS, each of the defendants was aware

2  of these wrongful acts, had access to adverse non-public information and was required to disclose

3  these facts promptly and accurately to MIPS shareholders and the financial markets but failed to do

4  so.

5       59.    Between 1999 and 2006, defendants falsely repeated in each proxy statement that the

6  stock option grants made during that period carried an exercise price that was not less than the fair

7  market value of MIPS stock on the date granted, as calculated by the public trading price of the stock

8  at the market's close on that date.

9       60.    Instead, defendants concealed that the stock option grants were repeatedly and

10  consciously manipulated to ensure that the strike price associated with the option grants was at or

11  near the lowest trading price in a given week or month. Due to defendants' breach of their fiduciary

12  duty in the administration of the stock option plans, plaintiffs seek to have the directors' and

13  officers' plans voided and gains from those plans returned to the Company. In the alternative,

14  plaintiffs seek to have all of the unexercised options granted to defendants between 1998 and 2006

15  cancelled, the financial gains obtained via the exercise of such options returned to the Company and

16  to have defendants revise the Company's financial statements to reflect the truth concerning these

17  option grants.

18       61.    To discharge their duties, the directors of MIPS were required to exercise reasonable

19  and prudent supervision over the management, policies, practices and controls of the business and

20  financial affairs of MIPS. By virtue of such duties, the officers and directors of MIPS were required,

21  among other things, to:

22            (a)    manage, conduct, supervise and direct the business affairs of MIPS in

23  accordance with all applicable law (including federal and state laws, government rules and

24  regulations and the charter and bylaws of MIPS);

25            (b)    neither engage in self-dealing nor knowingly permit any officer, director or

26  employee of MIPS to engage in self-dealing;

27            (c)    neither violate nor knowingly permit any officer, director or employee of

28  MIPS to violate applicable laws, rules and regulations;

(d)     remain informed as to the status of MIPS' operations, including its practices in relation to the pervasive backdating/spring-loading and improper accounting for such, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the U.S. federal securities laws and their duty of candor to the Company and its shareholders;

(e)     prudently protect the Company's assets, including taking all necessary steps to recover corporate assets (cash, stock options) improperly paid to Company executives and directors together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

(f)     establish and maintain systematic and accurate records and reports of the business and affairs of MIPS and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(g)     maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that MIPS' financial statements – including its expenses, accounting for stock option grants and other financial information – would be accurate and the actions of its directors would be in accordance with all applicable laws;

(h)     exercise control and supervision over the public statements to the securities markets and trading in MIPS stock by the officers and employees of MIPS; and

(i)     supervise the preparation and filing of any financial reports or other information required by law from MIPS and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of MIPS and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

62.     Each defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well

1  as in the use and preservation of its property and assets.  The conduct of the defendants complained

2  of herein involves a willful and culpable violation of their obligations as directors and/or officers of

3  MIPS, the absence of good faith on their part, and a reckless disregard for their duties to the

4  Company and its shareholders which defendants were aware or should have been aware posed a risk

5  of serious injury to the Company.  The conduct of defendants who were also officers and/or directors

6  of the Company during the Relevant Period has been ratified by the director defendants who

7  comprised MIPS' Board during the Relevant Period.

8  **The MIPS Board Committees**

9       63.    The members of MIPS' Board committees, who were specifically charged with

10 administering the Company's options programs and financial accounting, abdicated their duties by

11 participating in the manipulation of MIPS' options programs.

12      64.    From 1998 until November 2000, the responsibilities of the Options Administration

13 Committee included "administering the 1998 Long-Term Incentive Plan, reviewing and approving

14 grants under the Incentive Plan and approving other performance-based compensation which is

15 intended to be excluded from the deductibility limitations imposed by Section 162(m) of the Internal

16 Revenue Code of 1986."   After November 2000, the duties of the Options Administration

17 Committee were assumed by the Compensation Committee.

18      65.    From 1998 until November 2000, the responsibilities of the Compensation

19 Committee included "developing performance criteria for and periodically evaluating the

20 performance of our Chief Executive Officer, reviewing and recommending the salary, bonus and

21 stock incentive compensation of our Chief Executive Officer, reviewing the salaries, bonuses and

22 stock incentive compensation of our other officers as proposed by our Chief Executive Officer and

23 reviewing candidates and recommending nominees for election as directors."

24      66.    After the termination of the Options Administration Committee in November 2000,

25 the Compensation Committee assumed the duties of the Options Administration Committee.  From

26 November 2000 until the present, the responsibilities of the Compensation Committee included:

27        Administering the 1998 Long-Term Incentive Plan (the ''Incentive Plan''),
          reviewing and approving grants under the Incentive Plan and approving other
28        performance-based compensation, which is intended to be excluded from the

deductibility limitations imposed by Section 162(m) of the Internal Revenue Code of 1986, as amended (the ''Code''), developing performance criteria for and periodically evaluating the performance of our Chief Executive Officer, reviewing and recommending the salary, bonus and stock incentive compensation of our Chief Executive Officer, reviewing the salaries, bonuses and stock incentive compensation of our other officers as proposed by our Chief Executive Officer.

67.     The Audit Committee was responsible for overseeing the accounting and financial reporting processes of the Company, the audits of the Company's financial statements, and the Company's internal controls over financial reporting. The members of the Audit Committee, and the Board by its approval of their actions and recommendations, enabled, or through conscious abdication of duty, permitted the Company to manipulate stock option grants issued to certain defendants. By such actions, defendants breached their fiduciary duties to the Company.

68.     The following chart shows the makeup of the Board and committee assignments at MIPS from 1998 to 2005:

|  | Audit Committee | Compensation Committee | Option Administration Committee |
|---|---|---|---|
| FY99 | Kelly, Baskett/ Akeley, Gibbons | Coleman, Gibbons, Holbrook | Gibbons, Holbrook |
| FY00 | Kelly, Gibbons, Holbrook | Coleman, Gibbons, Holbrook | Gibbons, Holbrook |
| FY01 | Kelly, Gibbons, Holbrook | Coleman, Gibbons, Holbrook | *merged into compensation committee* |
| FY02 | Kelly, Gibbons, Holbrook | Coleman, Gibbons, Holbrook | *merged into compensation committee* |
| FY03 | Kelly, Gibbons, Holbrook | Coleman, Gibbons, Horowitz | *merged into compensation committee* |
| FY04 | Kelly, Gibbons, Holbrook | Coleman, Gibbons, Horowitz | *merged into compensation committee* |
| FY05 | Kelly, Gibbons, Holbrook | Coleman, Gibbons, Herb, Horowitz | *merged into compensation committee* |

69.     Defendants breached their duties of loyalty and good faith by allowing or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent defendants from taking such illegal actions. MIPS has

1    expended and will continue to expend significant sums of money as a result thereof.    Such

2    expenditures include, but are not limited to:

3            (a)    improvidently paid executive compensation;

4            (b)    increased capital costs as a result of the loss of market capitalization and the

5    Company's damaged reputation in the investment community;

6            (c)    costs incurred to carry out internal investigations, including legal fees paid to

7    outside counsel; and

8            (d)    incurring possible IRS penalties for improperly reporting compensation.

9        70.    These actions have irreparably damaged MIPS' corporate image and goodwill.  For at

10    least the foreseeable future, MIPS will suffer from what is known as the "liar's discount," a term

11    applied to the stocks of companies who have been implicated in illegal behavior and have misled the

12    investing public, such that MIPS' ability to raise equity capital or debt on favorable terms in the

13    future is now impaired.

14                        **AIDING AND ABETTING AND CONCERTED ACTION**

15        71.    In committing the wrongful acts alleged herein, defendants have pursued or joined in

16    the pursuit of a common course of conduct and acted in concert with one another in furtherance of

17    their common plan.

18        72.    During all times relevant hereto, defendants collectively and  individually initiated a

19    course of conduct which was designed to and did: (i) conceal the fact that the Company was

20    allowing its directors and senior officers to divert tens of millions of dollars to MIPS insiders,

21    directors, and other employees, and causing MIPS to misrepresent its financial results; (ii) maintain

22    defendants' executive and directorial positions at MIPS and the profits, power and prestige which

23    defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including

24    shareholders of MIPS, regarding defendants' compensation practices and MIPS' financial

25    performance.

26        73.    The purpose and effect of defendants' common course of conduct was, among other

27    things, to disguise defendants' violations of law, breaches of fiduciary duty, abuse of control, gross

28    mismanagement, corporate waste and unjust enrichment, to conceal adverse information concerning

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-06699-RMW            - 23 -

1   the Company's operation and financial condition and to artificially inflate the price of MIPS
2   common stock so they could dispose of millions of dollars of their own MIPS stock, and enhance
3   their executive and directorial positions and receive the substantial compensation they obtained as a
4   result thereof.

5          74.    Defendants accomplished their common enterprise and/or common course of conduct
6   by causing the Company to purposefully and/or recklessly engage in the option manipulation abuses
7   alleged herein and misrepresent MIPS' financial results.  Each of the defendants was a direct,
8   necessary, and substantial participant in the common enterprise and/or common course of conduct
9   complained of herein.

10         75.    Each of the defendants aided and abetted and rendered substantial assistance in the
11  wrongs complained of herein.  In taking such actions to substantially assist the commission of the
12  wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing,
13  substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall
14  contribution to and furtherance of the wrongdoing.

15                              **FACTUAL ALLEGATIONS**

16         76.    During the Relevant Period, the Company's executives, non-employee directors, and
17  rank-and-file employees, were compensated in large part through the issuance of stock options.  A
18  stock option granted to an employee and/or director of a corporation allows the individual to
19  purchase company stock at a specified price – referred to as the "exercise price" – for a specified
20  period of time.  Stock options are granted as part of employee and/or director compensation
21  packages as a means to create incentives to boost profitability and stock value.  When the employee
22  and/or director exercises the option, he or she purchases the stock from the company at the exercise
23  price, regardless of the stock's price at the time the option is exercised.  If the exercise price is lower
24  than it should be, the employee and/or director pays less and the company gets less when the stock
25  option is exercised.

26         77.    According to MIPS, stock options during the Relevant Period were issued pursuant to
27  the 1998 Long-Term Incentive Plan, which was approved by Company shareholders and
28  administered by the Company's Stock Administration Committee prior to 2000, and by the

1   Compensation and Nomination Committee after 2000.  The 1998 Long-Term Compensation Plan

2   specifically provides that the "valuation methodology" for stock option grants is required to be

3   approved by the Committee.  The Plan also provided that the "per share exercise price of such stock

4   options may not be less than 100% of the fair market value of the common stock on the date of

5   grant."

6        78.     Contrary to representations in public filings with the SEC and to Company

7   shareholders, the Individual Defendants manipulated stock options by falsifying or manipulating

8   documents evidencing stock option grant dates.  Instead of stock options being priced in accordance

9   with the fair market value on the grant date of the options, options were picked with hindsight and

10  backdated to reflect a date on which the fair market value of the stock was lower than that of the date

11  of the actual grant.  In many instances, stock options were backdated to a date where the fair market

12  value of the stock was at its lowest during a relevant week, month or quarter.

13       79.     The actual practice of granting stock options to MIPS officers and/or directors was

14  contrary to the terms of MIPS' stock option plans.  When the MIPS options were backdated to lower

15  their exercise price of the grant, the purpose of the stock option plans was undermined to the

16  detriment of the Company and its shareholders, as the recipients of the options received

17  compensation regardless of whether they achieved the goals that would otherwise be a prerequisite

18  to their benefiting from such compensation.  The backdating of options granted to Company insiders

19  also brought an instant paper gain to these insiders, as the options were priced below the stock's fair

20  market value when they were actually awarded.   Under GAAP, this instant paper gain was

21  equivalent to extra compensation and, thus, represented a cost to MIPS.  Because defendants caused

22  MIPS to omit quarterly and year-end costs associated with this extra compensation in its financial

23  results, its profits were overstated during the fiscal periods in which the options were granted.

24                      **DEFENDANTS' SCHEME BEGINS TO UNRAVEL**

25       80.     Until 2006, MIPS' shareholders were unaware of the options manipulation taking

26  place at the Company.  MIPS' 1999-2006 Proxy Statements omitted any reference to defendants'

27  option manipulation.  Instead, the proxy statements affirmatively misrepresented that options were

28  granted at the fair market value of MIPS' stock on the grant date.  MIPS' Forms 10-K similarly

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-06699-RMW            - 25 -

1  failed to disclose that options were routinely backdated. Instead, the Forms 10-K stated that options

2  were granted at 100% of fair market value, and that the Company followed APB Opinion No. 25 in

3  accounting for in-the-money options grants. Further, the Company's shareholders remained unaware

4  of defendants' wrongdoing when voting on proxy proposals modifying MIPS' options plans between

5  1999 and 2006.

6       81.    On March 18, 2006, *The Wall Street Journal* published an article describing the

7  practice of backdating and reporting that executives at certain companies had received options dated

8  on some of the days of the year with the lowest stock prices for several years in a row. According to

9  the study cited in the article, the chances against such patterns occurring by chance were

10  "astronomical" and, in some cases, as low as one in 300 billion. Following this article, numerous

11  companies came under suspicion for having backdated stock options.

12       82.    On August 30, 2006, shortly after approving new lucrative bonuses for MIPS

13  executives, MIPS announced that "its board of directors has formed a special committee, consisting

14  of independent directors, to review the Company's historical option grant practices and the

15  Company's accounting for its option grants." MIPS also announced that it would be delaying the

16  filing of its Form 10-K for fiscal year 2006 as a result.

17       83.    On September 19, 2006, MIPS announced that it had received a notice of delisting

18  from NASDAQ due to its failure to timely file its fiscal year 2006 Form 10-K. MIPS also

19  announced supplemental fees for the directors who were purportedly conducting the investigation of

20  MIPS stock option practices. MIPS stated that for a mere phone call lasting less than 30 minutes,

21  each director would be paid $500.

22       84.    On October 25, 2006, MIPS announced that the Special Committee had concluded

23  that stock options had been improperly granted:

24  > [T]he special committee has reached a determination that, different measurement
> dates should have been used for computing compensation costs for certain historic

25  > stock option grants than those used in the preparation of the Company's historical
> financial statements. . . . [T]he Company has determined that its historical financial

26  > statements included in reports that it has previously filed with the Securities and
> Exchange Commission will need to be restated. Consequently, such financial

27  > statements, and the Company's earnings releases reporting periodic operating results
> and financial conditions for such periods should no longer be relied upon.

28

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-06699-RMW     - 26 -

85.    On July 2, 2007, MIPS filed their much-delayed Form 10-K for fiscal year 2006.  In the Form 10-K, MIPS admitted to years of options backdating, including grants to CEO Bourgoin:

> The Special Committee examined the facts and circumstances surrounding grants made during the Review Period and determined that different measurement dates should have been used for computing compensation costs for certain historic stock option grants.  The Special Committee found that the Committee of the Board of Directors responsible for administering the option program had delegated its option-granting authority to the former Vice President of Human Resources.  The Special Committee concluded that hindsight was likely used by the former Vice President of Human Resources in selecting grant dates for options granted in the period October 1998 through October 2000 and this person had a lack of knowledge of the accounting rules related to the granting of options.  While no direct evidence of using hindsight was found, the quantum of circumstantial evidence, coupled with the absence of contemporaneously created electronic documents for the grants, led the Special Committee to reach this conclusion.  In particular, this circumstantial evidence included the fact that 20 out of 28 grants coincided with a weekly or monthly low in our stock price during this period.  The former Vice President of Human Resources left the Company in June 2003.  The investigation did not find any evidence that any other employees, executives or Board members were aware of the use of hindsight in selecting grant dates or that measurement dates were based on improper practices.  The investigation also did not find any evidence of intentional misconduct by our current management, or any evidence that the incorrect grant practice was used for the purpose of having a financial statement impact.

86.    However, defendants' options manipulation did not end in October 2000.  MIPS' July 2, 2007 Form 10-K does not specifically rule out backdating after October 2000, and indeed, options manipulation at MIPS continued into at least 2002:

(a)    Derek Meyer received an option grant for 21,000 shares of MIPS stock purportedly granted on January 5, 2001.  On January 5, 2001, MIPS stock was trading at $26.38.  This was the second lowest price of the month.

(b)    Mervin S. Kato received an option grant for 90,000 shares of MIPS stock purportedly granted on April 3, 2001.  On April 3, 2001, MIPS stock was trading at $16.44.  This was not only the lowest price of the month, but the lowest price of the first half of 2001.

(c)    Bourgoin received an option grant for 50,000 shares of MIPS stock purportedly granted on September 17, 2004.  On September 17, 2004, MIPS stock was trading at $5.01, the second lowest price of the month (the lowest was just $0.01 lower), and the lowest price for the remainder or the calendar year.

1      87.    These grants from 2000-2004 are consistent with the circumstantial evidence which

2  the Special Committee found compelling indications of backdating.  Specifically, grants which

3  "coincided with a weekly or monthly low in our stock price."

4      88.    Such option grant manipulation practices were directly contrary to MIPS' stated

5  compensation philosophy.  Rather than aligning management's interests with shareholder interests,

6  defendants' deceptive and undisclosed options malfeasance ensured that MIPS executives and

7  employees profited from options grants regardless of whether MIPS shareholders received any

8  returns whatsoever.

9             **MANIPULATED OPTIONS GRANTS DURING THE RELEVANT PERIOD**

10      89.    MIPS admits that options were routinely backdated during the Relevant Period.  The

11  MIPS Special Committee cited a pattern of options which bore a strike price of the lowest day in a

12  given week or month.  Indeed, between 1999 and 2002, MIPS backdated or manipulated at least five

13  out of the seven stock grants which were publicly reported in their proxy statements during this

14  period.  Further, MIPS backdated or manipulated many other grants to both rank-and-file and senior

15  employees during this period.  The following charts show a patter on backdating at MIPS from 198

16  until 2004.

17      90.    The grants shown below all evidence a pattern of backdating consistent with the

18  Special Committee's findings.

19

20

21

22

23

24

25

26

27

28

91.     Defendants Meyer, Lev, Holbrook, Gibbons, Eichler, Creighton, Coleman and Bourgoin all received grants for 1,300, 1,000, 40,000, 40,000, 1,000, 1,000, 1,285 and 1,000 shares, respectively of MIPS stock purportedly granted on July 6, 1998.  On this date, MIPS stock was trading at $11.38.  This was the second lowest price of the month.



CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-06699-RMW        - 29 -

1         92.     Defendant Knowles received a grant for 20,000 shares of MIPS stock purportedly

2    granted on January 5, 1999.  On this date, MIPS stock was trading at $28.25.  This was the lowest

3    price of the month.

4

5



**MIPS Technologies, Inc.**
December 4, 1998 to February 5, 1999



1      93.    Defendant Kato received a grant for 11,000 shares of MIPS stock purportedly granted

2 on May 26, 1999.  On this date, MIPS stock was trading at $25.50.  This was the lowest price of the

3 month.



94.    Defendants Meyer, Lev, Eichler, Creighton and Bourgoin received option grants for 50,000, 75,000, 55,000, 55,000 and 150,000 shares of MIPS stock respectively, purportedly on August 6, 1999.  On this date, MIPS stock was trading at $34.31.  This was the lowest price of the month.



**MIPS Technologies, Inc.**
July 6, 1999 to September 7, 1999

95.    Defendants Holbrook and Gibbons both received option grants for 10,000 shares of MIPS stock purportedly on October 28, 1999.  On this date, MIPS stock was trading at $27.44.  This was the second lowest price of the month and the lowest price of the remainder of the calendar year.



1     96.    Defendant Kato received option grants for 21,000 shares of MIPS stock purportedly

2   on May 26, 2000.  On this date, MIPS stock was trading at $18.38.  This was the third lowest price

3   of the month, and the lowest price of the remainder of the calendar year.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



1    97.    Defendants Creighton, Eichler, Meyer and Lev all received options grants for 70,000

2  shares of MIPS stock purportedly dated on July 11, 2000. Bourgoin received a grant for 200,000

3  shares of MIPS stock purportedly on the same date. On this date, MIPS stock was trading at $36.50.

4  This was the lowest price of the month.



**MIPS Technologies, Inc.**
June 9, 2000 to August 11, 2000

98.    Defendant Kato received an option grant for 90,000 shares of MIPS stock purportedly dated on April 3, 2001.  On this date, MIPS stock was trading at $16.44.  This was the lowest price of the month, and the lowest price of the year until June 15, 2001.



**MIPS Technologies, Inc.**
March 2, 2001 to May 3, 2001

99.    Defendant Bourgoin received an option grant for 50,000 shares of MIPS stock purportedly granted on September 17, 2004.  On September 17, 2004, MIPS stock was trading at $5.01, the second lowest price of the month (the lowest was just $0.01 lower), and the lowest price for the remainder of the calendar year.



MIPS Sought and Received Shareholder Approval Through the Issuance of False and Misleading Proxy Statements

100.    Throughout the Relevant Period, MIPS filed proxy statements with the SEC that contained false and misleading statements about the Company's stock option plans.

101.    At the time that the following proxy statements were filed, the members of the Board, and particularly the members of the Stock Administration Committee and the Compensation Committee, knew or should have known that the disclosures in the proxy statements regarding stock option compensation and practices were false and misleading as they failed to disclose the systematic manipulation of the Company's shareholder approved stock option plans.

102.     Further, in many instances, the MIPS Board solicited shareholder approval of amendments to the Company's stock option plans without disclosing that the terms of the plans were routinely evaded and manipulated.

103.     MIPS filed their 1999 Proxy Statement on September 20, 1999.  In the proxy statement, they solicited approval for the elimination of several restrictions of options grants, while stating that the "per share exercise price of such stock options may not be less than 100% of the fair market value of the common stock on the date of grant."

104.     MIPS filed their 2000 Proxy Statement on September 25, 2000.  The proxy statement assured investors that "[t]he Option Administration Committee determines the number of shares that will be subject to stock option grants based on our business plans, the executive's level of responsibility, individual performance, historical award data and competitive practice of comparable positions in similar high technology companies.  *All options to date have been granted at not less than the fair market value of the underlying shares on the date of grant*."

105.     MIPS filed their 2001 Proxy Statement on September 24, 2001.  The proxy statement assured investors that "[t]he Compensation Committee determines the number of shares that will be subject to stock option grants based on our business plans, the executive's level of responsibility, individual performance, historical award data and competitive practice of comparable positions in similar high technology companies.  *All options to date have been granted at not less than the fair market value of the underlying shares on the date of grant*."

106.     MIPS filed their 2002 Proxy Statement on September 24, 2002.  The proxy statement assured investors that "[t]he Compensation Committee determines the number of shares that will be subject to stock option grants based on our business plans, the executive's level of responsibility, individual performance, historical award data and competitive practice of comparable positions in similar high technology companies.  *All options to date have been granted at not less than the fair market value of the underlying shares on the date of grant*."

107.     MIPS filed their 2003 Proxy Statement on September 29, 2003.  The proxy statement assured investors that "[t]he Compensation and Nominating Committee determines the number of shares that will be subject to stock option grants based on our business plans, the executive's level of

1    responsibility, individual performance, historical award data and competitive practice of comparable

2    positions in similar high technology companies.  ***All options to date have been granted at not less***

3    ***than the fair market value of the underlying shares on the date of grant***."

4         108.    MIPS filed their 2004 Proxy Statement on September 22, 2004.  The proxy statement

5    assured investors that "[t]he Compensation and Nominating Committee determines the number of

6    shares that will be subject to stock option grants based on our business plans, the executive's level of

7    responsibility, individual performance, historical award data and competitive practice of comparable

8    positions in similar high technology companies.  ***All options to date have been granted at not less***

9    ***than the fair market value of the underlying shares on the date of grant***."

10        109.    MIPS filed their 2005 Proxy Statement on September 22, 2005.  The proxy statement

11   assured investors that "[t]he Compensation and Nominating Committee determines the number of

12   shares that will be subject to stock option grants based on our business plans, the executive's level of

13   responsibility, individual performance, historical award data and competitive practice of comparable

14   positions in similar high technology companies.  ***All options to date have been granted at not less***

15   ***than the fair market value of the underlying shares on the date of grant***."

16              **MIPS' FALSE FINANCIAL REPORTING IN VIOLATION OF GAAP**

17        110.    As a result of defendants' improper backdating of stock options, defendants caused

18   MIPS to violate GAAP, SEC regulations and IRS rules and regulations.

19        111.    MIPS' financial results for 1998-2006 were included in reports filed with the SEC

20   and in other shareholder reports.  In these reports, defendants represented that MIPS' financial

21   results were presented in a fair manner and in accordance with GAAP.

22        112.    Defendants' representations were false and misleading as to the financial information

23   reported, as such financial information was not prepared in conformity with GAAP, nor was the

24   financial information "a fair presentation" of the Company's financial condition and operations,

25   causing the financial results to be presented in violation of GAAP and SEC rules.

26        113.    GAAP consists of those principles recognized by the accounting profession as the

27   conventions, rules, and procedures necessary to define accepted accounting practice at the particular

28   time.  Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17

1   C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared

2   in compliance with GAAP, are presumed to be misleading and inaccurate.

3   **Violations of GAAP**

4        114.    During the Relevant Period, defendants caused the Company to understate its

5   compensation expense by not properly accounting for its stock options under GAAP and thus

6   overstated the Company's net earnings.

7        115.    Under well-settled accounting principles in effect throughout the Relevant Period,

8   MIPS did not need to record an expense for options granted to employees at the then-current market

9   price ("at the money"). The Company was, however, required to record an expense in its financial

10  statements for any options granted below the then-current market price ("in the money"). In order to

11  provide MIPS' executives and employees with far more lucrative "in the money" options, while

12  avoiding having to inform shareholders about millions of dollars incurred by the Company in

13  compensation expenses (and without paying the IRS millions of dollars in employment taxes),

14  defendants systematically falsified Company records to create the false appearance that options had

15  been granted at the market price on an earlier date.

16       116.    Throughout the Relevant Period, MIPS accounted for stock options using the intrinsic

17  method described in APB Opinion No. 25, "Accounting for Stock Issued to Employees." Under

18  APB Opinion No. 25, employers were required to record as an expense on their financial statements

19  the "intrinsic value" of a fixed stock option on its "measurement date." An option that is "in the

20  money" on the measurement date has intrinsic value, and the difference between its exercise price

21  and the quoted market price must be recorded as compensation expense to be recognized over the

22  vesting period of the option. Options that are "at the money" or "out of the money" on the

23  measurement date need not be expensed. Excluding non-employee directors, APB Opinion No. 25

24  required employers to record compensation expenses on options granted to non-employees

25  irrespective of whether they were "in the money" or not on the date of grant.

26  **MIPS' GAAP Violations Were Material**

27       117.    The false and misleading statements and omissions defendants caused MIPS to make

28  during the Relevant Period regarding its accounting were material, particularly in light of SEC

guidance on materiality. SEC Staff Accounting Bulletin ("SAB") Topic 1M, "Materiality," summarizes GAAP definitions of materiality. Among other items, SAB Topic 1M says: "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important." It also stresses that materiality requires qualitative, as well as quantitative considerations. For example, if a known misstatement would cause a significant market reaction that reaction should be taken into account in determining the materiality of the misstatement.

**SAB Topic 1M further states:**

> Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –
>
> *    *    *
>
> • whether the misstatement masks a change in earnings or other trends
>
> • whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise
>
> *    *    *
>
> • whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

118. SAB Topic 1M also says that an intentional misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting.

**MIPS' Financial Statements Violated Fundamental Concepts of GAAP**

119. Due to these accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, which are described by the following statements:

(a) The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB Opinion No. 28, ¶10);

(b) the principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, ¶34);

1         (c)     the principle that financial reporting should provide information about the
2 economic resources of an enterprise, the claims to those resources, and the effects of transactions,
3 events and circumstances that change resources and claims to those resources (FASB Statement of
4 Concepts No. 1, ¶40);

5         (d)     the principle that financial reporting should provide information about how
6 management of an enterprise has discharged its stewardship responsibility to stockholders for the use
7 of enterprise resources entrusted to it.  To the extent that management offers securities of the
8 enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective
9 investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

10         (e)     the principle that financial reporting should be reliable in that it represents
11 what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

12         (f)     the principle of completeness, which means that nothing material is left out of
13 the information that may be necessary to insure that it validly represents underlying events and
14 conditions (FASB Statement of Concepts No. 2, ¶79); and

15         (g)     the principle that conservatism be used as a prudent reaction to uncertainty to
16 try to ensure that uncertainties and risks inherent in business situations are adequately considered
17 (FASB Statement of Concepts No. 2, ¶¶95, 97).

18    120.    Further, the undisclosed adverse information concealed by defendants during the
19 Relevant Period is the type of information which, because of SEC regulations, regulations of the
20 national stock exchanges and customary business practice, is expected by investors and securities
21 analysts to be disclosed, and is known by corporate officials and their legal and financial advisors to
22 be the type of information which is expected to be and must be disclosed.

23 **Violations of the SEC Regulations**

24    121.    During the Relevant Period, defendants caused MIPS to violate SEC regulations by
25 failing to disclose that the Company's senior executives had been granted backdated stock options.

26    122.    Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer
27 must furnish information required by Item 402 of Regulation S-K [17 C.F.R. §229.402].  Item
28 402(b) and (c) require a company to provide both a Summary Compensation Table and an

1   Option/SAR Grants Table identifying the compensation of the named executive officers – the

2   company's CEO and its next four most highly paid executives.  Item 402 requires particularized

3   disclosures involving a company's stock option grants in the last fiscal year.  In the Summary

4   Compensation Table, the issuer must identify in a column "other annual compensation" received by

5   the named executives that is not properly categorized as salary or bonus, including any "[a]bove

6   market or preferential earnings on restricted stock, options, SARs or deferred compensation" paid to

7   the officer during the period.  Item 402(b)(2)(iii)(C)(2).  In the option grant table, the issuer must

8   identify in a column "[t]he per-share exercise or base price of the options . . . .  If such exercise or

9   base price is less than the market price of the underlying security on the date of grant, a separate,

10  adjoining column shall be added showing market price on the date of grant."  Item 402(c)(2)(iv).

11      123.    Defendants caused MIPS to violate SEC regulations by failing to disclose that the

12  Company's named executive officers had been granted options with exercise prices below the

13  market value on the date the Board or Compensation Committee approved the grant.

14  **Violations of IRS Rules and Regulations**

15      124.    During the Relevant Period, defendants further caused MIPS to violate IRS rules and

16  regulations due to its improper accounting for the backdated stock options.  As a result, the

17  Company's tax liabilities were understated exposing MIPS to potential amounts owed for back taxes,

18  penalties and interest to the IRS for improperly reporting compensation.

19      125.    Defendants caused the Company to violate IRS Code §162(m) which generally limits

20  a publicly traded company's tax deductions for compensation paid to each of its named executive

21  officers to $1 million unless the pay is determined to be "performance-based."  In order for

22  compensation to be performance-based, the Compensation Committee must have set pre-established

23  and objective performance goals.  The goals must then be approved by the shareholders.  Section

24  162(m) defines stock options as performance-based provided they are issued at an exercise price that

25  is no less than the fair market value of the stock on the date of the grant.  Accordingly, properly

26  issued stock options do not have to be taken into account in calculating whether an executive's

27  compensation has exceeded the $1 million compensation cap.

28

126.    Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top executives' soaring pay packages more closely to a company's performance. This change in the tax law turned compensation practices for a company's top executives away from straight salary-based compensation to performance-based compensation, including stock options. According to former SEC Chairman Harvey Pitt: "What [162(m)] did was create incentives to find other forms of compensation so people could get over the $1 million threshold without running afoul of the code." (Alteration in original.)

127.    Defendants caused MIPS to violate IRS Code §162(m) by providing backdated options to the Company's named executive officers which were granted with exercise prices that were less than the fair market value of the stock on the date of the grant. As a result all of the income resulting from the exercise of the options must be included for purposes of calculating whether the named executive's compensation exceeds the $1 million cap for federal tax purposes.

128.    Defendants further caused the Company to violate IRS rules and regulations in order to avoid having to withhold income and FICA tax from its executives and employees upon the exercise of MIPS' stock options by improperly accounting for its Non-Qualified Stock Options ("NQSOs") as Incentive Stock Options ("ISOs").

129.    ISOs are a form of equity compensation that may be provided to a company's employees. ISOs are required to be granted at an exercise price that is no less than the fair market value of the stock on the date of the grant and are entitled to preferential tax treatment as they are not subject to income tax upon exercise of the options but only upon sale of the stock (except for the possible imposition of alternative minimum tax on the option spread at the time of exercise). Stock options that do not qualify as ISOs are considered to be NQSOs. NQSOs are not entitled to preferential treatment as they are subject to income tax and FICA withholding upon exercise. As a result, a company that fails to withhold income tax and/or FICA upon the exercise of NQSOs by its employees would be liable for the amount of the income tax and FICA that the company failed to withhold upon exercise of the options, in addition to interest and penalties.

130.    By improperly treating their backdated options as ISOs, defendants failed to provide proper income tax and FICA withholdings upon the exercise of their options by their executives and employees in violation of IRS rules and regulations.

131.    The chart below illustrates MIPS' false and misleading fiscal year financial results which materially understated its compensation expenses and thus overstated its earnings due to improper backdating of stock options:

**MIPS Technologies, Inc**
**Impact of Restatement**
**Adjustments**
(in thousands of $ except EPS)

| | FY1999 | FY2000 | FY2001 | FY2002 | FY2003 | FY2004 | FY2005 |
|---|---|---|---|---|---|---|---|
| *As Originally Reported* | | | | | | | |
| **Operating Income** | 36,155 | 42,850 | 25,917 | (13,332) | (26,966) | 326 | 13,897 |
| **Net Income** | 22,661 | 27,113 | 19,062 | (9,390) | (28,907) | (1,531) | 14,909 |
| **Diluted EPS** | 0.58 | 0.68 | 0.47 | (0.24) | (0.73) | (0.04) | 0.33 |
| **Shares used in calculation of Diluted EPS** | 38,762 | 39,912 | 40,309 | 39,013 | 39,505 | 40,434 | 44,533 |
| *Adjustments* | | | | | | | |
| **Revised stock option measurement dates (pre-tax)** | (1,304) | (6,079) | (19,105) | (18,028) | (1,377) | (317) | (149) |
| **Income tax adjustment** | 0 | 2,137 | 5,767 | 7,001 | (698) | 0 | 0 |
| **Net increase/ (decrease) in net income** | (1,304) | (3,942) | (13,338) | (11,027) | (2,075) | (317) | (149) |
| **Effect on Diluted EPS** | (0.03) | (0.10) | (0.33) | (0.28) | (0.05) | (0.01) | (0.00) |
| *As Restated* | | | | | | | |
| **Operating Income** | 34,851 | 36,771 | 6,812 | (31,360) | (28,343) | 9 | 13,748 |
| **Net Income** | 21,357 | 23,171 | 5,724 | (20,417) | (30,982) | (1,848) | 14,760 |
| **Diluted EPS** | 0.55 | 0.58 | 0.14 | (0.52) | (0.78) | (0.05) | 0.33 |
| **Impact of Restatement** | | | | | | | |
| **Overstatement in Operating Income or (Understatement in Operating Loss)** | 3.7% | 16.5% | 280.5% | 57.5% | 4.9% | 3522.2% | 1.1% |
| **Overstatement in Net Income or (Understatement in Net Loss)** | 6.1% | 17.0% | 233.0% | 54.0% | 6.7% | 17.2% | 1.0% |

**MIPS' Reports on Form 10-K for the Relevant Period Were False and Misleading**

132.    Throughout the Relevant Period, the members of the MIPS Board either knew, or should have known, that MIPS was filing false and misleading Forms 10-K with the SEC.  The Forms 10-K included false financial statements and misrepresented the options granting practices at MIPS.

**The 1999 Form 10-K**

133.     On or about September 21, 1999, the Company filed its 1999 Form 10-K with the SEC.  The 1999 Form 10-K was simultaneously distributed to shareholders and the public.  The 1999 Form 10-K included MIPS' 1999 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  The Company also stated that it accounts for its stock option plans and its employee stock purchase plan in accordance with provisions of APB Opinion No. 25.   As a result, MIPS' compensation expense was understated and its net earnings were overstated.

134.     The 1999 Form 10-K made the following false and misleading statement: "Stock options are granted at an exercise price of not less than the fair value on the date of grant."

135.     The 1999 Form 10-K was signed by Bourgoin, Eichler, Akeley, Coleman, Gibbons, Holbrook, Kelly and Sekimoto.

**The 2000 Form 10-K**

136.     On or about September 22, 2000, the Company filed its 2000 Form 10-K with the SEC.  The 2000 Form 10-K was signed by Bourgoin, Eichler, Coleman, Gibbons, Holbrook and Kelly.  The 2000 Form 10-K was simultaneously distributed to shareholders and the public.  The 2000 Form 10-K included MIPS' 2000 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  The Company also stated that it accounts for its stock option plans and its employee stock purchase plan in accordance with provisions of APB Opinion No. 25.   As a result, MIPS' compensation expense was understated and its net earnings were overstated.

137.     The 2000 Form 10-K also clearly showed that defendants understood the accounting rules for granting stock options whose exercise price is below the fair market value of the Company's stock on the grant date.  The 2000 Form 10-K stated:

> We have elected to follow APB 25 in accounting for our employee stock options to purchase both Silicon Graphics and MIPS' common stock.  Under APB 25, no compensation expense is recognized in our financial statements except in connection with the granting of restricted stock for nominal consideration and unless the exercise price of the employee stock options is less than the market price of the underlying stock on the date of grant.  Total compensation expense recognized in our financial

statements for stock-based awards under APB 25 was $90,000 in fiscal 2000, $898,000 in fiscal 1999, and $1.0 million in fiscal 1998.

**The 2001 Form 10-K**

138.    On or about September 24, 2001, the Company filed its 2001 Form 10-K with the SEC.  The 2001 Form 10-K was simultaneously distributed to shareholders and the public.  The 2001 Form 10-K included MIPS' 2001 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  The Company also stated that it accounts for its stock option plans and its employee stock purchase plan in accordance with provisions of APB Opinion No. 25 and that "[s]tock options are granted at an exercise price of not less than the fair value on the date of grant."  As a result, MIPS' compensation expense was understated and its net earnings were overstated.  The Form 10-K was signed by Bourgoin, Eichler, Coleman, Gibbons, Holbrook and Kelly.

**The 2002 Form 10-K**

139.    On or about September 25, 2002, the Company filed its 2002 Form 10-K with the SEC.  The 2002 Form 10-K was signed by Bourgoin, Eichler, Coleman, Gibbons, Holbrook, Horowitz and Kelly.  The 2002 Form 10-K was simultaneously distributed to shareholders and the public.  The 2002 Form 10-K included MIPS' 2002 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, MIPS' compensation expense was understated and its net earnings were overstated.

140.    The 2002 Form 10-K made the following false and misleading statements: "Stock options are granted at an exercise price of not less than the fair value on the date of grant."

**The 2003 Form 10-K**

141.    On or about September 24, 2003, the Company filed its 2003 Form 10-K with the SEC.  The 2003 Form 10-K was simultaneously distributed to shareholders and the public.  The 2003 Form 10-K included MIPS' 2003 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  The Company also stated that it accounts for its stock option plans and its employee stock

1  purchase plan in accordance with provisions of APB Opinion No. 25.  As a result, MIPS'

2  compensation expense was understated and its net losses were understated.

3       142.  The 2003 Form 10-K made the following false and misleading statements: "Stock

4  options are granted at an exercise price of not less than the fair value on the date of grant."

5       143.  The 2003 Form 10-K was signed by Bourgoin, Eichler, Coleman, Gibbons, Holbrook,

6  Horowitz and Kelly.

7  **The 2004 Form 10-K**

8       144.  On or about September 8, 2004, the Company filed its 2004 Form 10-K with the SEC.

9  The 2004 Form 10-K was signed by Bourgoin, Eichler, Coleman, Gibbons, Holbrook, Horowitz and

10  Kelly.  The 2004 Form 10-K was simultaneously distributed to shareholders and the public.  The

11  2004 Form 10-K included MIPS' 2004 financial statements which were materially false and

12  misleading and presented in violation of GAAP, due to improper accounting for the backdated stock

13  options.  As a result, MIPS' compensation expense was understated and its net earnings were

14  overstated.

15       145.  The 2004 Form 10-K again made clear that defendants understood the accounting

16  implications of granting stock options with a fair market value below the price of the Company's

17  stock on the grant date:

18      As allowed by SFAS No. 123, we account for stock-based employee compensation
arrangements under the intrinsic value method prescribed by Accounting Principles

19  Board Opinion No. 25, *Accounting for Stock Issued to Employees* (APB 25).  As a
result, no expense was recognized for options to purchase our common stock that

20  were granted with an exercise price equal to fair market value at the date of grants
and no expense was recognized in connection with purchases under our employee

21  stock purchase plan.  For restricted common stock issued at discounted prices, we
recognize compensation expense over the vesting period for the difference between

22  the exercise or purchase price and the fair market value on the measurement date.
Total compensation expense recognized in our financial statements for stock-

23  based awards under APB 25 was $642,000 in fiscal 2004, $588,000 in fiscal 2003, and
$1,000 in fiscal 2002.

24  **The 2005 Form 10-K**

25       146.  On or about September 9, 2005 the Company filed its 2005 Form 10-K with the SEC.

26  The 2005 Form 10-K was signed by Bourgoin, Eichler, Coleman, Gibbons, Herb, Holbrook,

27  Horowitz and Kelly.  The 2005 Form 10-K was simultaneously distributed to shareholders and the

28

1   public.  The 2005 Form 10-K included MIPS' 2005 financial statements which were materially false

2   and misleading and presented in violation of GAAP, due to improper accounting for the backdated

3   stock options.  As a result, MIPS' compensation expense was understated and its net earnings were

4   overstated.

5       147.    The 2005 Form 10-K made the following false and misleading statements: "Stock

6   options are granted at an exercise price of not less than the fair value on the date of grant."

7       148.    In addition to the false financials and other false statements in MIPS Forms 10-K,

8   MIPS' CEO and CFO, defendants Bourgoin and Eichler, also signed Sarbanes-Oxley §302

9   certifications falsely stating that MIPS' fiscal year 2003-2005 Forms 10-K did not contain any

10  material misstatements or omit material information and that the reports fairly presented in all

11  material respects MIPS' financial condition and results of operations.  These statements were untrue

12  at the time they were made due to the unlawful stock option backdating particularized herein.

13      149.    During the Relevant Period, defendants caused MIPS' shares to trade at artificially

14  inflated levels by issuing a series of materially false and misleading statements regarding the

15  Company's financial statements, business and prospects.  Specifically, defendants caused or allowed

16  MIPS to issue statements that failed to disclose or misstated the following: (i) that the Company had

17  problems with its internal controls that prevented it from issuing accurate financial reports and

18  projections; (ii) that because of improperly recorded stock-based compensation expenses the

19  Company's financial results violated GAAP; and (iii) that the Company's public disclosures

20  presented an inflated view of MIPS' earnings and restated earnings.

21              **TOLLING OF THE STATUTE OF LIMITATIONS**

22      150.    The Counts alleged herein are timely.  As an initial matter, defendants wrongfully

23  concealed their manipulation of the stock option plans, through strategic timing and fraudulent

24  backdating, by issuing false and misleading proxy statements, by falsely reassuring MIPS' public

25  investors that MIPS' option grants were being administered by a committee of independent directors,

26  and by failing to disclose that backdated options were, in fact, actually issued on dates other than

27  those disclosed, and that strategically timed option grants were issued based on the manipulation of

28

1   insider information that ensured that the true fair market value of the Company's stock was, in fact,

2   higher than the publicly traded price on the date of the option grant.

3       151.    MIPS' public investors had no reason to know of defendants' breaches of their

4   fiduciary duties until at least August 2006, when MIPS announced that it was investigating its

5   historical options granting practices.

6       152.    Finally, as fiduciaries of MIPS and its public shareholders, defendants cannot rely on

7   any limitations defense where they withheld from MIPS' public shareholders the facts that give rise

8   to the claims asserted herein, *i.e.*, that the MIPS Board had abdicated its fiduciary responsibilities to

9   oversee the Company's executive compensation practices, and that the option grant dates had been

10  manipulated to maximize the profit for the grant recipients and, accordingly, to divert assets away

11  from the Company.

12              **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

13      153.    Plaintiffs bring this action derivatively in the right and for the benefit of MIPS to

14  redress injuries suffered and to be suffered by MIPS as a direct result of defendants' violations of

15  state and federal law, breaches of fiduciary duty, abuse of control, gross mismanagement, corporate

16  waste and unjust enrichment, as well as the aiding and abetting thereof, by the defendants. This is

17  not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

18      154.    Plaintiffs will adequately and fairly represent the interests of MIPS and its

19  shareholders in enforcing and prosecuting its rights.

20      155.    Plaintiffs are owners of MIPS stock and were owners of MIPS stock during times

21  relevant to defendants' illegal and wrongful course of conduct alleged herein, including times when

22  backdated and manipulated options were granted by defendants.

23      156.    Prior demand upon a board of directors is excused if plaintiffs allege facts that, if

24  accepted as true, raise a reasonable doubt that: (a) the challenged transaction was the product of a

25  valid business judgment; or (b) a majority of the directors are disinterested and independent. If

26  either prong of this test is satisfied, demand is excused.

27      157.    By reason of their corporate positions and their ability to control the business and

28  corporate affairs of MIPS at all relevant times, the directors of MIPS owed MIPS and its

1  stockholders fiduciary duties of candor, fidelity, trust, and loyalty, and are and were required to use

2  their ability to control MIPS in a fair, just and equitable manner, as well as to act in furtherance of

3  the best interests of MIPS and its stockholders.  In addition, the directors owed MIPS the fiduciary

4  duty to exercise due care and diligence in the management and administration of the affairs of MIPS

5  and in the use and preservation of its property and assets.  In violation of their fiduciary duties,

6  defendants approved of and/or caused MIPS to issue improperly manipulated stock options to many

7  of its employees and to issue false and misleading statements for a period beginning in at least 1998

8  and continuing until at least 2006.

9  **Demand Is Futile Because a Majority of MIPS' Directors Are Not Disinterested**

10      158.    Based upon the facts set forth throughout this Complaint, applicable law and the

11  longstanding rule that equity does not compel a useless and futile act, a pre-filing demand upon the

12  MIPS Board to institute this action against the officers and members of the MIPS Board is excused

13  as futile.  Demand is excused because plaintiffs can show a reasonable doubt that the majority of

14  directors were not disinterested at the time that this action was filed.  At the time that plaintiffs filed

15  this action, the MIPS Board consisted of Holbrook, Bourgoin, Coleman, Gibbons, Herb, Horowitz

16  and Kelly.

17      159.    Defendant Bourgoin has served as President of MIPS since September 1996, as a

18  director of the Company since May 1997 and as CEO since February 1998.  During this period,

19  Bourgoin is alleged to have received numerous grants of backdated stock options.  Indeed, MIPS has

20  admitted options were backdated to Bourgoin and other MIPS executives on three occasions.  MIPS

21  had to take a $3.8 million charge due to these instances of backdating to Bourgoin alone.  Bourgoin

22  is not disinterested because he received a personal financial benefit from the manipulation of MIPS'

23  stock options that was not equally shared by MIPS' stockholders.  MIPS' shareholders did not have

24  the benefit of receiving manipulated option grants and shares at a low-price point.  As a recipient of

25  backdated options, Bourgoin can be neither disinterested nor independent in considering a demand

26  related to backdating at MIPS.

27      160.    Defendant Gibbons has been a director of MIPS since 1998.  Gibbons served on the

28  Option Administration Committee from 1998 to 2000, and on the Compensation Committee from

1    1999 until the present.  Because of Gibbons' specific duties with respect to the granting and approval

2    of stock options and accounting practices within the Company, Gibbons had the authority and

3    obligation under the stock-options plans to administer the plans and to ensure compliance with them.

4    Gibbons bore ultimate responsibility for ensuring that stock options were granted at fair market

5    value on the date of the grant as well as deciding the grant dates for the options.  Gibbons violated

6    this duty by granting and approving manipulated stock option grants.  While approving manipulated

7    option grants through his service on the Options Administration Committee and Compensation

8    Committee, Gibbons also approved MIPS' falsified financial statements while serving on the Audit

9    Committee from 1999 until 2005.  Gibbons was also the recipient of manipulated options in 1998

10   and 1999.   Gibbons faces a substantial risk of personal liability for granting and approving

11   manipulated options.  Further, Gibbons is not disinterested because he received a personal financial

12   benefit from the manipulation of MIPS' stock options that was not equally shared by MIPS'

13   stockholders.  MIPS' shareholders did not have the benefit of receiving manipulated option grants

14   and shares at a low-price point.  Having both received and approved manipulated option grants,

15   Gibbons can be neither disinterested nor independent in considering a demand related to backdating

16   at MIPS.

17          161.    Defendant Holbrook has been a director of MIPS since 1998.  Holbrook served on the

18   Options Administration Committee from 1998 to 2000, and on the Compensation Committee from

19   1999 to the present.  Because of Holbrook's specific duties with respect to the granting and approval

20   of stock options and accounting practices within the Company, Holbrook had the authority and

21   obligation under the stock-options plans to administer the plans and to ensure compliance with them.

22   Holbrook bore ultimate responsibility for ensuring that stock options were granted at fair market

23   value on the date of the grant as well as deciding the grant dates for the options.  While approving

24   manipulated option grants through his service on the Options Administration Committee and

25   Compensation Committee, Holbrook also approved MIPS' falsified financial statements while

26   serving on the Audit Committee from 2000 until 2005.  Holbrook was also the recipient of

27   manipulated options in 1998 and 1999.  Holbrook faces a substantial risk of personal liability for

28   granting and approving manipulated options.  Further, Holbrook is not disinterested because he

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-06699-RMW          - 52 -

1    received a personal financial benefit from the manipulation of MIPS' stock options that was not

2    equally shared by MIPS' stockholders.  MIPS' shareholders did not have the benefit of receiving

3    manipulated option grants and shares at a low-price point.  Having both received and approved

4    manipulated option grants, Holbrook can be neither disinterested nor independent in considering a

5    demand related to backdating at MIPS.

6          162.    Defendant Coleman has been a director of MIPS since 1998.  Coleman served on the

7    Compensation Committee from 1999 to the present.  Because of Coleman's specific duties with

8    respect to the granting and approval of stock options and accounting practices within the Company,

9    Coleman had the authority and obligation under the stock-options plans to administer the plans and

10   to ensure compliance with them.  Coleman bore ultimate responsibility for ensuring that stock

11   options were granted at fair market value on the date of the grant as well as deciding the grant dates

12   for the options.  Coleman was also the recipient of manipulated options in 1998.  Coleman faces a

13   substantial risk of personal liability for granting and approving manipulated options.  Further,

14   Coleman is not disinterested because he received a personal financial benefit from the manipulation

15   of MIPS' stock options that was not equally shared by MIPS' stockholders.  MIPS' shareholders did

16   not have the benefit of receiving manipulated option grants and shares at a low-price point.  Having

17   both received and approved of manipulated option grants, Coleman can be neither disinterested nor

18   independent in considering a demand related to backdating at MIPS.

19         163.    Defendant Horowitz has been a director of MIPS since 2002.  Horowitz served on the

20   Compensation Committee from 2002 until the present.  Because of Horowitz's specific duties with

21   respect to the granting and approval of stock options and accounting practices within the Company,

22   Horowitz had the authority and obligation under the stock-options plans to administer the plans and

23   to ensure compliance with them.  Horowitz bore ultimate responsibility for ensuring that stock

24   options were granted at fair market value on the date of the grant as well as deciding the grant dates

25   for the options.  Horowitz faces a substantial risk of personal liability for granting and approving

26   manipulated options.  Having approved of manipulated option grants, Horowitz can be neither

27   disinterested nor independent in considering a demand related to backdating at MIPS.

28

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-06699-RMW          - 53 -

1    164.    Defendant Kelly has been a director of MIPS since 1998.  Kelly served on the Audit

2    Committee from 1999 until the present.  Because of Kelly's specific duties with respect to the

3    accounting practices within the Company, Kelly had the authority and obligation to ensure that

4    MIPS' financial statements accurately accounted for stock-based compensation expenses under APB

5    Opinion No. 25.  Kelly faces a substantial risk of personal liability for approving false financials

6    statements through his service on the MIPS Audit Committee.  Having approved of manipulated

7    option grants, Kelly can be neither disinterested nor independent in considering a demand related to

8    backdating at MIPS.

9    **Demand Is Futile Because Options Backdating and/or Manipulation Is Not the Product of a
     Valid Business Judgment, Is *Ultra Vires*, Illegal, and Is Contrary to the Stated Purpose of**
10   **the Stock Option Plans**

11   165.    The practice of backdating stock option grants is not protected by the business

12   judgment rule because it is *ultra vires*.  The various incentive stock option plans under which these

13   options were purportedly given, and the proxy statements disclosing grants to senior executives and

14   directors during this time period, all represented and required that the stock grants in question be

15   priced based on the fair market value of MIPS' stock on the day of the grant.

16   166.    Further, dating stock options via spring-loading or bullet-dodging, without explicit

17   authorization from shareholders, also constitutes deceptive conduct.  A director's duty of loyalty

18   includes the duty to deal fairly and honestly with the shareholders for whom he is a fiduciary.  It is

19   inconsistent with such a duty for a board of directors to ask for shareholder approval of an incentive

20   stock option plan and then later to distribute shares to managers in such a way as to undermine the

21   very objectives approved by shareholders.  This remains true even if the board complies with the

22   strict letter of a shareholder-approved plan as it relates to strike prices or issue dates.

23   167.    Contrary to the limited authority given to the Board by MIPS' stock option plans, and

24   contrary to MIPS' representations in their proxy filings, many of MIPS' option grants between 1998

25   and 2006 were made more valuable via backdating, spring-loading, and/or bullet-dodging.  Because

26   granting options in such a way is not permitted by the stock option plans, this conduct is *ultra vires*

27   and void on its face.  *Ultra vires* acts are not protected by the business judgment rule, and thus

28   demand is excused.

1    168.    Additionally, defendants' conduct caused MIPS to issue materially false financial

2    reports and proxy statements for the entirety of the period in question, in violation of numerous

3    provisions of the federal securities laws.  Each director defendant violated §14(a) of the Exchange

4    Act by issuing false and misleading proxy statements from 1998 to 2006.  And each director violated

5    §20(a) of the Exchange Act by being controlling persons of MIPS.  Demand is excused because

6    these are illegal acts that are not protected by the business judgment rule.

7    169.    Even if stock option backdating was not illegal, *ultra vires*, and void, there would be

8    no plausible argument that the manipulation of stock options was a valid exercise of business

9    judgment.  As represented in MIPS' proxy statements, the stated purpose of MIPS' incentive stock

10   option plans is to encourage the productivity of MIPS' employees by providing compensation that is

11   proportional to gains in MIPS' stock price.  However, by granting options with manipulated strike

12   prices, defendants undermined the purpose of the stock option plans by awarding employees

13   compensation that had intrinsic value regardless of gains in MIPS' stock price.

14   170.    Defendants could have achieved the stated purpose of attracting and retaining

15   qualified employees by granting those employees additional options under their incentive plans, or

16   by granting options at a price less than the fair market value on the day of the grant and simply

17   disclosing and expensing these grants.  Instead, defendants failed to report these grants in their

18   financial disclosures in order to improve their bottom line.

19   171.    Further, the practice of backdating stock options could not have been a valid exercise

20   of business judgment because it has subjected MIPS to potentially massive liability.  The Company

21   will likely suffer tax liabilities for the additional compensation they will have to expense, and they

22   have tarnished their reputation in the investment community through this misconduct.

23   **Demand Is Futile Because a Majority of the MIPS Board Is Not Independent**

24   172.    The MIPS Board cannot exercise independent objective judgment in deciding

25   whether to bring this action or whether to vigorously prosecute this action because each of its

26   members participated personally in the wrongdoing or are dependent upon other defendants who also

27   did.

28

173.    The MIPS Board and senior management participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in the omission of these facts from MIPS' public disclosures and/or recklessly disregarded the wrongs complained of herein, and are therefore not disinterested parties.  As a result of their access to and review of internal corporate documents, or conversations and connections with other corporate officers, employees, and directors and attendance at management and/or Board meetings, each of the defendants knew the adverse non-public information regarding the improper stock option grants and financial reporting.  Defendants breached the fiduciary duties that they owed to MIPS and its shareholders in that they failed to prevent and correct the improper stock option granting and financial reporting.

174.    During the Relevant Period, defendants authorized the filing of proxy statements, in support of their nomination as directors, which failed to disclose that certain directors' stock options had been backdated.  They also authorized the filing of shareholder approved stock option plans, which misrepresented that the options carry the stock price of the day of the award.  Any suit by defendants to remedy the wrongs complained of herein could also expose them to suit for proxy violations and other violations of law; thus, they are hopelessly conflicted in making any supposedly independent determination of a demand.

175.    All of the defendants signed one or more of the Company's annual reports during the Relevant Period containing the Company's financial statements and failed to account for the backdated stock options as compensation and an expense of the Company.  As a result, those financial statements of the Company may have overstated its profits and may need to be restated.  Any suit by defendants to remedy the wrongs complained of herein could also expose them to suit for securities fraud; thus, they are hopelessly conflicted in making any supposedly independent determination of a demand.

176.    The acts complained of constitute violations of the fiduciary duties owed by MIPS' officers and directors and these acts are incapable of ratification.

177.    The members of the MIPS Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of

1  control and the perquisites derived thereof, and are incapable of exercising independent objective

2  judgment in deciding whether to bring this action.

3          178.    Any suit by the current directors of MIPS to remedy these wrongs would likely

4  further expose the liability of defendants under the federal securities laws, which could result in

5  additional civil and/or criminal actions being filed against one or more of the defendants, thus, they

6  are hopelessly conflicted in making any supposedly independent determination whether to sue

7  themselves.

8          179.    MIPS has been and will continue to be exposed to significant losses due to the

9  wrongdoing complained of herein, yet the current Board has not filed any lawsuits against itself or

10  others who were responsible for that wrongful conduct to attempt to recover for MIPS any part of the

11  damages MIPS suffered and will suffer thereby.

12          180.    In order to properly prosecute this lawsuit, it would be necessary for the directors to

13  sue themselves and the other defendants, requiring them to expose themselves and their comrades to

14  millions of dollars in potential civil liability and criminal sanctions, or IRS penalties.  This they will

15  not do.

16          181.    MIPS' current and past officers and directors are protected against personal liability

17  for their acts of mismanagement, waste and breach of fiduciary duty alleged in this Complaint by

18  directors' and officers' liability insurance which they caused the Company to purchase for their

19  protection with corporate funds, *i.e.*, monies belonging to the stockholders of MIPS.  However, due

20  to certain changes in the language of directors' and officers' liability insurance policies in the past

21  few years, the directors' and officers' liability insurance policies covering the defendants in this case

22  contain provisions which eliminate coverage for any action brought directly by MIPS against these

23  defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these

24  directors were to sue themselves or certain of the officers of MIPS, there would be no directors' and

25  officers' insurance protection and thus, this is a further reason why they will not bring such a suit.

26  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance

27  coverage exists and will provide a basis for the Company to effectuate a recovery.

28

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-06699-RMW          - 57 -

182.    In order to bring this action for breaching their fiduciary duties, the members of the MIPS Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

183.    Because of these financial and personal inter-relationships, the entire MIPS Board cannot be independent with respect to the transactions complained of herein, and demand is futile.

184.    Plaintiffs have not made any demand on shareholders of MIPS to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    MIPS is a publicly traded company with approximately 43 million shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

**COUNT I**
**Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**
**Against Bourgoin and Eichler**

185.    Lead plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

186.    Throughout the Relevant Period, Bourgoin and Eichler, individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct which allowed certain of the Company's officers, directors, and rank-and-file employees, including some of the defendants, to receive improper option grants and make no recompense to the Company.

187.    Bourgoin and Eichler employed devices, schemes and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading

1  statements of material facts and/or omitting to state material facts necessary in order to make the

2  statements made about MIPS not misleading.

3      188.    Bourgoin, as CEO, and Eichler, as CFO, are liable as direct participants in the wrongs

4  complained of herein.  Through their positions of control and authority, as CEO and CFO of MIPS,

5  Bourgoin and Eichler were able to and did control the conduct complained of herein and the content

6  of the public statements disseminated by MIPS.

7      189.    Bourgoin and Eichler acted with scienter throughout the Relevant Period, in that they

8  either had actual knowledge of the misrepresentations and/or omissions of material facts set forth

9  herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the

10  true facts, even though such facts were available to them.  Defendants were CEO and CFO of the

11  Company, and were therefore directly responsible for the false and misleading statements and/or

12  omissions disseminated to the public through press releases, news reports and filings with the SEC.

13      190.    Bourgoin and Eichler participated in a scheme to defraud with the purpose and effect

14  of defrauding MIPS.

15      191.    By virtue of the foregoing, Bourgoin and Eichler have violated §10(b) of the

16  Exchange Act, and Rule 10b-5 promulgated thereunder, and caused MIPS to sustain damages as

17  alleged hereunder.

18                              **COUNT II**
                  **Violations of Section 14(a) of the Exchange Act**
19                          **Against All Defendants**

20      192.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

21  above, as though fully set forth herein.

22      193.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no

23  proxy statement shall contain "any statement which, at the time and in the light of the circumstances

24  under which it is made, is false or misleading with respect to any material fact, or which omits to

25  state any material fact necessary in order to make the statements therein not false or misleading." 17

26  C.F.R. §240.14a-9.

27

28

194.    The 1999-2006 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that defendants were causing MIPS to engage in an option backdating and manipulation.

195.    In the exercise of reasonable care, defendants should have known that the proxy statements were materially false and misleading.

196.    The misrepresentations and omissions in the proxy statements were material to plaintiff in voting on each proxy statement.  The proxy statements were an essential link in the accomplishment of the continuation of defendants' unlawful stock option manipulation practices, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

197.    The Company was damaged as a result of the material misrepresentations and omissions in the proxy statements.

**COUNT III**
**Violations of Section 20(a) of the Exchange Act**
**Against All Defendants**

198.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

199.    Defendants, by virtue of their positions with MIPS and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of MIPS within the meaning of §20(a) of the Exchange Act.  They had the power and influence and exercised the same to cause MIPS to engage in the illegal conduct and practices complained of herein.

**COUNT IV**
**Accounting**
**Against All Defendants**

200.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

201.    At all relevant times, defendants, as directors and/or officers of MIPS, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

1    202.    In breach of their fiduciary duties owed to MIPS and its shareholders, defendants

2    caused MIPS, among other things, to grant backdated stock options to themselves and/or certain

3    other officers and directors of MIPS.  By this wrongdoing, defendants breached their fiduciary duties

4    owed to MIPS and its shareholders.

5    203.    Defendants possess complete and unfettered control over their improperly issued

6    stock option grants and the books and records of the Company concerning the details of such

7    improperly backdated stock option grants to the defendants.

8    204.    As a result of defendants' misconduct, MIPS has been substantially injured and

9    damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those

10   improperly granted options which have been exercised and sold.

11   205.    Plaintiffs demand an accounting be made of all stock option grants made to

12   defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value

13   of the grants, the recipients of the grants, the exercise date of stock options granted to the defendants,

14   as well as the disposition of any proceeds received by defendants via sale or other exercise of

15   backdated stock option grants received by the defendants.

16                              **COUNT V**
                **Breach of Fiduciary Duty and/or Aiding and Abetting**
17                        **Against All Defendants**

18   206.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

19   above, as though fully set forth herein.

20   207.    Each of the defendants agreed to and did participate with Bourgoin and the other

21   defendants and/or aided and abetted one another in a deliberate course of action designed to divert

22   corporate assets in breach of fiduciary duties defendants owed to the Company.

23   208.    Defendants have violated fiduciary duties of care, loyalty, candor and independence

24   owed to MIPS and its public shareholders, have engaged in unlawful self-dealing and have acted to

25   put their personal interests and/or their colleagues' interests ahead of the interests of MIPS and its

26   shareholders.

27   209.    As demonstrated by the allegations above, defendants failed to exercise the care

28   required, and breached their duties of loyalty, good faith, candor and independence owed to MIPS

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-06699-RMW          - 61 -

1  and its public shareholders, and they failed to disclose material information and/or made material

2  misrepresentations to shareholders regarding defendants' option backdating and manipulation.

3      210.    By reason of the foregoing acts, practices and course of conduct, the defendants have

4  failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward

5  MIPS and its public shareholders.

6      211.    As a proximate result of defendants' conduct, in concert with Bourgoin, MIPS has

7  been injured and is entitled to damages.

8                              **COUNT VI**
                              **Abuse of Control**
9                           **Against All Defendants**

10     212.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

11  above, as though fully set forth herein.

12     213.    Defendants employed the alleged scheme for the purpose of maintaining and

13  entrenching themselves in their positions of power, prestige and profit at, and control over, MIPS,

14  and to continue to receive the substantial benefits, salaries and emoluments associated with their

15  positions at MIPS.  As a part of this scheme, defendants actively made and/or participated in the

16  making of or aided and abetted the making of, misrepresentations regarding MIPS.

17     214.    Defendants' conduct constituted an abuse of their ability to control and influence

18  MIPS.

19     215.    By reason of the foregoing, MIPS has been damaged.

20                              **COUNT VII**
                           **Gross Mismanagement**
21                          **Against All Defendants**

22     216.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

23  above, as though fully set forth herein.

24     217.    Defendants had a duty to MIPS and its shareholders to prudently supervise, manage

25  and control the operations, business and internal financial accounting and disclosure controls of

26  MIPS.

27     218.    Defendants, by their actions and by engaging in the wrongdoing described herein,

28  abandoned and abdicated their responsibilities and duties with regard to prudently managing the

1    businesses of MIPS in a manner consistent with the duties imposed upon them by law.  By

2    committing the misconduct alleged herein, defendants breached their duties of due care, diligence

3    and candor in the management and administration of MIPS' affairs and in the use and preservation

4    of MIPS' assets.

5        219.    During the course of the discharge of their duties, defendants knew or recklessly

6    disregarded the unreasonable risks and losses associated with their misconduct, yet defendants

7    caused MIPS to engage in the wrongful conduct complained of herein which they knew had an

8    unreasonable risk of damage to MIPS, thus breaching their duties to the Company.  As a result,

9    defendants grossly mismanaged MIPS.

10       220.    By reason of the foregoing, MIPS has been damaged.

11                                        **COUNT VIII**
                                          **Corporate Waste**
12                                        **Against All Defendants**

13       221.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

14    above, as though fully set forth herein.

15       222.    By failing to properly consider the interests of the Company and its public

16    shareholders, by failing to conduct proper supervision, and by giving away millions of dollars to

17    defendants via the option backdating abuses alleged herein, defendants have caused MIPS to waste

18    valuable corporate assets.

19       223.    As a result of defendants' corporate waste, they are liable to the Company.

20                                        **COUNT IX**
                                          **Unjust Enrichment**
21                                        **Against All Defendants**

22       224.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

23    above, as though fully set forth herein.

24       225.    As a result of the conduct described above, defendants will be and have been unjustly

25    enriched at the expense of MIPS, in the form of unjustified salaries, benefits, bonuses, stock option

26    grants and other emoluments of office.

27

28

226. All the payments and benefits provided to the defendants were at the expense of MIPS. The Company received no benefit from these payments. MIPS was damaged by such payments.

227. Certain of the defendants sold MIPS' stock for a profit during the period of deception, misusing confidential non-public corporate information. These defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of MIPS. A constructive trust for the benefit of the Company should be imposed thereon.

**COUNT X**
**Against All Defendants**
**for Rescission**

228. Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

229. As a result of the acts alleged herein, the stock option contracts between the officer defendants and MIPS entered into during the Relevant Period were obtained through defendants' fraud, deceit and abuse of control. Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the publicly filed contracts regarding the officer defendants' employment agreements and the Company's stock option plan which was also approved by MIPS' shareholders and filed with the SEC.

230. All contracts which provide for stock option grants between the officer defendants and MIPS and were entered into during the Relevant Period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

**COUNT XI**
**Against the Insider Selling Defendants**
**for Violation of California Corporations Code Sections 25402 and 25502.5**

231. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

232. At the time that the insider selling defendants sold their MIPS common stock as set forth herein at ¶21, by reason of their executive and/or directorial positions with MIPS, each of the insider selling defendants was an officer, director or controlling person of MIPS whose relationship

to MIPS gave him access, directly or indirectly, to material information about MIPS not generally available to the public. Each of the insider selling defendants purchased and/or sold MIPS securities at a time when he knew material information about MIPS gained from such relationship which information would significantly affect the market price of that security and which is not generally available to the public, and which he knew was not intended to be so available.

233. The insider selling defendants, and each of them, had actual knowledge of material, adverse non-public information and thus sold their MIPS common stock in California in violation of Cal. Corp. Code §25402.

234. Pursuant to Cal. Corp. Code §25502.5, the insider selling defendants, and each of them, are liable to MIPS for damages in an amount up to three times the difference between the price at which MIPS common stock was sold by these defendants, and each of them, and the market value which MIPS common stock would have had at the time of the sale if the information known to these defendants, and each of them, had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

**COUNT XII**
**Against the Insider Selling Defendants**
**for Breach of Fiduciary Duties, Insider Selling**
**and Misappropriation of Information**

235. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

236. At the time of the stock sales set forth herein, the insider selling defendants were aware of the information described above, and sold MIPS common stock on the basis of such information.

237. The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the insider selling defendants used for their own benefit when they sold MIPS common stock.

238. At the time of their stock sales, the insider selling defendants were aware that the Company's revenues were materially overstated. The insider selling defendants' sales of MIPS

1  common stock while in possession and control of this material adverse non-public information was a

2  breach of their fiduciary duties of loyalty and good faith.

3          239.    Since the use of the Company's proprietary information for their own gain constitutes

4  a breach of the insider selling defendants' fiduciary duties, the Company is entitled to the imposition

5  of a constructive trust on any profits the insider selling defendants obtained thereby.

6                                          **COUNT XIII**
                         **Violation of California Corporations Code Sections 25400 and 25500**
7                                      **Against All Defendants**

8          240.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

9  above, as though fully set forth herein.

10         241.    For the purpose of inducing the purchase of MIPS stock by others, each of the

11  defendants acting individually and pursuant to a common plan willfully participated in the making of

12  statements which were, at the time and in light of the circumstances under which they were made,

13  false or misleading with respect to material facts and/or omitted material facts necessary to make the

14  statements made in light of the circumstances in which they were made not misleading and

15  defendants knew or had reasonable grounds to believe that such statements and/or omissions were

16  false or misleading.  In particular, these false statements were made directly in SEC filings and

17  public statements as set forth above.

18         242.    Defendants, as top executive officers and directors of the Company, are liable as

19  direct participants in the wrongs complained of herein.  Through their positions of control and

20  authority as officers of the Company, each of the defendants was able to and did control the conduct

21  complained of herein and the content of the public statements disseminated by MIPS.

22         243.    By reason of the foregoing, defendants violated Cal. Corp. Code §25400, thereby

23  entitling plaintiff to recover damages pursuant to Cal. Corp. Code §25500.

24                                      **PRAYER FOR RELIEF**

25         WHEREFORE, plaintiffs demands judgment as follows:

26         A.      Awarding money damages against all defendants, jointly and severally, for all losses

27  and damages suffered as a result of the acts and transactions complained of herein, together with pre-

28  judgment interest, to ensure defendants do not participate therein or benefit thereby;

1    B.    Directing all defendants to account for all damages caused by them and all profits and

2 special benefits and unjust enrichment they have obtained as a result of their unlawful conduct,

3 including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and

4 imposing a constructive trust thereon; and

5    C.    Directing MIPS to take all necessary actions to reform and improve its corporate

6 governance and internal control procedures to comply with applicable law, including, but not limited

7 to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or

8 Articles of Incorporation and taking such other action as may be necessary to place before

9 shareholders for a vote adoption of the following Corporate Governance policies:

10    (i)    A proposal requiring that the office of CEO of MIPS and Chairman of the

11 MIPS Board be permanently held by separate individuals and that the Chairman of the MIPS Board

12 meets rigorous "independent" standards;

13    (ii)    a proposal to strengthen the MIPS Board's supervision of operations and

14 develop and implement procedures for greater shareholder input into the policies and guidelines of

15 the Board;

16

17    (iii)    appropriately test and then strengthen the internal audit and control function;

18    (iv)    cause MIPS to rotate its outside audit firm every five years;

19    (v)    control and limit insider stock selling and the terms and timing of stock option

20 grants;

21

22    (vi)    reform executive compensation;

23    (vii)    Order the imposition of a constructive trust over defendants' stock options and

24 any proceeds derived therefrom;

25    (viii)    Award punitive damages;

26    (ix)    Award costs and disbursements of this action, including reasonable attorneys',

27 accountants', and experts' fees; and

28

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-06699-RMW    - 67 -

1    (x)    Grant such other and further relief, including injunctive and other equitable

2 relief, as this Court may deem just and proper.

3                                **JURY DEMAND**

4    Plaintiffs demand a trial by jury.

5 DATED:  August 30, 2007                LERACH COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP
6                                        JOHN K. GRANT
                                         SHAWN A. WILLIAMS
7                                        MONIQUE C. WINKLER
                                         AELISH M. BAIG
8

9

10                                            _____/s/_____
                                                 JOHN K. GRANT
11
                                         100 Pine Street, Suite 2600
12                                       San Francisco, CA  94111
                                         Telephone:  415/288-4545
13                                       415/288-4534 (fax)

14                                       LERACH COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP
15                                       TRAVIS E. DOWNS III
                                         KATHLEEN A. HERKENHOFF
16                                       BENNY C. GOODMAN III
                                         MARY LYNNE CALKINS
17                                       655 West Broadway, Suite 1900
                                         San Diego, CA  92101-3301
18                                       Telephone:  619/231-1058
                                         619/231-7423 (fax)
19
                                         Lead Counsel for Plaintiffs
20

21 T:\CasesSF\MIPS Derivative\Cpt MIPS Consol Derv.doc

22

23

24

25

26

27

28

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-06699-RMW        - 68 -

1

<u>CERTIFICATE OF SERVICE</u>

2      I hereby certify that on August 30, 2007, I electronically filed the foregoing with the Clerk of

3 the Court using the CM/ECF system which will send notification of such filing to the e-mail

4 addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5 mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6 participants indicated on the attached Manual Notice List.

7      I certify under penalty of perjury under the laws of the United States of America that the

8 foregoing is true and correct.  Executed on August 30, 2007.

9

10                                                        /s/
                                            JOHN K. GRANT

11                                          LERACH COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
12                                          100 Pine Street, 26th Floor
13                                          San Francisco, CA  94111
                                            Telephone:  415/288-4545
14                                          415/288-4534 (fax)

15                                          E-mail: Johng@lerachlaw.com

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 5:06-cv-06699-RMW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Bradley A. Dirks**
  bdirks@sbtklaw.com

- **Travis E. Downs , III**
  travisd@lerachlaw.com,e_file_sd@lerachlaw.com

- **Lawrence Timothy Fisher**
  ltfisher@bramsonplutzik.com,moldenburg@bramsonplutzik.com

- **John K. Grant**
  johnkg@lerachlaw.com,cwood@lerachlaw.com,e_file_sf@lerachlaw.com,e_file_sd

- **Tara Puhua Kao**
  tkao@sbtklaw.com,der_filings@sbtklaw.com

- **Felix Shih-Young Lee**
  flee@fenwick.com

- **William S. Lerach**
  e_file_sf@lerachlaw.com

- **Kalama M. Lui-Kwan**
  klui-kwan@fenwick.com,cgalvin@fenwick.com

- **Gaurav Mathur**
  gmathur@fenwick.com

- **Susan Samuels Muck**
  smuck@fenwick.com,cgalvin@fenwick.com

- **Alan R Plutzik**
  aplutzik@bramsonplutzik.com

- **Alan Roth Plutzik**
  aplutzik@bramsonplutzik.com

- **Jay L. Pomerantz**

jpomerantz@fenwick.com,slim@fenwick.com

- **Kathryn Anne Schofield**
  kschofield@bramsonplutzik.com,moldenburg@bramsonplutzik.com

- **Christopher James Steskal**
  csteskal@fenwick.com,cgalvin@fenwick.com

- **Michael C. Wagner**
  mwagner@sbtklaw.com,der_filings@sbtklaw.com

- **Shawn A. Williams**
  shawnw@lerachlaw.com,cwood@lerachlaw.com,e_file_sf@lerachlaw.com,travisd@

- **Eric L. Zagar**
  ezagar@sbtklaw.com,kpopovich@sbtklaw.com,der_filings@sbtklaw.com,rwinchest

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for
this case (who therefore require manual noticing). You may wish to use your mouse to
select and copy this list into your word processing program in order to create notices or
labels for these recipients.

**Robert Bramson**
Schiffrin Barroway Topas & Kessler LLP
2125 Oak Grove Road
Suite 120
Walnut Creek, CA 94589

**L Timothy Fisher**
Schiffrin Barroway Topaz & Kessler LLP
2125 Oak Grove Road
Suite 102
Walnut Creek, Ca 94598

**Eric Lechtzin**
Schiffrin & Barroway LLP
280 King of Prussia Road
Radnor, PA 19087

**Darren Jay Robbins**
 Lerach Coughlin Stoia Geller Rudman  & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

**Lee D. Rudy**
Schiffrin Barroway Topaz &Kessler, LLP
280 King of Prussia Road
Radnor, PA 19087