IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re MIPS TECHNOLOGIES, INC. DERIVATIVE LITIGATION | No. C-06-06699 RMW |
| | ORDER GRANTING NOMINAL DEFENDANT'S MOTION TO DISMISS |
| This Document Relates To: | **[Re Docket No. 33]** |
| ALL ACTIONS. | |

Lead plaintiff Joseph Carco ("Carco") brings the present action as a derivative suit on behalf of MIPS Technologies, Inc. ("MIPS") against certain current and former directors and officers of MIPS. Nominal defendant MIPS moves to dismiss the first amended complaint ("FAC") for failure to make demand against the company or to plead with particularity that demand should be excused. Carco opposes the motion. The court has read the moving and responding papers and considered the arguments of counsel presented at a hearing on January 11, 2008. For the reasons set forth below, the court GRANTS MIPS's motion to dismiss. Carco has 20 days to file an amended complaint.

## I. FACTS

Carco asserts violations of federal securities and state laws against certain current and former directors and officers of MIPS arising from stock option backdating. FAC ¶¶ 1, 2. Specifically, Carco alleges that officers and directors of MIPS manipulated the grant dates and associated

documentation of stock options used to compensate MIPS employees and directors. *Id.* ¶¶ 5, 6. Carco alleges that the various illegal activities occurred between 1998 and 2006, which is the "relevant period" for this lawsuit. *Id.* ¶ 2. Because Carco must demonstrate that making a demand on the board of directors would have been futile (a factually-intensive inquiry), the details of MIPS's corporate structure, history, and transactions follow.

### A. Structure of the Board of Directors

MIPS Technologies, Inc. is a Delaware corporation with its principal executive offices in Mountain View, California. FAC ¶ 4. MIPS develops standardized processor architectures and cores for use in a variety of electronic applications. *Id.* Its common stock is listed on the Nasdaq under the stock symbol MIPS.

The MIPS board has three committees relevant to this motion. The Audit Committee oversees MIPS's accounting and reporting obligations. FAC ¶ 67. The Option Administration Committee reviewed and approved stock option grants from 1998 until November 2000, when it was merged with the Compensation Committee. *Id.* ¶ 64. The Compensation Committee now oversees option grants, as well as its traditional role of reviewing officer performance and compensation. *Id.* ¶¶ 65, 66.

At the time this suit was filed, MIPS's board of directors consisted of defendants Anthony B. Holbrook, John E. Bourgoin, Robert E. Herb, Fred M. Gibbons, Benjamin A. Horowitz, Kenneth L. Coleman, and William M. Kelly. FAC ¶¶ 38-39, 51-55. Holbrook has been a MIPS director since July 1998 and has served as the board's chairman since August 2003. *Id.* ¶ 38. Bourgoin has been President of MIPS since September 1996, a director since May 1997, and has served as MIPS's CEO since February 1998. *Id.* ¶ 39. Herb became a director in January 2005 and has served on the Compensation Committee. *Id.* ¶ 51. Gibbons has been a director since 1998 and sat on the Option Administration Committee from 1998 to 2000, the Audit Committee from 1999 to 2005, and on the Compensation Committee from 1999 to the present. *Id.* ¶ 52. Horowitz became a director in 2001 and has sat on the Compensation Committee since 2003. *Id.* ¶ 53. Coleman has been a director since 1998, serving on the Compensation Committee from 1999 until the present. *Id.* ¶ 54. Kelly has been a director since 1998 and has served on the Audit Committee since 1999. *Id.* ¶ 55.

Carco summarizes these committee membership details in the following table:

|  | Audit Committee | Compensation Committee | Option Admin. Committee |
|---|---|---|---|
| FY99 | Kelly, Baskett/Akeley, Gibbons | Coleman, Gibbons, Holbrook | Gibbons, Holbrook |
| FY00 | Kelly, Gibbons, Holbrook | Coleman, Gibbons, Holbrook | Gibbons, Holbrook |
| FY01 | Kelly, Gibbons, Holbrook | Coleman, Gibbons, Holbrook | *merged into Compensation Committee* |
| FY02 | Kelly, Gibbons, Holbrook | Coleman, Gibbons, Holbrook | |
| FY03 | Kelly, Gibbons, Holbrook | Coleman, Gibbons, Horowitz | |
| FY04 | Kelly, Gibbons, Holbrook | Coleman, Gibbons, Horowitz | |
| FY05 | Kelly, Gibbons, Holbrook | Coleman, Gibbons, Horowitz, Herb | |

*Id.* ¶ 68. Further summarizing, MIPS's audit committee has remained largely unchanged over the relevant period. The composition of the compensation committee only changed in 2003 when Horowitz replaced Holbrook and in 2005 when the committee expanded to include Herb. John Bourgoin, MIPS's CEO, has never been a member of any of the relevant committees.

According to MIPS's certificate of incorporation, MIPS directors are not liable for any breach of fiduciary duty, except for breaches of the duty of loyalty, actions involving intentional misconduct or actions taken "not in good faith," and transactions from which they derive an improper personal benefit. MIPS Techs., Inc., Current Report (Form 8-K), at Ex. 3.1, Art. IX (Nov. 12, 2003) (reproducing MIPS certificate of incorporation); *see also* 8 Del. C. § 102(b)(7).

**B.      MIPS's Two Stock Option Plans**

Similar to other local technology companies, stock options play a large part in MIPS's compensation of its employees, officers and directors. FAC ¶ 6. Stock options are awarded pursuant to one of two plans. The first is the 1998 Long Term Incentive Plan, which allows the

ORDER GRANTING NOMINAL DEFENDANT'S MOTION TO DISMISS—06-06699 RMW
TSF                                                                 3

board to award stock options to employees and officers. *See* MIPS Techs., Inc., Annual Report (Form 10-K), at Ex. 10.8 (Sept. 24, 1998) (hereinafter "1998 Plan").[1] The purpose of the plan is two-fold: one, to "promote long-term success" by encouraging individuals to contribute to the firm's long-term growth, and two, to attract, retain, and motivate highly qualified individuals. *Id.* ¶ 1. The plan authorizes a board committee (now, the Compensation Committee) to select recipients and determine the terms and conditions of the grants awarded to the recipients. *Id.* ¶¶ 3(a), 9(a). The plan does *not* limit the exercise price of the options that may be awarded; it only requires the Committee to fix the terms of the option at the time of the grant. *Id.* ¶ 8(b).[2] By contrast, the option plan for directors (discussed below) limits the option's exercise price to fair market value. Furthermore, the Committee is free under the 1998 Plan to delegate "some or all of its authority" to a director or officer of the company, except that such a director or officer cannot grant themselves awards. *Id.* ¶ 3(d). Finally, the plan absolves the Committee members of liability for any action taken in good faith. *Id.* ¶ 3(e).

The second plan is the MIPS Directors' Stock Options Plan. *See* MIPS Techs., Inc., Annual Report (Form 10-K), at Ex. 10.10 (Sept. 20, 1999). Unlike the Long Term Incentive Plan, grants under the Directors Plan are "automatic and non-discretionary." *Id.* ¶ 4(b). The Plan automatically grants an option to purchase 40,000 shares to directors on the date they start work. *Id.* ¶ 4(b)(ii). The Plan also automatically grants an option to purchase 10,000 shares to each director who has served for the prior six months on the date of each annual meeting. *Id.* ¶ 4(b)(iii). Notably, the

---

[1] MIPS requests that the court take judicial notice of various SEC filings. *See* Docket Nos. 35, 41. Such public records are properly the subject of judicial notice, and routinely considered in deciding a motion to dismiss in a securities case. *E.g.*, *In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 953-54 (N.D. Cal. 2007); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 865 (N.D. Cal. 2004); *In re Calpine Sec. Litig.*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal.2003).

[2] Carco's complaint alleges that the "1998 Long-Term Compensation Plan" provides that the "per share exercise price of such stock options may not be less than 100% of the fair market value of the common stock on the date of the grant." FAC ¶ 77. Carco incorrectly names the stock option plan, but more significantly, quotes a passage that simply does not exist. The closest analogue to the alleged provision limits the exercise of stock appreciation rights and provides that "the exercise price per share shall be no less than 100% of the Fair Market Value per share on the date of grant." 1998 Plan, ¶ 9(a). Nonetheless, Carco's allegation is contradicted by the actual text of the plan contained in MIPS's 10-K filing. A court may reject an allegation that is contradicted by a public record. *See Anderson v. Seeman*, 252 F.2d 321, 325-26 (5th Cir. 1958); *see also Desimone v. Barrows*, 924 A.2d 908, 921 & fn 23 (Del. Ch. Ct. 2007) (rejecting allegation regarding stock option plan plainly contradicted by text of the plan).

exercise price of an option under the Directors Plan must be "100% of the Fair Market Value per Share on the date of the grant of the Option." *Id.* ¶ 7(a).

### C. MIPS's Investigation Into Backdating, Restatement, and Remedial Action

Concerns about stock option backdating began with the now-famous *Wall Street Journal* article of March 18, 2006 reporting academic research suggesting that various companies were suspiciously lucky in selecting their option grant dates. On August 30, 2006, MIPS announced that it formed a special committee of independent directors to investigate its option granting practices. FAC ¶ 82. This investigation delayed the filing of MIPS's Form 10-K for 2006 and jeopardized MIPS's listing on Nasdaq. *Id.* ¶¶ 82-83. On October 25, 2006, MIPS announced that it had uncovered historic option grants with incorrect dates. *Id.* ¶ 84. Accordingly, MIPS advised that its past financial statements and earnings releases could not be relied upon and would need to be restated. *Id.*[3]

MIPS released further details of its investigation in its delayed Form 10-K for 2006, filed on July 2, 2007. *See* MIPS Techs., Inc., Annual Report (Form 10-K), at 26-33 (July 2, 2007). The special committee examined options grants from July 1, 1998 through June 2006. *Id.* at 2. The review encompassed 107 granting actions and 1,849 individual grants. *Id.* at 26. The special committee first noted that the Compensation Committee had delegated its option granting authority to the former Vice President of Human Resources. *Id.* at 27. Of the grants, the special committee concluded "hindsight was likely used by the former Vice President of Human Resources in selecting grant dates for options granted in the period October 1998 through October 2000 and this person had a lack of knowledge of the accounting rules related to the granting of options." *Id.* The special committee found no direct evidence of backdating, but concluded that "20 out of 28 grants coincided with a weekly or monthly low in our stock price during this period" and that this circumstantial evidence suggested backdating had occurred from 1998 to 2000. *Id.* Examining the individual grants, the special committee concluded that no grants to board members under the MIPS Directors' stock option plan had been backdated. *Id.* One option grant to the CEO (who is also a board

---

[3] The first of the three consolidated lawsuits comprising this action was filed two days later on October 27, 2006.

ORDER GRANTING NOMINAL DEFENDANT'S MOTION TO DISMISS—06-06699 RMW
TSF                                    5

member) required adjustment. *Id.* To be clear, MIPS admitted in its 2006 Form 10-K that backdating had occurred between October 1998 and October 2000 and formally restated its financial records.

MIPS provided the results of its investigation to the SEC. *See* MIPS Techs., Inc., Quarterly Report (Form 10-Q), at 30 (Nov. 14, 2007). MIPS also responded to informal requests for records and additional information. *Id.* On October 29, 2007, the SEC informed MIPS that it had ended its investigation and recommended no enforcement action to the commission. *Id.*

The special committee also detailed how MIPS's option granting practice has evolved over the years. *See* MIPS Techs., Inc., Annual Report (Form 10-K), at 33 (July 2, 2007). In November 2000, MIPS began requiring its general counsel to send an email to the Compensation Committee the day a grant decision was made to create a record of the decision. *Id.* In June 2004, MIPS began requiring that grants for new hires, promotions and adjustments take place on a pre-determined date – the last Thursday of each month. *Id.* Finally, in March 2007, MIPS began requiring its general counsel sit in on all Compensation Committee meetings. *Id.*

### D. Additional Instances of Alleged Backdating

Carco alleges that backdating at MIPS under the Long Term Compensation Plan continued after October 2000 and "into at least 2002." FAC ¶ 86. Carco alleges three additional options grants were backdated. First, Derek Meyer received an option grant on January 5, 2001 that was granted at the second lowest point of the month. *Id.* ¶ 86(a). Second, Mervin S. Kato received an option grant on April 3, 2001, the stock's lowest date of the month and also the lowest date of the first half. *Id.* ¶ 86(b). Third, CEO John Bourgoin received an option grant on September 17, 2004, the second lowest price of the month and lowest price for the remainder of the year. *Id.* ¶ 87(c). Carco alleges these option grants were backdated because they occurred on "weekly or monthly low[s]" in the stock price. *Id.* ¶ 88. The complaint does not allege how many other option grants occurred in the same time period, so there is no context to determine if these grants reflect anything more than random probability. Carco merely alleges that the three grants occurred on low dates in a month. These allegations are plainly insufficient to infer backdating occurred. *See, e.g., In re CNET Networks Inc.*, 483 F. Supp. 2d 947, 959-62 (N.D. Cal. 2007).

## II. ANALYSIS

Carco did not make a demand to the MIPS board before filing this suit. FAC ¶ 31. Nominal defendant MIPS moves to dismiss because Carco has not adequately alleged that demand would have been futile. Before reaching the issue of demand futility, the court must address a variety of procedural issues.

### A. Preliminary Procedural Issues

The motion to dismiss raises two procedural points: first, that Carco has not met the requirements of Rule 23.1 because he failed to verify his complaint, and two, that Carco lacks standing to sue regarding many of the allegedly backdated option grants.

#### 1. Verification

Rule 23.1(b) requires the complaint in a derivative action to be verified. The verification requirement exists to prevent baseless strike suits. *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 371 (1966). Combined, Rule 11 and Rule 23.1 serve to assure the court "that some person, party, attorney, advisor, or otherwise has responsibly investigated the allegations at the behest of the named plaintiff, who then stands behind the merits of the complaint." *Rogosin v. Steadman*, 65 F.R.D. 365, 367 (S.D.N.Y. 1974). An unverified derivative complaint should be dismissed with leave to amend. *E.g.*, *Glenbrook Capital Ltd. Partnership v. Kuo*, 2007 WL 2601260, at *13 (N.D. Cal. Sept. 6, 2007) (Jenkins, J.); Wright, Miller & Kane, Federal Practice and Procedure § 1827, at 57-58 (2d ed. 1995); *but see, e.g., McDonough v. Americom Int'l Corp.*, 151 F.R.D. 140, 143 (M.D. Fla. 1993) (declining to dismiss but requiring plaintiff to submit a verification within thirty days).

Rule 23.1(b)'s verification requirement has rarely been the subject of litigation leaving many questions about its limits and what requirement it imposes above and beyond Rule 11's required reasonable investigation. *See generally* Wright, Miller & Kane, Federal Practice and Procedure § 1827 (2d ed. 1995). Rule 23.1's requirement appears similar to that imposed on private securities plaintiffs under the Private Securities Litigation Reform Act. *Compare* 15 U.S.C. § 77z-1(a)(2). The certification requirement for private securities class actions was imposed because Congress believed "that the plaintiff's bar had seized control of class action suits, bringing frivolous suits on behalf of only nominally interested plaintiffs in the hope of obtaining a quick settlement." *Greebel*

*v. FTP Software, Inc.*, 939 F. Supp. 57, 58 (D. Mass.1996). Congress hoped that requiring the investor to certify the complaint would "transfer[] control of the litigation from the attorneys to the investors." *In re USEC Securities Litigation*, 168 F. Supp. 2d 560, 564 (D. Md. 2001).

Here, Carco's amended complaint has not been verified. *See* FAC. Prior versions of the complaints in these cases, however, have been. *See* Docket No. 1 (verified complaint of Marvin Steger); Docket No. 1, C-07-00661 (verified complaint of Joseph Carco); Docket No. 1, C-07-00771 (verified complaint of Leo Michaels). The failure to certify is significant given the factual developments between the original filings (when MIPS had admitted to concerns about backdating and informed the public that its prior financial statements were unreliable) and the amended complaint (at which point MIPS had admitted to some backdating, restated its earnings, and disclosed its procedures to prevent future backdating). In light of these intervening events, it is appropriate to insist on the verification to confirm that the plaintiff investors still wish to pursue this case.

### 2. Carco's Standing

Delaware law requires a shareholder bringing a derivative suit to have been a shareholder at the time of the challenged transaction. 8 Del. C. § 327. The Federal Rule of Civil Procedure have an identical requirement, eliminating any *Erie* difficulties. Fed. R. Civ. P. 23.1(b)(1). The strict interpretation of the rule serves to prevent strike suits and to ensure that a derivative plaintiff truly acts in the corporation's best interest in bringing a claim. *Conrad v. Blank*, 2007 WL 2593540, at *10 (Del. Ch. Ct. Sept. 7, 2007) (holding that plaintiff lacked standing to challenge stock option grants predating her ownership of the corporation's stock). The Delaware Chancery Court has repeatedly applied this rule in stock options backdating cases. *See Ryan v. Gifford*, 918 A.2d 341, 358-59 (Del. Ch. Ct. 2007) (dismissing claims that predated plaintiff's ownership); *Desimone v. Barrows*, 924 A.2d 908, 924-27 (Del. Ch. Ct. 2007) (dismissing all claims predating plaintiff's ownership).

Carco alleges that he became a MIPS shareholder in March 21, 2000. FAC ¶ 36. Nevertheless, Carco purports to sue for violations throughout the alleged "Relevant Period," namely from 1998 to 2006. *Id.* ¶ 2. In his opposition to the motion to dismiss, Carco acknowledges that he

lacks standing to sue for any violations prior to March 2000. *See* Opp'n at 24-25. Carco maintains that events occurring prior to March 21, 2000 are still relevant to determine whether a demand would be futile. On the other hand, MIPS argues that because Carco lacks standing to challenge transactions in 1998 and 1999, none of those transactions are relevant to the demand futility analysis. As to this narrow point, Carco is correct – regardless of whether he has standing to sue, events occurring before his ownership are relevant to the demand futility analysis. *See Melzer v. CNET Networks, Inc.*, 934 A.2d 912, 918-20 (Del. Ch. Ct. 2007) (permitting shareholders to examine books and records predating ownership to search for evidence to support their demand futility allegation).

## B. Demand Futility

Delaware law requires a derivative plaintiff to first make a demand on the board of directors to address the shareholder's concerns. *Ryan v. Gifford*, 918 A.2d 341, 351-52 (Del. Ch. Ct. 2007). If the shareholder chooses not to make a demand, the shareholder must plead with particularity why such a demand is excused. Fed. R. Civ. P. 23.1(b)(3)(B); *see, e.g., CNET Networks*, 483 F. Supp. 2d 947.

### 1. Standards Governing Demand Futility

Delaware law has two standards for excusing demand. *Compare Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) *with Rales v. Blasband*, 634 A.2d 927, 933-34 (Del. 1993). The difference is whether or not the board to which the derivative plaintiff should have made the demand also made the decision which the derivative plaintiff challenges. Where the board at the time the complaint was filed made the challenged decision, demand may be excused where a plaintiff makes particular allegations raising a reasonable doubt that (1) a majority of the board of directors in place at the time of the complaint is disinterested or independent or (2) the challenged acts were the product of the board's valid exercise of business judgment. *Aronson*, 473 A.2d at 812. However, "where the challenged transaction was not a decision of the board upon which plaintiff must seek demand," the *Rales* test applies. *E.g., Ryan*, 918 A.2d at 353. The *Rales* test requires the plaintiff to allege particular facts that "create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in

ORDER GRANTING NOMINAL DEFENDANT'S MOTION TO DISMISS—06-06699 RMW
TSF 9

responding to a demand." *Id.* at 353 (quoting *Rales*, 634 A.2d at 933-34).

It is worth noting the similarity between the *Rales* test and the first prong of *Aronson* – they are the same. The difference in demand standards lays in the fact that a later, disinterested and independent board can, and is in the best position to, evaluate whether the earlier board made a valid exercise of its business judgment. Accordingly, where a different board exists, it must be given the opportunity to evaluate the prior board's conduct. The fact that the earlier board failed to properly exercise its business judgment does not excuse a shareholder's failure to make a demand on the current board. This simple rule respects the basic principle that the board, not the shareholders, manage the corporation. *See* 8 Del. C. § 141.

The board in place at the time Carco filed suit did not take any of the actions that Carco challenges. Carco's challenges are to options granted under the 1998 Long Term Compensation Plan. Accordingly, the court applies the *Rales* standard to decide whether demand is excused. *Accord Desimone v. Barrows*, 924 A.2d 908, 927-28 (Del. Ch. Ct. 2007) (applying *Rales* where all parties agreed it applied); *Conrad v. Blank*, 2007 WL 259340, at *6 (Del. Ch. Ct. Sept. 7, 2007) (applying *Rales* where the challenged transaction "was not made by the board, or even half of its members").[4]

### 2. Whether the MIPS Board is Disinterested and Independent

To successfully plead demand futility, Carco must demonstrate that there is a reasonable doubt that a majority of the board of directors are not disinterested and independent. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048-49 (Del. 2004). To be clear, a director is presumed to be faithful to the corporation and able to objectively consider a demand. *Id.* at 1048. The plaintiff must show, with particularity, why that presumption is overcome

---

[4] Carco argues that the court should apply the *Aronson* standard. Nonetheless, the bulk of the arguments that Carco makes in support of demand futility challenge whether the board is disinterested and independent. Carco makes only one argument in favor of demand excuse specific to *Aronson*'s business judgment prong, namely, that the board's delegation of stock option authority was an *ultra vires* act in direct violation of Delaware law. Carco muddles Delaware law applying to the issuance of *stock* with law regarding the issuance of *stock options*. Putting aside Carco's authorities related to the issuance of stock, Carco supplies no authority for the proposition that delegating the authority to administer an options plan is a "blatant violation of Delaware law." On the contrary, 8 Del. C. § 157(c) expressly authorizes a board to delegate option administration to a corporate officer. While this provision was added in 2001, Carco supplies no authority to suggest that section 157(c) worked a sea change in the law and permitted a practice previously illegal.

with respect to a majority of the board. *Id.* at 1048-49. Accordingly, Carco must demonstrate that there is a reasonable doubt that at least four (of seven) MIPS directors were not disinterested and independent. In determining whether Carco has pled demand excuse, the court notes that an inquiry into a board's ability to consider a demand is context-dependent and fact-specific. *Id.* at 1049-50; *see also Desimone*, 924 A.2d at 931 (suggesting a "cautious" and "non-generic" approach to considering challenges to options practices). This sensitive inquiry is not amenable to "boilerplate" pleading.

Accordingly, to plead demand futility Carco must specifically allege facts that create a reasonable doubt that a majority of directors are disinterested and independent. Paragraphs 153 to 184 comprise Carco's allegations regarding demand futility. At the time suit was filed, Carco alleges the MIPS board comprised of John E. Bourgoin, Robert E. Herb, Fred M. Gibbons, Benjamin A. Horowitz, Kenneth L. Coleman, and William M. Kelly. FAC ¶ 158. Carco does not challenge Robert E. Herb's independence or disinterestedness.

### a. John E. Bourgoin

As discussed, John E. Bourgoin is a director and CEO of MIPS. Carco alleges that Bourgoin is neither disinterested nor independent because Bourgoin received backdated stock option grants. FAC ¶ 159. The special committee of the MIPS board investigating backdating concluded that three option grants to executives required new measurement dates. MIPS Techs., Inc., Annual Report (Form 10-K), at 27 (July 2, 2007). One of the grants may have been backdated. *Id.* However, none of these options were ever exercised by Bourgoin and none remain outstanding because they were cancelled in a company-wide program to exchange out-of-the-money options in 2002. *Id.*

The Delaware Chancery Court has held that accepting backdated stock options creates a reason to doubt a director's disinterestedness sufficient to disqualify him or her from being able to consider a demand. *Ryan*, 918 A.2d at 356. This court has suggested that a director who no longer stands to benefit from backdated options may no longer be disqualified from considering a demand. *See CNET*, 483 F. Supp. 2d at 962. Here, Bourgoin had traded in the apparently backdated stock options long before Carco filed suit. Nonetheless, it is possible that Bourgoin received more in the exchange of options than he would have otherwise because some of the stock options were

1 backdated. The current record does not allow the court to determine whether the stock option
2 exchange accounted for, or was corrected for, the alleged backdating. Accordingly, it is possible
3 that Bourgoin should be disqualified from considering a demand on the board regarding backdating
4 because he may still stand to benefit from the backdating.

### b. Fred M. Gibbons

Fred M. Gibbons has been a MIPS director since 1998. FAC ¶ 160. Carco alleges that Gibbons is not independent because he served as a member of the options granting committees and the audit committee during the relevant period. *Id.* While a member of the committees, Gibbons allegedly "granted and approved manipulated stock options" and approved false financial statements. *Id.* Carco further alleges that Gibbons received manipulated options in 1998 and 1999. *Id.* Carco does not allege when Gibbons received his options or how he received them. Additional facts can be gleaned from SEC filings however. As discussed, the special committee concluded that no board member received an improper grant. MIPS Techs., Inc., Annual Report (Form 10-K), at 26 (July 2, 2007). On July 6, 1998, Gibbons was elected to the board of directors. MIPS Techs., Inc., Annual Report (Form 10-K), at 8 (Sept. 24, 1998). October 28, 1999 was the date of the annual stockholder meeting. MIPS Techs., Inc., Proxy Statement (Sept. 20, 1999). Under the Director Plan, both of these events entitled Gibbons to stock option grants.

Knowingly granting or approving stock options can render a director interested, while "mere membership" of a committee is insufficient. *Desimone*, 924 A.2d at 938; *CNET*, 483 F. Supp. 2d at 963 (explaining *Ryan*). Carco does not allege which options grants Gibbons "granted and approved." On the contrary, MIPS's internal investigation states that the committee delegated options-granting authority to the Vice President of Human Resources. Carco's boilerplate allegation cannot overcome this fact. Carco's argument in his briefing that "[i]f these duties were delegated to the Vice President of Human Resources, what was the Committee doing? Why have a committee at all?" permits, at best, an inference, but demand excuse requires particularized facts, not stray inferences. Nonetheless, the Delaware Chancery Court has rejected this "inference," holding that the allegation that a committee "administered" an options plan does not "suggest in any way that the Compensation Committee was involved in or had knowledge of any backdating." *Desimone*, 924

ORDER GRANTING NOMINAL DEFENDANT'S MOTION TO DISMISS—06-06699 RMW
TSF                                                            12

A.2d at 938. Furthermore, the Supreme Court has made clear that a complaint must rise "above the speculative level" and do more than "merely create[] a suspicion" in the context of standard notice pleading. *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) (quotations omitted). Where, as here, the pleading rules require even more, i.e., particularized facts, Carco's mere allegation that Gibbons "granted and approved" stock options fails.

Carco argues that Gibbons' membership on the audit committee also disqualifies him from considering a demand. Carco has not alleged any facts demonstrating that Gibbons knew he was certifying false financial statements while on the audit committee. The Delaware Chancery Court has also rejected this basis for disqualifying a board member – "I reject Desimone's contention that they knew that stock options were being backdated simply because they served on [the company's] Audit Committee." *Desimone*, 924 A.2d at 942. "[T]he fact that [the company] accounted for the backdated options grants incorrectly does nothing to suggest any conscious wrongdoing on the part of the Audit Committee and is consistent with the notion that the Audit Committee was simply ignorant of any backdating." *Id.* Carco's largely conclusory complaint adds nothing to justify distinguishing this case from *Desimone*.

Finally, Carco alleges that Gibbons received backdated stock options in 1999. MIPS pointed out that its public filings plausibly explain the source of those grants and why they were not backdated. First, the MIPS special committee concluded in MIPS's 10-K that no director received backdated options. Second, MIPS has shown that Gibbons' stock options were awarded pursuant to a plan that tied stock option grants to specific dates, preventing backdating. *See Desimone*, 924 A.2d at 917 (rejecting argument that options automatically granted by a plan disqualify a board member where options were allegedly "spring-loaded"); *CNET*, 483 F. Supp. 2d at 960 (holding that options issued pursuant to a plan were not backdated). Tellingly, Carco's only comment in opposition is that he "does not intend to rely on their receipt of these grants in support of his demand futility allegations at this time." Opp. at 18, fn. 16.

In short, Carco made three boilerplate allegations attacking Gibbons' ability to independently consider a demand on the board. All three fail. Two fail to allege sufficient facts to justify inferring

ORDER GRANTING NOMINAL DEFENDANT'S MOTION TO DISMISS—06-06699 RMW
TSF                                                                      13

that there is a reasonable doubt about Gibbons, the third appears directly contradicted by the facts in the record.

### c. Anthony B. Holbrook

Anthony B. Holbrook has been a MIPS director since 1998. FAC ¶ 161. Like Gibbons, he served on the option granting committees[5] and on the audit committee during the relevant time period. Carco also alleges that "Holbrook was also the recipient of manipulated options in 1998 and 1999." *Id.* Like Gibbons, Holbrook was also entitled to receive stock option grants in 1998 and 1999 pursuant to the Director Plan. For the reasons discussed above regarding Gibbons, Carco has not alleged particularized facts to support a reasonable doubt about Holbrook's ability to consider a demand on the board.

### d. Kenneth L. Coleman

Kenneth L. Coleman has also been a MIPS director since 1998. During the relevant period, he served on the option granting committees. FAC ¶ 162. Carco also alleges that Coleman received backdated options in 1998. *Id.*

With respect to Coleman's alleged receipt of backdated options, SEC filings indicate otherwise. In disclosing his initial ownership of MIPS securities and changes in ownership, Coleman disclosed that he owned 1,285 shares of MIPS's stock and held no MIPS derivative securities (i.e., stock options) in 1998. *See* Kenneth L. Coleman, Initial Statement of Beneficial Ownership of Securities (Form 3) (July 21, 1998); Kenneth L. Coleman, Statement of Changes in Beneficial Ownership (Form 4) (Sept. 1, 1998).

As discussed with Gibbons, Coleman's mere service on the options granting committees is insufficient. Carco does not allege any facts to suggest that Coleman knowingly approved or granted backdated stock options. Given that Carco has disclaimed any reliance on Coleman's receipt of securities, *see* Opp. at 18, fn. 16, there is no basis for holding that Coleman would have been unable to consider a demand.

### e. Benjamin A. Horowitz

---

[5] Carco's complaint contains contradictory allegations on this point. Carco first alleges that Holbrook only served on the compensation committee until 2003. FAC ¶¶ 38, 68. Carco then alleges that Holbrook still serves on the compensation committee. FAC ¶ 161.

ORDER GRANTING NOMINAL DEFENDANT'S MOTION TO DISMISS—06-06699 RMW
TSF 14

Benjamin A. Horowitz was a MIPS director at the time the initial complaint was filed.[6] He served on the board and on the compensation committee, starting in 2002. FAC ¶ 163. Carco alleges that "[h]aving approved of manipulated option grants, Horowitz can be neither disinterested nor independent in considering a demand related to backdating at MIPS." *Id.*

Carco's allegations are totally insufficient with respect to Horowitz. Carco has alleged *one* instance of backdating that Horowitz could have knowingly approved. *See* FAC ¶ 99. As discussed above though, Carco has failed to demonstrate that this transaction was backdated. Absent any backdated transactions, Horowitz could not have knowingly approved of any backdated transactions.

### f. William M. Kelly

William M. Kelly has been a MIPS director since 1998 and has served on the audit committee since 1999. FAC ¶ 164. Kelly's service on the audit committee is the sole basis for Carco's attack on his impartiality. As discussed with respect to Gibbons, this boilerplate accusation fails to demonstrate that Kelly is not disinterested and independent.

In summary, Carco bears the burden of demonstrating that there is a reasonable doubt that a majority of the board of directors at the time the complaint was filed were disinterested and independent. At best, Carco has pled facts suggesting that Bourgoin may be interested (though the lack of details regarding the exchange of stock options makes it impossible to know if Bourgoin has in fact retained any benefit from the alleged backdating). With respect to the other directors, Carco's allegations fall far short.

### C. Leave to Amend and Lifting the Discovery Stay

In the event that the court grants MIPS's motion to dismiss, Carco has requested leave to amend and the opportunity to brief the issue of lifting the stay of discovery. With respect to the stay of discovery, Carco does not hint at why he believes the discovery stay should be lifted. In opposition, MIPS points the court to Judge Illston's discussion of the issue in *In re Openwave Systems, Inc. Shareholder Derivative Litigation*. 503 F. Supp. 2d 1341, 1352-53 (N.D. Cal. 2007). The court endorses Judge Illston's reasoning, and only adds that as a shareholder, Carco has

---

[6] Contrary to Carco's first amended complaint (filed on August 30, 2007), Horowitz is no longer a director. *See* MIPS Techs., Inc., Definitive Proxy Statement (Form DEF 14A), at 3 (July 2, 2007). He appears to have resigned in 2006 or 2007. *Id.*

discovery tools unavailable to the traditional plaintiff, namely, his ability to inspect corporate books and records. 8 Del. C. § 220; *see Melzer*, 934 A.2d at 916-20 (explicitly authorizing review of corporate books and records to determine whether illegal backdating occurred). The court fails to comprehend what "limited" discovery could be conducted for the purpose of amending Carco's complaint that cannot be done through a books-and-records request.

Carco also requests leave to amend. MIPS points to authority where a consolidated derivative complaint was dismissed without leave to amend. *In re Hansen Natural Corp. Sec. Litig.*, __ F. Supp. 2d __, 2007 WL 3244646, at *17-*18 (C.D. Cal. 2007). "Dismissal without leave to amend is improper unless it is clear that the complaint could not be saved by any amendment." *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 991 (9th Cir. 1999). The Ninth Circuit upheld dismissal without leave to amend in *Silicon Graphics* because the plaintiffs failed to set forth any additional facts that could save their complaint. *Id.* At oral argument, counsel for Carco indicated that he could allege additional facts regarding MIPS's option transactions from MIPS's proxy statements. Therefore, leave to amend is appropriate. Fed. R. Civ. P. 15(a)(2).

### III. ORDER

For the foregoing reasons, the court GRANTS MIPS's motion to dismiss. Carco has 20 days to file an amended complaint.

DATED: 1/11/08

*Ronald M. Whyte*
RONALD M. WHYTE
United States District Judge

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiffs:**

| | |
|---|---|
| Robert Bramson | rbramson@bramsonplutzik.com |
| Bradley A. Dirks | bdirks@sbtklaw.com |
| Travis E. Downs , III | travisd@csgrr.com |
| Lawrence Timothy Fisher | ltfisher@bramsonplutzik.com |
| John K. Grant | johnkg@csgrr.com |
| Tara Puhua Kao | tkao@sbtklaw.com |
| Alan R Plutzik | aplutzik@bramsonplutzik.com |
| Kathryn Anne Schofield | kschofield@bramsonplutzik.com |
| Michael C. Wagner | mwagner@sbtklaw.com |
| Shawn A. Williams | shawnw@csgrr.com |
| Eric L. Zagar | ezagar@sbtklaw.com |

**Counsel for Defendants:**

| | |
|---|---|
| Kalama M. Lui-Kwan | klui-kwan@fenwick.com |
| Gaurav Mathur | gmathur@fenwick.com |
| Kevin Peter Muck | kmuck@fenwick.com |
| Susan Samuels Muck | smuck@fenwick.com |
| Felix Shih-Young Lee | flee@fenwick.com |
| Jay L. Pomerantz | jpomerantz@fenwick.com |
| Christopher James Steskal | csteskal@fenwick.com |

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**   1/11/08                                                                 TSF
                                                                                     **Chambers of Judge Whyte**