1  COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
2  JOHN K. GRANT (169813)
   SHAWN A. WILLIAMS (213113)
3  AELISH M. BAIG (201279)
   CHRISTOPHER M. WOOD (254908)
4  100 Pine Street, Suite 2600
   San Francisco, CA  94111
5  Telephone:  415/288-4545
   415/288-4534 (fax)
6  johng@csgrr.com
   shawnw@csgrr.com
7  cwood@csgrr.com
   abaig@csgrr.com
8
   Lead Counsel for Plaintiffs
9  [Additional counsel appear on signature page.]

10                  UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                       SAN JOSE DIVISION

13  In re MIPS TECHNOLOGIES, INC.        )  No. C-06-06699-RMW
    DERIVATIVE LITIGATION                )
14  ─────────────────────────────────── )  PLAINTIFFS' FIRST AMENDED
                                         )  CONSOLIDATED VERIFIED
15  This Document Relates To:            )  SHAREHOLDER DERIVATIVE
                                         )  COMPLAINT FOR VIOLATION OF THE
16       ALL ACTIONS.                    )  FEDERAL SECURITIES LAWS AND
    ─────────────────────────────────── )  STATE LAW
17  JOSEPH CARCO and TIMMY ROLLINS,      )
    Derivatively on Behalf of MIPS       )
18  TECHNOLOGIES, INC.,                  )
                                         )
19                    Plaintiffs,        )
                                         )
20          vs.                          )
                                         )
21  ANTHONY B. HOLBROOK, JOHN E.         )
    BOURGOIN, MERVIN S. KATO, KATE       )
22  HUNT RUNDLE, BRAD HOLTZINGER,        )
    MARK TYNDALL, JACK BROWNE,           )
23  SANDY CREIGHTON, LAVI LEV, BRIAN     )  DEMAND FOR JURY TRIAL
    KNOWLES, DEREK MEYER, KEVIN C.       )
24  EICHLER, G. MICHAEL UHLER, ROBERT    )
    R. HERB, FRED M. GIBBONS, BENJAMIN   )
25  A. HOROWITZ, KENNETH L. COLEMAN,     )
    WILLIAM M. KELLY and RENATA LANE,    )
26                                       )
                      Defendants,        )
27  ─────────────────────────────────── )
    [Caption continued on following page.]
28

1        – and –                          )
                                          )
2  MIPS TECHNOLOGIES, INC., a Delaware    )
   corporation,                           )
3                                         )
                          Nominal Defendant.   )
4                                         )
                                          )
5

**INTRODUCTION AND OVERVIEW**

1.      This is a consolidated shareholder derivative action brought derivatively on behalf of MIPS Technologies, Inc. ("MIPS" or the "Company"), against its entire Board of Directors ("Board") and certain current officers and former top officers and/or directors (collectively, the "Individual Defendants").[1]

2.      The action seeks to remedy defendants' violations of federal and state law, including the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), §10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), §14(a) of the Exchange Act, §20 of the Exchange Act, Cal. Corp. Code §§25400, 25402, 25500 and 25502.5, as well as breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment between 1998-2006 (the "Relevant Period").

3.      Dating back to at least 1998, many of the Individual Defendants engaged in a course of conduct designed to manipulate MIPS stock option grant dates so as to secretly maximize profits to themselves and other Company executives at the expense of the Company and its shareholders. Specifically, since 1998, defendants backdated certain stock options grants to ensure that these grants to MIPS' directors, executives, and rank-and-file employees would be profitable to them regardless of how the Company's stock price performed over the long-term, and regardless of whether MIPS' share price increased at all.  In order to avoid disclosing the compensation costs of in-the-money stock option grants in their financial statements, defendants backdated stock option grants to themselves and other MIPS executives and employees.[2]  This backdating was approved of by a majority of MIPS' Board of Directors.

---

[1]      The Individual Defendants are: Anthony B. Holbrook ("Holbrook"), John E. Bourgoin ("Bourgoin"), Mervin S. Kato ("Kato"), Kate Hunt Rundle ("Rundle"), Brad Holtzinger ("Holtzinger"), Mark Tyndall ("Tyndall"), Jack Browne ("Browne"), Sandy Creighton ("Creighton"), Lavi Lev ("Lev"), Brian Knowles ("Knowles"), Derek Meyer ("Meyer"), Kevin C. Eichler ("Eichler"), G. Michael Uhler ("Uhler"), Robert R. Herb ("Herb"), Fred M. Gibbons ("Gibbons"), Benjamin A. Horowitz ("Horowitz"), Kenneth L. Coleman ("Coleman"), Renata Lane ("Lane") and William M. Kelly ("Kelly").

[2]      Plaintiffs' use of term "backdated" or "backdating" throughout the complaint may also refer to other forms of related stock option manipulation perpetuated by defendants in this action.

1       4.      When MIPS' Chief Executive Officer ("CEO"), defendant Bourgoin, was first

2  confronted with allegations that questioned MIPS' stock option granting practices, he categorically

3  denied having engaged in backdating.  Subsequent to this denial, MIPS was forced to acknowledge

4  that it had indeed engaged in backdating stock options during the Relevant Period, but declined to

5  take any action whatsoever against a single person involved in the backdating at MIPS.  Instead,

6  MIPS laid sole blame for the backdating at the Company on defendant Lane – MIPS' former Vice

7  President of Human Resources.  MIPS stated that "this person had a lack of knowledge of the

8  accounting rules related to the granting of options."  However, plaintiffs' investigation, as well as

9  MIPS' public filings, show that the MIPS Board, as well as defendant Bourgoin, were all intimately

10  involved in approving backdated stock options at MIPS.

11      5.      In particular, the members of the MIPS Board committees which were specifically

12  charged with approving stock options and accounting practices at the Company violated their

13  fiduciary duties by approving manipulated stock options grants, as well as the accounting associated

14  with these grants.  These individuals bore ultimate responsibility for ensuring that stock options were

15  granted at fair market value on the date of the grant as well as deciding the grant dates for the

16  options.  These defendants breached their fiduciary duties by allowing for options to be manipulated

17  throughout the Relevant Period, and by affirmatively misleading MIPS' shareholders about the

18  Company's compensation practices.

19      6.      Plaintiffs demand an accounting of all stock option grants made to defendants during

20  times relevant hereto, the rescission of all contracts which provide for stock option grants by MIPS

21  to any of the defendants which were entered into during times relevant hereto, and a declaration that

22  the illicit stock options, and all proceeds derived from the exercise thereof, are and have been held in

23  constructive trust for the Company's benefit.

24      7.      Nominal party MIPS is a Delaware corporation with its principal executive offices

25  located at 1225 Charleston Road, Mountain View, California.  MIPS is a leading provider of

26  industry-standard processor architectures and cores for digital consumer, networking, personal

27  entertainment, communications and business applications.

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - C-06-06699-RMW                                                    - 2 -

8.      During the Relevant Period, the Company's executives, directors and rank-and-file employees were compensated in large part through the issuance of stock options.  A stock option granted to an employee and/or director of a corporation allows the employee and/or director to purchase company stock at a specified price – referred to as the "exercise price," typically the fair market value of the stock on the date the option is granted.  When properly issued, stock options serve as a valuable part of employee and/or director compensation packages as a means to create incentives to boost employee production and corporate profitability.  When the employee and/or director exercises the option, he or she purchases the stock from the company at the exercise price, regardless of the stock's trading price at the time the option is exercised.

9.      "Backdating" is a practice by which a stock option is reported as having been granted on a certain date, but was granted days or months later when, with the benefit of hindsight, a lower price can be selected for the option grant.  Backdating is a manipulative practice which is designed to allow and does allow company executives and stock option grantees to realize immediate unearned and undisclosed financial gains at the expense of the company and its shareholders.  Backdating of stock option grants has been compared to picking lottery numbers on the day after the winning numbers are announced, or betting on a horse after the race has finished.  Arthur Levitt, a former chairman of the Securities and Exchange Commission ("SEC") was quoted as stating that stock option backdating "represents the ultimate in greed."  Further, Levitt stated: "It is stealing, in effect.  *It is ripping off shareholders in an unconscionable way*."[3]

10.      MIPS recently issued a partial admission to this conduct, stating that "for options granted in the period October 1998 through October 2000 . . . 20 out of 28 grants coincided with a weekly or monthly low in our stock price during this period."  The Company further said that "*hindsight was likely used*" in the selection of the option dates.  In other words, backdating occurred.

---

[3]      For all citations, emphasis has been added and citations and quotations omitted, unless otherwise indicated.

11.     The members of the MIPS Board were aware that the Company was not taking a compensation expense for these backdated options as was required by Accounting Principles Board ("APB") Opinion No. 25.   MIPS' options plans stated that the MIPS committee which was responsible for administering the 1998 Long-Term Incentive Plan (the "1998 Plan") was specifically charged with determining and approving the "valuation methodology" for granting options at MIPS. Further, MIPS' Forms 10-K, which all the director defendants signed, show that defendants were fully aware of the how to properly expense in-the-market options grants pursuant to APB Opinion No. 25.

12.     In addition to defendants' breaches of fiduciary duty, defendants' manipulation of MIPS' stock option plans resulted in other forms of corporate malfeasance, including the falsification of documents for personal gain.  As former SEC Chairman Harvey Pitt recently stated:

> Many discussions of backdating options start with the observation that backdating is not, per se, illegal. ***That is wrong.  Options backdating frequently involves falsification of records used to gain access to corporate assets***.  That conduct violates the Foreign Corrupt Practices Act and its internal controls requirements.  If corporate directors were complicit in these efforts, state law fiduciary obligations are violated. ***Backdating is not only illegal and unethical, it points to a lack of integrity in a company's internal controls***.

13.     Furthermore, backdating stock options creates an instant paper gain to grantees who receive them because the options were really priced below the stock's fair market value when they were actually awarded.  Under Generally Accepted Accounting Principles ("GAAP"), this instant paper gain is equivalent to paying extra compensation and thus is a cost to MIPS.  Accordingly, MIPS was required to record an expense on its financial statements for any options granted below the fair market value on the grant date of the option, or "in the money" options.  However, the Individual Defendants did not properly record these known costs on MIPS' financial statements, causing MIPS' financial statements throughout the Relevant Period to be issued in violation of GAAP.  Specifically, these financial statements overstated reported earnings and understated reported expenses.

14.     In addition to defendants' clear breach of fiduciary duty and violation of accounting rules, defendants' backdating of stock options may have extremely serious tax consequences for the Company.  While stock options generally qualify for favorable tax treatment, options issued at a

1   discount to the market price do not qualify for that treatment.  Accordingly, backdated stock options

2   are automatically disqualified from that favorable tax relief, and MIPS may well owe millions of

3   dollars in unpaid taxes.

4          15.    Most importantly, since 1998, defendants caused MIPS to file false and misleading

5   statements with the SEC, including proxy statements filed with the SEC which stated that the options

6   granted by MIPS carried with them an exercise price that was not less than the fair market value of

7   MIPS stock on the date of grant and issuance, and that solicited shareholder approval for stock

8   option plans without disclosing that defendants were routinely backdating stock option grants.

9          16.    In fact, defendants were aware that the practices employed by the Board allowed

10   stock option grants to be backdated to dates when the Company's shares were trading at or near the

11   lowest price for that Relevant Period.  Defendants' backdating practices yielded stock option grants

12   to the Company's executive officers worth millions of dollars, contributing to their ability to pocket

13   $16 million from the sale of MIPS stock during the Relevant Period.

14          17.    Further, MIPS' quarterly and annual financial results as reported and filed with the

15   SEC were false.  Defendants' misrepresentations and wrongful course of conduct violated the

16   Exchange Act, as well as state law.  By authorizing and/or acquiescing in the stock option

17   backdating and manipulation practices, defendants: (i) caused MIPS to issue false statements;

18   (ii) diverted millions of dollars of corporate asset from MIPS to senior MIPS executives; and

19   (iii) subjected MIPS to potential liability from regulators, including the SEC and the IRS.

20          18.    Defendants' gross mismanagement and malfeasance over the past decade has exposed

21   MIPS and its senior executives to potential criminal and civil liability for issuing false and

22   misleading financial statements.  Specifically, defendants caused or allowed MIPS to issue

23   statements that failed to disclose or misstated the following: (i) the Company had material

24   weaknesses with its internal controls that prevented it from issuing accurate financial reports and

25   projections; (ii) because of improperly recorded stock-based compensation expenses, the Company's

26   financial results violated GAAP; and (iii) the Company's public disclosures presented an inflated

27   view of MIPS' earnings and earnings per share.

28

19.     Through key executives and the Board's Option Administration and/or Compensation and Audit Committees, defendants also falsely assured shareholders that financial statements and associated representations were accurate.  Indeed, defendants each claimed that they had investigated and reviewed the Company's financial statements and internal control processes and authorized their inclusion in the Company's public filings.  Both defendants Bourgoin and Eichler also signed false certifications pursuant to Sarbanes-Oxley §§302 and 906.  For example, defendant Bourgoin's 2003 Sarbanes-Oxley certification affirms:

I, John E. Bourgoin, certify that:

1.      I have reviewed this annual report on Form 10-K of MIPS Technologies, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusion about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

20.    For years, the Company's senior executives and Board members engaged in a practice of manipulating MIPS' stock option plans in order to grant options to themselves and to other MIPS executives in a manner designed to create immediate and risk-free profits in direct contravention of the Company's stated and shareholder-approved stock option plans and proxy statements.

21.    Furthermore, defendants knew that because the Company had not taken a compensation expense for backdated options required by APB Opinion No. 25, MIPS' reported earnings and expenses were false and misleading and not in compliance with GAAP.  Thus, by falsifying the date on which options were granted, defendants materially understated MIPS' expenses, overstated its income and falsely represented that it had not incurred any expenses for option grants.

22.    Defendants' conduct during the Relevant Period has wreaked substantial damage on MIPS.  The Company's senior executives were incentivized to over-pay themselves, to profit from their misconduct by cashing in on under-priced stock options and to issue false financial statements to cover up their misdeeds.  Defendants' breaches of fiduciary duties in the administration of the Company's stock option plans polluted the plans with grant date manipulations so as to undermine the validity of all grants made pursuant to the plans.  Meanwhile, certain of the defendants, who received mispriced stock options and/or were aware of material non-public information regarding MIPS' internal control problems, violated their fiduciary duties to MIPS and its shareholders by selling over $16 million worth of their own MIPS shares at artificially inflated prices during the Relevant Period:

| DEFENDANT | DATES OF SALES | SHARES SOLD | PROCEEDS RECEIVED |
|---|---|---|---|
| EICHLER | 07/28/99–01/25/05 | 236,700 | $6,134,910 |
| BOURGOIN | 07/23/99–01/27/05 | 220,000 | $7,590,190 |
| KATO | 08/22/00 | 10,000 | $550,000 |
| UHLER | 07/30/03–08/22/06 | 139,409 | $1,098,869 |

| BROWNE | 02/25/03–02/08/06 | 155,977 | $1,170,258 |
| GIBBONS | 08/12/99 | 10,000 | $390,600 |
| | | | |
| **TOTAL** | | **772,806** | **$16,934,827** |

23.     This action seeks recovery for MIPS against these so-called fiduciaries, as the MIPS Board, as currently composed, is simply unable and unwilling to do so.

**Illegal Backdating and Suspicious Stock Option Grants at MIPS Revealed**

24.     On May 16, 2006, the Center for Financial Research and Analysis ("CFRA") issued a report: "Options Backdating – Which Companies are at Risk?"  The report identified the risks for companies that have taken part in options backdating:

- SEC investigation risk – The SEC has begun informal investigations at many companies in recent months and has also begun to call for improved disclosure around all areas of executive compensation.

- Accounting restatement risk – Some companies which have admitted backdating options have accompanied those admissions with financial restatements impacting both the balance sheet and earnings.

- Tax/Cash implications – The change in options from the practice of options backdating may force some companies to restate tax positions for the years in question, which could result in an obligation to pay back taxes.

- Management credibility risk – If a reputable management team is found to have repeatedly backdated options, thereby enriching themselves at the expense of shareholders, the reputation of management (and the related stock premium for superior management) could take a hit.

25.     As with so many cases of backdating, the first public indications of problematic granting practices at MIPS came not from the Company itself, but from analysts, who were concerned that backdating could create significant problems for companies found to be involved in the practice.  During a July 26, 2006 earnings call, defendant Bourgoin was asked about possible backdating at MIPS by analyst Gary Mobley at AG Edwards.  Bourgoin denied that any backdating had taken place:

> <Q>: I just had one follow-up question.  Could you just talk about your review of your option practices, the degree to which you have reviewed and maybe talk about who is head of the option committee and how independent that person maybe?

<center>*     *     *</center>

1   &lt;A&gt;: Yeah, we have done a review – we have done an internal review all the way
2   back to our inception as a public company back in 1999 and **we found no backdating**, so you know our audit committee looks at that stuff very carefully.

3   26.   After this categorical denial, in late August 2006 a brokerage report was released

4   which analyzed suspicious stock option granting patterns at numerous companies, including MIPS.

5   Following the publication of this report, on August 30, 2006, MIPS was forced to announce that it

6   had formed a Special Committee to review its historical option granting practices and that it would

7   be delaying the filing of its Form 10-K for fiscal year 2006 due to the ongoing internal investigation

8   into the Company's past practices related to stock option grants to officers and directors.   On

9   September 19, 2006, MIPS said the SEC had recently requested that the Company provide it with

10  certain information relating to stock option practices.

11  27.   On October 25, 2006, MIPS said the probe had found the Company didn't use the

12  correct measurement dates to calculate compensation costs for certain stock option grants in its

13  financial statements.   As a result, the Company determined that it would have to restate results.

14  28.   Thus, contrary to defendants' repeated assertions in SEC filings over the previous

15  eight years to the effect that it was the Company's practice to issue stock options with exercise prices

16  equal to the fair market value of the Company's common stock at the date of grant, defendants

17  admitted that stock options issued by defendants throughout the Relevant Period were misdated or

18  backdated.

19  29.   On July 2, 2007, MIPS filed their Form 10-K for fiscal year 2006.   The Form 10-K

20  contained a partial admission regarding the backdating of options at MIPS:

21  The Special Committee concluded that hindsight was likely used by the former Vice
22  President of Human Resources in selecting grant dates for options granted in the
    period October 1998 through October 2000 and this person had a lack of knowledge
    of the accounting rules related to the granting of options.  While no direct evidence
23  of using hindsight was found, the quantum of circumstantial evidence, coupled with
    the absence of contemporaneously created electronic documents for the grants, led
24  the Special Committee to reach this conclusion.  In particular, this circumstantial
    evidence included the fact that 20 out of 28 grants coincided with a weekly or
25  monthly low in our stock price during this period.  The former Vice President of
    Human Resources left the Company in June 2003.
26
27  30.   The Company did not rule out inappropriate conduct by MIPS' current executives and

28  board members.   Rather, the Special Committee cited a lack of "evidence" regarding these

PLAINTIFFS' FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - C-06-06699-RMW                                                      - 9 -

1  individuals "intentional misconduct."  However, plaintiffs' investigation has revealed that the MIPS

2  Board, as well as MIPS' CEO, defendant Bourgoin, were directly involved in the granting and

3  approval of backdated stock options at MIPS.

4          31.     The manipulation of stock options at MIPS will likely cause the Company substantial

5  tax and regulatory liability, and the Company will need to expend significant resources associated

6  with the following:

7                  (a)     costs incurred to carry out internal investigations, including legal fees paid to

8  outside counsel, accounting firms and consultants;

9                  (b)     costs incurred from increased directors' and officers' insurance premiums as a

10  result of the manipulated stock option grants;

11                  (c)     costs incurred from directing manpower to correct MIPS' defective internal

12  controls;

13                  (d)     costs incurred from directing manpower away from other projects in order to

14  restate MIPS' financial results;

15                  (e)     costs associated with the Company's unpaid taxes resulting from the

16  backdating of stock options; and

17                  (f)     costs already incurred and that will continue to be incurred to respond to

18  investigations by the Attorney General and the SEC.

19          32.     Plaintiffs have not made a demand on the Company because at the time this action

20  was initiated, the Board consisted of seven directors (defendants Bourgoin, Holbrook, Coleman,

21  Gibbons, Herb, Horowitz and Kelly) all of whom are incapable of independently and disinterestedly

22  considering a demand to prosecute the above-captioned action because, among other reasons detailed

23  herein, they either received manipulated options or were specifically responsible for the

24  administration of the MIPS' options plan, or authorized the manipulation of MIPS' options plans.

25  For these reasons, in addition to those set forth in further detail in ¶¶176-207, any demand on such

26  individuals (all of whom, have substantial conflicts of interest), would have requested that they sue

27  themselves, and would have been futile.

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - C-06-06699-RMW                                                          - 10 -

**JURISDICTION AND VENUE**

33.    The claims asserted herein arise under §§14(a) and 20(a) of the Exchange Act, and under state law for breach of fiduciary duty, abuse of control, corporate waste, unjust enrichment and gross mismanagement.  In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

34.    This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §§1331 and 1337.  This Court also has jurisdiction pursuant to 28 U.S.C. §1332(a)(1) in that plaintiffs and defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

35.    This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

36.    Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  MIPS is located in and conducts its business in this District.  Further, defendants conduct business in this District, and certain of the defendants are citizens of California and reside in this District.

**PARTIES**

37.    Plaintiff Joseph Carco is, and was during the Relevant Period, a shareholder of nominal defendant MIPS.  Carco acquired MIPS stock on March 21, 2000, and has held MIPS stock continuously to the present.  Mr. Carco resides in New York.

38.    Plaintiff Timmy Rollins is, and was during the Relevant Period, a shareholder of nominal defendant MIPS.  Rollins acquired MIPS stock on March 8, 2000, and has held MIPS stock continuously to the present.  Mr. Rollins resides in West Virginia.

39.    Nominal party MIPS is a Delaware corporation with its principal executive offices located at 1225 Charleston Road, Mountain View, California.

40.     Defendant Anthony B. Holbrook has served as Chairman of the MIPS Board since August 2003 and has served as a director since July 1998.  Holbrook served on the Option Administration Committee from 1998 until 2000, and on the Compensation Committee from 1998 until 2002.  Holbrook served on the Audit Committee from 2000 until 2005.  Because of Holbrook's position, he knew the adverse non-public information about the business of MIPS, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the Relevant Period, Holbrook participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  As a member of the Audit and Corporate Governance Committee, defendant Holbrook caused or allowed the dissemination of the improper public statements described herein. Mr. Holbrook resides in California.

41.     Defendant John E. Bourgoin has served as President of MIPS since September 1996, as a director of the Company since May 1999 and as CEO since February 1998.  Bourgoin was the recipient of option grants throughout the Relevant Period which MIPS admits were backdating. Because of Bourgoin's positions, he knew the adverse non-public information about the business of MIPS, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Bourgoin participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant Bourgoin violated Cal. Corp. Code §§25402 and 25502.5 by selling 220,000 shares of MIPS stock for proceeds of $7.5 million during the Relevant Period.  Mr. Bourgoin resides in California.

42.     Defendant Mervin S. Kato has served as Vice President of Finance of MIPS since May 2001 and as Chief Financial Officer ("CFO") since January 2006.  Previously, Kato served as

1  Corporate Controller from May 1998 until his promotion to his current position.  Because of Kato's

2  positions, he knew the adverse non-public information about the business of MIPS, as well as its

3  finances, markets and present and future business prospects, via access to internal corporate

4  documents, conversations and connections with other corporate officers and employees, attendance

5  at management meetings and via reports and other information provided to him in connection

6  therewith.  Defendant Kato, by his specialized financial expertise, was in a unique position to

7  understand the business of MIPS, as well as its finances, markets and present and future business

8  prospects.  During the Relevant Period, Kato participated in the issuance of false and/or misleading

9  statements, including the preparation of the false and/or misleading press releases and SEC filings.

10  Based on his knowledge of material non-public information regarding the Company, defendant Kato

11  violated Cal. Corp. Code §§25402 and 25502.5 by selling 10,000 shares of MIPS stock for proceeds

12  of $550,000 during the Relevant Period.  Mr. Kato resides in California.

13        43.    Defendant Kate Hunt Rundle has served as Vice President and General Counsel of

14  MIPS since February 2006.  Because of Rundle's positions, he knew the adverse non-public

15  information about the business of MIPS, as well as its finances, markets and present and future

16  business prospects, via access to internal corporate documents, conversations and connections with

17  other corporate officers and employees, attendance at management meetings and via reports and

18  other information provided to him in connection therewith.  During the Relevant Period, Rundle

19  participated in the issuance of false and/or misleading statements, including the preparation of the

20  false and/or misleading press releases and SEC filings.  Ms. Rundle resides in California.

21        44.    Defendant Brad Holtzinger has been Vice President of Worldwide Sales of MIPS

22  since November 2005.  Previously, Holtzinger served as Director of Systems Solutions of MIPS

23  from 2001 to 2002 and as Vice President, Sales from 2002 to 2005.  Because of Holtzinger's

24  positions, he knew the adverse non-public information about the business of MIPS, as well as its

25  finances, markets and present and future business prospects, via access to internal corporate

26  documents, conversations and connections with other corporate officers and employees, attendance

27  at management meetings and via reports and other information provided to him in connection

28  therewith.  During the Relevant Period, Holtzinger participated in the issuance of false and/or

1    misleading statements, including the preparation of the false and/or misleading press releases and

2    SEC filings.  Mr. Holtzinger resides in California.

3         45.    Defendant Mark Tyndall has served as Vice President, Business Development and

4    Corporate Relations of MIPS since June 2006.  Because of Tyndall's positions, he knew the adverse

5    non-public information about the business of MIPS, as well as its finances, markets and present and

6    future business prospects, via access to internal corporate documents, conversations and connections

7    with other corporate officers and employees, attendance at management meetings and via reports and

8    other information provided to him in connection therewith.  During the Relevant Period, Tyndall

9    participated in the issuance of false and/or misleading statements, including the preparation of the

10   false and/or misleading press releases and SEC filings.  Mr. Tyndall resides in California.

11        46.    Defendant Jack Browne has served as Vice President of Worldwide Sales of MIPS

12   since August 2002.  Previously, Browne served as Director of Market Development of the Company

13   from December 2001 to August 2002.  Because of Browne's positions, he knew the adverse non-

14   public information about the business of MIPS, as well as its finances, markets and present and

15   future business prospects, via access to internal corporate documents, conversations and connections

16   with other corporate officers and employees, attendance at management meetings and via reports and

17   other information provided to him in connection therewith.  During the Relevant Period, Browne

18   participated in the issuance of false and/or misleading statements, including the preparation of the

19   false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-

20   public information regarding the Company, defendant Browne violated Cal. Corp. Code §§25402

21   and 25502.5 by selling 155,977 shares of MIPS stock for proceeds of $1.1 million during the

22   Relevant Period.  Mr. Browne resides in California.

23        47.    Defendant Sandy Creighton has served as Vice President, Human Resources and

24   Corporate Administration of MIPS since February 2006.  Previously, Creighton served as Vice

25   President, General Counsel and Corporate Secretary for MIPS from June 1998 until February 2006.

26   Because of Creighton's positions, she knew the adverse non-public information about the business of

27   MIPS, as well as its finances, markets and present and future business prospects, via access to

28   internal corporate documents, conversations and connections with other corporate officers and

1   employees, attendance at management meetings and via reports and other information provided to

2   her in connection therewith.  During the Relevant Period, Creighton participated in the issuance of

3   false and/or misleading statements, including the preparation of the false and/or misleading press

4   releases and SEC filings.  Ms. Creighton resides in California.

5        48.    Defendant Lavi Lev served as the Company's Senior Vice President of Engineering

6   from 1998 to 2001 and as Vice President, Engineering of Silicon Graphics from 1996 to 1998.

7   Because of Lev's positions, he knew the adverse non-public information about the business of MIPS,

8   as well as its finances, markets and present and future business prospects, via access to internal

9   corporate documents, conversations and connections with other corporate officers and employees,

10  attendance at management meetings and via reports and other information provided to him in

11  connection therewith.  During the relevant period, Lev participated in the issuance of false and/or

12  misleading statements, including the preparation of the false and/or misleading press releases and

13  SEC filings.  Mr. Lev resides in California.

14       49.    Defendant Brian Knowles served as the Company's Director of European Business

15  Development from December 1998 until October 1999.  From October 1999 until at least 2001,

16  Knowles served as the Company's Vice President of Worldwide Marketing.  Because of Knowles'

17  positions, he knew the adverse non-public information about the business of MIPS, as well as its

18  finances, markets and present and future business prospects, via access to internal corporate

19  documents, conversations and connections with other corporate officers and employees, attendance

20  at management meetings and via reports and other information provided to him in connection

21  therewith.  During the Relevant Period, Knowles participated in the issuance of false and/or

22  misleading statements, including the preparation of the false and/or misleading press releases and

23  SEC filings.  Mr. Knowles resides in California.

24       50.    Defendant Derek Meyer served as the Company's Vice President of Worldwide Field

25  Operations from September 1999 to June 2002, as Vice President, Sales and Marketing from March

26  1998 to September 1999, and as Director of Worldwide Marketing and Sales from May 1996 to

27  March 1998.  Because of Meyer's positions, he knew the adverse non-public information about the

28  business of MIPS, as well as its finances, markets and present and future business prospects, via

access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the Relevant Period, Meyer participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Mr. Meyer resides in California.

51.    Defendant Kevin C. Eichler had been CFO and Vice President of Finance of MIPS from May 1998 until January 2006.  Because of Eichler's positions, he knew the adverse non-public information about the business of MIPS, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Defendant Eichler, by his specialized financial expertise, was in a unique position to understand the business of MIPS, as well as its finances, markets and present and future business prospects.  During the Relevant Period, Eichler participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant Eichler violated Cal. Corp. Code §§25402 and 25502.5 by selling 236,700 shares of MIPS stock for proceeds of $6.1 million during the Relevant Period.  Mr. Eichler resides in California.

52.    Defendant G. Michael Uhler has served as Chief Technology Officer since May 2003.  Previously, Uhler served in various engineering management positions from 1994 to 2001, and as Vice President of Architecture and Software Products from October 2001 to May 2003.  Because of Uhler's positions, he knew the adverse non-public information about the business of MIPS, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the Relevant Period, Uhler participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant

1   Browne violated Cal. Corp. Code §§25402 and 25502.5 by selling 139,409 shares of MIPS stock for

2   proceeds of $1.09 million during the Relevant Period.  Mr. Uhler resides in California.

3          53.     Defendant Robert R. Herb has been a director of MIPS since January 2005.  Because

4   of Herb's position, he knew the adverse non-public information about the business of MIPS, as well

5   as its finances, markets and present and future business prospects, via access to internal corporate

6   documents, conversations and connections with other corporate officers and employees, attendance

7   at Board meetings and committees thereof and via reports and other information provided to him in

8   connection therewith.  As a member of the Compensation and Nominating Committee, defendant

9   Herb controlled the other defendants' stock option awards.  During the Relevant Period, Herb

10  participated in the issuance of false and/or misleading statements, including the preparation of the

11  false and/or misleading press releases and SEC filings.  Mr. Herb resides in California.

12         54.     Defendant Fred M. Gibbons has been a director of MIPS since 1998.  Gibbons served

13  on the Option Administration Committee from 1998 until 2000, and on the Compensation

14  Committee from 1999 until the present.  Gibbons served on the Audit Committee from 1999 until

15  2005.  Because of Gibbons' position, he knew the adverse non-public information about the business

16  of MIPS, as well as its finances, markets and present and future business prospects, via access to

17  internal corporate documents, conversations and connections with other corporate officers and

18  employees, attendance at Board meetings and committees thereof and via reports and other

19  information provided to him in connection therewith.  During the Relevant Period, Gibbons

20  participated in the issuance of false and/or misleading statements, including the preparation of the

21  false and/or misleading press releases and SEC filings.  As a member of the Compensation and

22  Nominating Committee, defendant Gibbons controlled the other defendants' stock option awards.

23  As a member of the Audit and Corporate Governance Committee, defendant Gibbons caused or

24  allowed the dissemination of the improper public statements described herein.  Based on his

25  knowledge of material non-public information regarding the Company, defendant Gibbons violated

26  Cal. Corp. Code §§25402 and 25502.5 by selling 10,000 shares of MIPS stock for proceeds of

27  $390,600 during the Relevant Period.  Mr. Gibbons resides in California.

28

1    55.    Defendant Benjamin A. Horowitz was a director of MIPS from 2001 until August

2    2007.   Horowitz served on the Compensation Committee from 2003 until 2007.   Because of

3    Horowitz's position, he knew the adverse non-public information about the business of MIPS, as

4    well as its finances, markets and present and future business prospects, via access to internal

5    corporate documents, conversations and connections with other corporate officers and employees,

6    attendance at Board meetings and committees thereof and via reports and other information provided

7    to him in connection therewith.   During the Relevant Period, Horowitz participated in the issuance of

8    false and/or misleading statements, including the preparation of the false and/or misleading press

9    releases and SEC filings.   As a member of the Compensation and Nominating Committee, defendant

10   Horowitz controlled the other defendants' stock option awards.   Mr. Horowitz resides in California.

11   56.    Defendant Kenneth L. Coleman has been a director of MIPS since 1998.   Coleman

12   served on the Compensation Committee from 1999 until present.   Because of Coleman's position, he

13   knew the adverse non-public information about the business of MIPS, as well as its finances,

14   markets and present and future business prospects, via access to internal corporate documents,

15   conversations and connections with other corporate officers and employees, attendance at Board

16   meetings and committees thereof and via reports and other information provided to him in

17   connection therewith.   During the Relevant Period, Coleman participated in the issuance of false

18   and/or misleading statements, including the preparation of the false and/or misleading press releases

19   and SEC filings.   As the Chairperson of the Compensation and Nominating Committee, defendant

20   Coleman controlled the other defendants' stock option awards.   Mr. Coleman resides in California.

21   57.    Defendant William M. Kelly has been a director of MIPS since 1998.   Kelly served

22   on the Audit Committee from 1999 until present.   Because of Kelly's position, he knew the adverse

23   non-public information about the business of MIPS, as well as its finances, markets and present and

24   future business prospects, via access to internal corporate documents, conversations and connections

25   with other corporate officers and employees, attendance at Board meetings and committees thereof

26   and via reports and other information provided to him in connection therewith.   During the Relevant

27   Period, Kelly participated in the issuance of false and/or misleading statements, including the

28   preparation of the false and/or misleading press releases and SEC filings.   As the Chairperson of the

1   Audit and Corporate Governance Committee, defendant Kelly caused or allowed the dissemination

2   of the improper public statements described herein.  Mr. Kelly resides in California.

3          58.    Defendant Renata Lane was employed as MIPS' Vice President of Human Resources

4   from 1998 until 2003 and is currently employed as Senior Vice President of Human Resources at

5   Palm, Inc.  Lane reported to MIPS' CEO Bourgoin during her tenure at the Company.   On

6   information and belief, Lane is the "Vice President of Human Resources," whom the Company has

7   identified as being responsible for backdating stock option grants at MIPS.  Ms. Lane resides in

8   California.

9                        **DEFENDANTS WERE CONTROL PERSONS**
                         **WITH FIDUCIARY DUTIES TO MIPS**
10

11         59.    Each officer and director of MIPS named herein owed the Company and MIPS

12   shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and

13   administration of the affairs of the Company, as well as in the use and preservation of its property

14   and assets.  Contrary to these duties, the conduct of MIPS' directors and officers complained of

15   herein involves knowing, intentional and culpable violations of their obligations as officers and

16   directors of MIPS.  Further, the misconduct of MIPS' officers has been ratified by the MIPS Board,

17   which has failed to take any legal action on behalf of the Company against them.

18         60.    By reason of their positions as officers, directors and fiduciaries of MIPS, and

19   because of their ability to control the business and corporate affairs of the Company, defendants

20   owed MIPS and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were

21   required to use their ability to control and manage MIPS in a fair, just, honest and equitable manner,

22   and to act in furtherance of the best interests of MIPS and its shareholders so as to benefit all

23   shareholders equally and not in furtherance of their personal interest or benefit.  In addition, as

24   officers and/or directors of a publicly held company, defendants had a duty to refrain from utilizing

25   their control over MIPS to divert assets to themselves via improper and/or unlawful practices.

26   Defendants also had a duty to promptly disseminate accurate and truthful information with respect to

27   the Company's operations, earnings and compensation practices.

28

61.     Because of their positions of control and authority as directors or officers of MIPS, each of the defendants was able to and did, directly and indirectly, control the wrongful acts complained of herein.  As to the director defendants, these acts include: (i) agreement to and/or acquiescence in defendants' options manipulation; and (ii) willingness to cause MIPS to disseminate false proxy statements for 1999-2006, which proxy statements failed to disclose defendants' option backdating and manipulation practices and omitted the fact that executive officers were engaged in stock option backdating in order to manipulate the strike price of the stock options granted to themselves and other MIPS employees.  Because of their positions with MIPS, each of the defendants was aware of these wrongful acts, had access to adverse non-public information and was required to disclose these facts promptly and accurately to MIPS shareholders and the financial markets but failed to do so.

62.     Between 1999 and 2006, defendants falsely repeated in each proxy statement filed during this period that the stock option grants made during that period carried an exercise price that was not less than the fair market value of MIPS stock on the date granted, as calculated by the public trading price of the stock at the market's close on that date.

63.     Instead, defendants concealed that the stock option grants were repeatedly and consciously manipulated to ensure that the strike price associated with the option grants was at or near the lowest trading price in a given week or month.  Due to defendants' breach of their fiduciary duty in the administration of the stock option plans, plaintiffs seek to have the directors' and officers' plans voided and gains from those plans returned to the Company.  In the alternative, plaintiffs seek to have all of the unexercised options granted to defendants between 1998 and 2006 cancelled, the financial gains obtained via the exercise of such options returned to the Company and to have defendants revise the Company's financial statements to reflect the truth concerning these option grants.

64.     To discharge their duties, the directors of MIPS were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of MIPS.  By virtue of such duties, the officers and directors of MIPS were required, among other things, to:

1        (a)     manage, conduct, supervise and direct the business affairs of MIPS in

2 accordance with all applicable law (including federal and state laws, government rules and

3 regulations and the charter and bylaws of MIPS);

4        (b)     neither engage in self-dealing nor knowingly permit any officer, director or

5 employee of MIPS to engage in self-dealing;

6        (c)     neither violate nor knowingly permit any officer, director or employee of

7 MIPS to violate applicable laws, rules and regulations;

8        (d)     remain informed as to the status of MIPS' operations, including its practices

9 in relation to the pervasive backdating/spring-loading and improper accounting for such, and upon

10 receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in

11 connection therewith, and to take steps to correct such conditions or practices and make such

12 disclosures as are necessary to comply with the U.S. federal securities laws and their duty of candor

13 to the Company and its shareholders;

14        (e)     prudently protect the Company's assets, including taking all necessary steps to

15 recover corporate assets (cash, stock options) improperly paid to Company executives and directors

16 together with the related costs (professional fees) proximately caused by the illegal conduct

17 described herein;

18        (f)     establish and maintain systematic and accurate records and reports of the

19 business and affairs of MIPS and procedures for the reporting of the business and affairs to the

20 Board and to periodically investigate, or cause independent investigation to be made of, said reports

21 and records;

22        (g)     maintain and implement an adequate, functioning system of internal legal,

23 financial and accounting controls, such that MIPS' financial statements – including its expenses,

24 accounting for stock option grants and other financial information – would be accurate and the

25 actions of its directors would be in accordance with all applicable laws;

26        (h)     exercise control and supervision over the public statements to the securities

27 markets and trading in MIPS stock by the officers and employees of MIPS; and

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - C-06-06699-RMW                                - 21 -

1    (i)    supervise the preparation and filing of any financial reports or other

2  information required by law from MIPS and to examine and evaluate any reports of examinations,

3  audits or other financial information concerning the financial affairs of MIPS and to make full and

4  accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set

5  forth above.

6    65.    Each defendant, by virtue of his or her position as a director and/or officer, owed to

7  the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of

8  due care and diligence in the management and administration of the affairs of the Company, as well

9  as in the use and preservation of its property and assets.  The conduct of the defendants complained

10  of herein involves a willful and culpable violation of their obligations as directors and/or officers of

11  MIPS, the absence of good faith on their part, and a reckless disregard for their duties to the

12  Company and its shareholders which defendants were aware or should have been aware posed a risk

13  of serious injury to the Company.  The conduct of defendants who were also officers and/or directors

14  of the Company during the Relevant Period has been ratified by the director defendants who

15  comprised the MIPS Board during the Relevant Period.

16  **The MIPS Board Committees**

17    66.    The members of the MIPS Board committees, who were specifically charged with

18  administering the Company's options programs and financial accounting, abdicated their duties by

19  participating in the manipulation of MIPS' options programs.

20    67.    From 1998 until November 2000, the responsibilities of the Options Administration

21  Committee included "administering the 1998 Long-Term Incentive Plan, reviewing and approving

22  grants under the Incentive Plan and approving other performance-based compensation which is

23  intended to be excluded from the deductibility limitations imposed by Section 162(m) of the Internal

24  Revenue Code of 1986."   After November 2000, the duties of the Options Administration

25  Committee were assumed by the Compensation Committee.

26    68.    From 1998 until November 2000, the responsibilities of the Compensation

27  Committee included "developing performance criteria for and periodically evaluating the

28  performance of our Chief Executive Officer, reviewing and recommending the salary, bonus and

PLAINTIFFS' FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - C-06-06699-RMW                                                          - 22 -

1  stock incentive compensation of our Chief Executive Officer, reviewing the salaries, bonuses and

2  stock incentive compensation of our other officers as proposed by our Chief Executive Officer and

3  reviewing candidates and recommending nominees for election as directors."

4        69.    After the termination of the Options Administration Committee in November 2000,

5  the Compensation Committee assumed the duties of the Options Administration Committee.  From

6  November 2000 until the present, the responsibilities of the Compensation Committee included:

7          Administering the 1998 Long-Term Incentive Plan (the ''Incentive Plan''),
        reviewing and approving grants under the Incentive Plan and approving other

8          performance-based compensation, which is intended to be excluded from the
        deductibility limitations imposed by Section 162(m) of the Internal Revenue Code of

9          1986, as amended (the ''Code''), developing performance criteria for and
        periodically evaluating the performance of our Chief Executive Officer, reviewing

10         and recommending the salary, bonus and stock incentive compensation of our Chief
        Executive Officer, reviewing the salaries, bonuses and stock incentive compensation

11         of our other officers as proposed by our Chief Executive Officer.

12       70.    The Audit Committee was responsible for overseeing the accounting and financial

13 reporting processes of the Company, the audits of the Company's financial statements, and the

14 Company's internal controls over financial reporting.  The members of the Audit Committee, and the

15 Board by its approval of their actions and recommendations, enabled, or through conscious

16 abdication of duty, permitted the Company to manipulate stock option grants issued to certain

17 defendants.  By such actions, defendants breached their fiduciary duties to the Company.

18       71.    The following chart shows the makeup of the Board and committee assignments at

19 MIPS from 1998 to 2005:

|      | Audit Committee | Compensation Committee | Option Administration Committee |
| --- | --- | --- | --- |
| **FY99** | Kelly, Baskett/ Akeley, Gibbons | Coleman, Gibbons, Holbrook | Gibbons, Holbrook |
| **FY00** | Kelly, Gibbons, Holbrook | Coleman, Gibbons, Holbrook | Gibbons, Holbrook |
| **FY01** | Kelly, Gibbons, Holbrook | Coleman, Gibbons, Holbrook | *merged into compensation committee* |
| **FY02** | Kelly, Gibbons, Holbrook | Coleman, Gibbons, Holbrook | *merged into compensation committee* |
| **FY03** | Kelly, Gibbons, Holbrook | Coleman, Gibbons, Horowitz | *merged into compensation committee* |

| | Audit Committee | Compensation Committee | Option Administration Committee |
|---|---|---|---|
| **FY04** | Kelly, Gibbons, Holbrook | Coleman, Gibbons, Horowitz | *merged into compensation committee* |
| **FY05** | Kelly, Gibbons, Holbrook | Coleman, Gibbons, Herb, Horowitz | *merged into compensation committee* |

72.     Defendants breached their duties of loyalty and good faith by allowing or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent defendants from taking such illegal actions.  MIPS has expended and will continue to expend significant sums of money as a result thereof.  Such expenditures include, but are not limited to:

(a)     improvidently paid executive compensation;

(b)     increased capital costs as a result of the loss of market capitalization and the Company's damaged reputation in the investment community;

(c)     costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(d)     incurring possible IRS penalties for improperly reporting compensation.

73.     These actions have irreparably damaged MIPS' corporate image and goodwill.  For at least the foreseeable future, MIPS will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that MIPS' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## AIDING AND ABETTING AND CONCERTED ACTION

74.     In committing the wrongful acts alleged herein, defendants have pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.

75.     During all times relevant hereto, defendants collectively and individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was allowing its directors and senior officers to divert tens of millions of dollars to MIPS insiders,

1  directors, and other employees, and causing MIPS to misrepresent its financial results; (ii) maintain

2  defendants' executive and directorial positions at MIPS and the profits, power and prestige which

3  defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including

4  shareholders of MIPS, regarding defendants' compensation practices and MIPS' financial

5  performance.

6      76.    The purpose and effect of defendants' common course of conduct was, among other

7  things, to disguise defendants' violations of law, breaches of fiduciary duty, abuse of control, gross

8  mismanagement, corporate waste and unjust enrichment, to conceal adverse information concerning

9  the Company's operation and financial condition and to artificially inflate the price of MIPS

10 common stock so they could dispose of millions of dollars of their own MIPS stock, and enhance

11 their executive and directorial positions and receive the substantial compensation they obtained as a

12 result thereof.

13     77.    Defendants accomplished their common enterprise and/or common course of conduct

14 by causing the Company to purposefully and/or recklessly engage in the option manipulation abuses

15 alleged herein and misrepresent MIPS' financial results.  Each of the defendants was a direct,

16 necessary, and substantial participant in the common enterprise and/or common course of conduct

17 complained of herein.

18     78.    Each of the defendants aided and abetted and rendered substantial assistance in the

19 wrongs complained of herein.  In taking such actions to substantially assist the commission of the

20 wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing,

21 substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall

22 contribution to and furtherance of the wrongdoing.

23                          **CONFIDENTIAL WITNESSES**

24     79.    The allegations pled herein are made, in part, on information and belief and are

25 supported by first-hand accounts of Confidential Witnesses ("CWs").  These witnesses are

26 comprised of former MIPS employees employed during the Relevant Period.

27     80.    CW1 was a Director of Human Resources and Human Resources Manager at MIPS

28 from 1998 until 2003.  CW1 reported directly to defendant Lane and worked closely with defendant

1  Lane.  CW1 was acquainted with the stock option granting practices at MIPS because he/she was

2  one of only three members of MIPS' human resources department during her tenure.  CW1 recruited

3  and interviewed potential new employees at MIPS and extended offers to new employees which

4  included grants of stock options.  Potential employees would at times communicate with CW1 about

5  options-related matters.

6        81.  CW2 worked at Silicon Graphics, and following the spin-off of MIPS, worked at

7  MIPS from 1987 until September 2001.  During the last several years of his/her employment, he/she

8  served as a Senior Financial Analyst.  In his/her role as a Senior Financial Analyst, CW2 was aware

9  of the processes that MIPS undertook in granting and approving stock options.  CW2 was directly

10  responsible for entering stock option-related information into MIPS E*Trade system for both regular

11  employees and senior executives.  CW2 reported to MIPS current CFO, Mervin Kato.

12  **FACTUAL ALLEGATIONS**

13        82.  During the Relevant Period, the Company's executives, non-employee directors, and

14  rank-and-file employees, were compensated in large part through the issuance of stock options.  A

15  stock option granted to an employee and/or director of a corporation allows the individual to

16  purchase company stock at a specified price – referred to as the "exercise price" – for a specified

17  period of time.  Stock options are granted as part of employee and/or director compensation

18  packages as a means to create incentives to boost profitability and stock value.  When the employee

19  and/or director exercises the option, he or she purchases the stock from the company at the exercise

20  price, regardless of the stock's price at the time the option is exercised.  If the exercise price is lower

21  than it should be, the employee and/or director pays less and the company gets less when the stock

22  option is exercised.

23        83.  According to MIPS, during the Relevant Period, stock options to both executives and

24  rank-and-file employees were issued pursuant to the 1998 Plan, which was approved by Company

25  shareholders and administered by the Company's Stock Administration Committee prior to 2000,

26  and by the Compensation and Nomination Committee after 2000.  The 1998 Long-Term Incentive

27  Plan specifically provides that the "valuation methodology" for stock option grants is required to be

28  approved by the Committee.

84.     As set forth in the Company's September 22, 1999 Proxy Statement soliciting approval for, and summarizing the 1998 Plan, ***the MIPS Board represented and understood that incentive stock option grants under the 1998 Plan were required to be granted at "not [] less than 100% of the fair market value of the common stock on the date of grant***."

85.     In soliciting approval for the 1998 Long-Term Incentive Plan in a Form 14A Proxy Statement filed with the SEC on September 22, 1999, defendants Holbrook, Bourgoin, Coleman, Gibbons and Kelly stated:

> *Stock Options.*   Under the Incentive Plan, the Option Administration Committee may award both nonqualified stock options and incentive stock options within the meaning of Section 422 of the Internal Revenue Code.  The per share exercise price of such stock options ***may not be less than 100% of the fair market value*** of the common stock on the date of grant; provided, however, that incentive stock options granted to a participant who owns more than ten percent of the voting power of our stock will be priced at 110% of fair market value on the date of grant.

86.     In a Form 10-K filed with the SEC on September 22, 2000, defendants Bourgoin, Eichler, Gibbons, Holbrook and Kelly stated:

> ***1998 Long-Term Incentive Plan***.  The 1998 Long-Term Incentive Plan (the "Plan") was adopted by our board of directors and approved by our stockholder in May 1998 and later amended by our board of directors in August 1998 and May 1999 and approved by our stockholders in October 1999.  The Plan authorized the issuance of various forms of stock-based awards including incentive and non-qualified stock options, stock appreciation rights, stock awards and performance unit awards to officers and other key employees and consultants.  ***Stock options are granted at an exercise price of not less than the fair value on the date of grant***; the board of directors determines the prices of other stock awards.

87.     Further, defendants represented that, throughout the Relevant Period, all options were in fact granted at 100% of fair market value.  In a Form 14A Proxy Statement filed with the SEC on September 22, 1999, defendants Holbrook, Bourgoin, Coleman, Gibbons and Kelly stated that:

> The Option Administration Committee determines the number of shares based on MIPS' business plans, the executive's level of responsibility, individual performance, historical award data and competitive practices for comparable positions in similar high technology companies.  ***All options to date have been granted at not less than the fair market value on the date of grant***.

88.     In a Form 14A Proxy Statement filed with the SEC on September 26, 2000, defendants Holbrook, Bourgoin, Coleman, Gibbons and Kelly stated that:

> The Option Administration Committee determines the number of shares that will be subject to stock option grants based on our business plans, the executive's level of responsibility, individual performance, historical award data and competitive practice

of comparable positions in similar high technology companies. ***All options to date have been granted at not less than the fair market value of the underlying shares on the date of grant***.

89.     In a Form 14A Proxy Statement filed with the SEC on September 24, 2001, defendants Holbrook, Bourgoin, Coleman, Gibbons and Kelly stated that:

The Compensation Committee determines the number of shares that will be subject to stock option grants based on our business plans, the executive's level of responsibility, individual performance, historical award data and competitive practice of comparable positions in similar high technology companies. ***All options to date have been granted at not less than the fair market value of the underlying shares on the date of grant***.

90.     Contrary to these representations in public filings with the SEC and to Company shareholders, the Individual Defendants manipulated stock options by falsifying or manipulating documents evidencing stock option grant dates. Instead of stock options being priced in accordance with the fair market value on the grant date of the options, options were picked with hindsight and backdated to reflect a date on which the fair market value of the stock was lower than that of the date of the actual grant. In many instances, stock options were backdated to a date where the fair market value of the stock was at its lowest during a relevant week, month or quarter.

91.     The actual practice of granting stock options to MIPS officers and/or employees was contrary to the terms of MIPS' stock option plans. When the MIPS options were backdated to lower the exercise price of the grant, the purpose of the stock option plans was undermined to the detriment of the Company and its shareholders, as the recipients of the options received compensation regardless of whether they achieved the goals that would otherwise be a prerequisite to their benefiting from such compensation. The backdating of options granted to Company insiders also brought an instant paper gain to these insiders, as the options were priced below the stock's fair market value when they were actually awarded. Under GAAP, this instant paper gain was equivalent to extra compensation and, thus, represented a cost to MIPS. Because defendants caused MIPS to omit quarterly and year-end costs associated with this extra compensation in its financial results, its profits were overstated during the fiscal periods in which the options were granted.

92.     The MIPS Board, as well as defendant Bourgoin, were directly involved in the granting of stock options at MIPS. The members of MIPS Stock Administration Committee and

1    Compensation Committee approved the granting of backdated options throughout the Relevant

2    Period, often through unanimous written consents.

3          93.    On a Form 14A Proxy Statement filed with the SEC in September 22, 1999,

4    defendants Holbrook, Bourgoin, Coleman, Gibbons and Kelly stated:

5          During fiscal year 1999, the members of the Options Administration
           Committee were Mr. Gibbons and Mr. Holbrook.  The Options Administration
6          Committee met one time and took action by unanimous written consent ten times
           during fiscal year 1999.  The responsibilities of the Option Administration
7          Committee include administering the 1998 Long-Term Incentive Plan (the "Incentive
           Plan"), reviewing and approving grants under the Incentive Plan and approving other
8          performance-based compensation which is intended to be excluded from the
           deductibility limitations imposed by Section 162(m) of the Internal Revenue Code of
9          1986.

10         94.    Similarly, in a Form 14A Proxy Statement filed with the SEC on September 26, 2000,

11   defendants Holbrook, Bourgoin, Coleman, Gibbons and Kelly stated:

12         During fiscal year 2000, the members of the Option Administration
           Committee were Mr. Gibbons and Mr. Holbrook.  The Option Administration
13         Committee met once and took action by unanimous written consent ten times during
           fiscal year 2000.  The responsibilities of the Option Administration Committee
14         include administering the 1998 Long-Term Incentive Plan (the "Incentive Plan"),
           reviewing and approving grants under the Incentive Plan and approving other
15         performance-based compensation, which is intended to be excluded from the
           deductibility limitations imposed by Section 162(m) of the Internal Revenue Code of
16         1986, as amended (the "Code").

17         95.    Further, in the September 26, 2000 Proxy Statement, defendants Coleman, Holbrook

18   and Gibbons specifically stated the Options Administration Committee had approved the July 2000

19   stock option grant to defendant Bourgoin which, as alleged below, was backdated:

20         The Option Administration Committee approved an additional set of option
           grants in July 2000, after the close of the fiscal year, including a grant of 200,000
21         stock options for Mr. Bourgoin.  These grants do not begin vesting for three years,
           after which they vest in twelve monthly installments during the fourth year.  The
22         main purpose of this vesting schedule is to maximize executive retention by
           commencing vesting only after the executives' 1998 and 1999 option grants have
23         become fully vested.

24         96.    In addition, information provided by CW's shows that the MIPS Board, as well as

25   defendant Bourgoin, were directly involved in the granting of stock options at MIPS throughout the

26   Relevant Period.

27         97.    CW1 was a Director of Human Resources and Human Resources Manager from 1998

28   until 2003.  According to CW1 the MIPS Board approved stock option grants and communicated

PLAINTIFFS' FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - C-06-06699-RMW                                                              - 29 -

with Lane about the approved options.  CW1 extended offer letters to potential new employees at MIPS.  These offer letters contained offers of stock option grants which were later approved by either the MIPS Board, or a Board committee.  When new hires would inquire regarding when they would receive their promised options, CW1 would explain that the Board needed to approve the option grants before they would receive their options.

98.  CW1 believed that the MIPS Board determined the exercise price of options, and then communicated their approval to defendant Lane – communications which defendant Bourgoin was privy to.  CW1 found it disturbing that MIPS' Form 10-K appeared to solely blame Lane for the backdating at MIPS.

99.  CW2 worked at MIPS from 1987 until September 2001.  During the last several years of his/her employment, he/she served as a Senior Financial Analyst.  In his/her role as a Senior Financial Analyst, CW2 was aware of the processes that MIPS undertook in granting and approving stock options.  CW2's responsibilities included entering the data pertaining to the options into the E*Trade system that MIPS utilized for its employee options.

100.  CW2 would receive a list of information related to the options, which included the names of the recipients, the number of options awarded to each individual, the exercise price, and the date at which the options had been awarded, among other details.  Once CW2 received the list, he/she entered the information into the E*Trade system.  According to CW2, Lane was not solely responsible for determining the pricing and dating information for stock option grants.  According to CW2, MIPS would not have enabled a single employee to make independent decisions of such a critical nature as the dating and pricing of stock options.  Rather, because of the small size and intimacy of MIPS, business decisions were not made in isolation by employees without the involvement and knowledge of other personnel.

101.  According to CW2, the members of the Options Administration and/or Compensation Committee were "very aware of what [Lane] was doing" with respect to stock option grants.  Lane, as well as other executive staff at MIPS participated in meetings, and were "heavily involved" with, the Option Administration and/or Compensation Committee during her tenure.

1    102.    CW2 described the conclusion of the Special Committee regarding Lane's

2  involvement in backdating as "a terrible cop-out" and stated that the "senior executives [at MIPS]

3  must have known Lane's protocol" for how options were priced and dated.  CW2 also discussed her

4  role in the options granting process with the MIPS Special Committee and informed them that there

5  was no way that Lane was solely involved in or responsible for how options at MIPS were dated,

6  priced and issued.

7                      **DEFENDANTS' SCHEME BEGINS TO UNRAVEL**

8    103.    Until 2006, MIPS' shareholders were unaware of the options manipulation taking

9  place at the Company.  MIPS' 1999-2006 Proxy Statements omitted any reference to defendants'

10  option manipulation.  Instead, the proxy statements affirmatively misrepresented that options were

11  granted at the fair market value of MIPS' stock on the grant date.  MIPS' Forms 10-K similarly

12  failed to disclose that options were routinely backdated.  Instead, the Forms 10-K stated that options

13  were granted at 100% of fair market value, and that the Company followed APB Opinion No. 25 in

14  accounting for in-the-money options grants.  Further, the Company's shareholders remained unaware

15  of defendants' wrongdoing when voting on proxy proposals modifying MIPS' options plans between

16  1999 and 2006.

17    104.    On March 18, 2006, *The Wall Street Journal* published an article describing the

18  practice of backdating and reporting that executives at certain companies had received options dated

19  on some of the days of the year with the lowest stock prices for several years in a row.  According to

20  the study cited in the article, the chances against such patterns occurring by chance were

21  "astronomical" and, in some cases, as low as one in 300 billion.  Following this article, numerous

22  companies came under suspicion for having backdated stock options.

23    105.    During a July 26, 2006 earnings call, defendant Bourgoin was asked about possible

24  backdating at MIPS by analyst Gary Mobley at AG Edwards.  Bourgoin denied that any backdating

25  had taken place:

26        <Q>: I just had one follow-up question.  Could you just talk about your review of
        your option practices, the degree to which you have reviewed and maybe talk about
27        who is head of the option committee and how independent that person maybe?

28                      *        *        *

1    <A>: Yeah, we have done a review – we have done an internal review all the way
2    back to our inception as a public company back in 1999 and **we found no
     backdating,** so you know our audit committee looks at that stuff very carefully.

3    106.    After this categorical denial, in late August 2006 a brokerage report was released

4    which analyzed suspicious stock option granting patterns at numerous companies, including MIPS.

5    107.    On August 30, 2006, shortly after approving new lucrative bonuses for MIPS

6    executives, MIPS announced that "its board of directors has formed a special committee, consisting

7    of independent directors, to review the Company's historical option grant practices and the

8    Company's accounting for its option grants."  MIPS also announced that it would be delaying the

9    filing of its Form 10-K for fiscal year 2006 as a result.

10   108.    On September 19, 2006, MIPS announced that it had received a notice of delisting

11   from NASDAQ due to its failure to timely file its fiscal year 2006 Form 10-K.  MIPS also

12   announced supplemental fees for the directors who were purportedly conducting the investigation of

13   MIPS stock option practices.  MIPS stated that for a mere phone call lasting less than 30 minutes,

14   each director would be paid $500.

15   109.    On October 25, 2006, MIPS announced that the Special Committee had concluded

16   that stock options had been improperly granted:

17   [T]he special committee has reached a determination that, different measurement
18   dates should have been used for computing compensation costs for certain historic
     stock option grants than those used in the preparation of the Company's historical
19   financial statements. . . . [T]he Company has determined that its historical financial
     statements included in reports that it has previously filed with the Securities and
20   Exchange Commission will need to be restated.  Consequently, such financial
     statements, and the Company's earnings releases reporting periodic operating results
21   and financial conditions for such periods should no longer be relied upon.

22   110.    On July 2, 2007, MIPS filed their much-delayed Form 10-K for fiscal year 2006.  In
23
     the Form 10-K, MIPS admitted to years of options backdating, including grants to CEO Bourgoin:

24   The Special Committee examined the facts and circumstances surrounding
     grants made during the Review Period and determined that different measurement
25   dates should have been used for computing compensation costs for certain historic
     stock option grants.  The Special Committee found that the Committee of the Board
26   of Directors responsible for administering the option program had delegated its
     option-granting authority to the former Vice President of Human Resources.  The
27   Special Committee concluded that hindsight was likely used by the former Vice
     President of Human Resources in selecting grant dates for options granted in the
28   period October 1998 through October 2000 and this person had a lack of knowledge
     of the accounting rules related to the granting of options.  While no direct evidence

1
2
3
4
5
6

of using hindsight was found, the quantum of circumstantial evidence, coupled with the absence of contemporaneously created electronic documents for the grants, led the Special Committee to reach this conclusion.  In particular, this circumstantial evidence included the fact that 20 out of 28 grants coincided with a weekly or monthly low in our stock price during this period.  The former Vice President of Human Resources left the Company in June 2003.  The investigation did not find any evidence that any other employees, executives or Board members were aware of the use of hindsight in selecting grant dates or that measurement dates were based on improper practices.  The investigation also did not find any evidence of intentional misconduct by our current management, or any evidence that the incorrect grant practice was used for the purpose of having a financial statement impact.

7    111.    Defendants' options manipulation did not end in October 2000.  MIPS' July 2, 2007

8    Form 10-K does not specifically rule out backdating after October 2000, and indeed, options

9    manipulation at MIPS continued into at least 2002:

10    (a)    Derek Meyer received an option grant for 21,000 shares of MIPS stock

11    purportedly granted on January 5, 2001.  On January 5, 2001, MIPS stock was trading at $26.38.

12    This was the second lowest price of the month.

13    (b)    Mervin S. Kato received an option grant for 90,000 shares of MIPS stock

14    purportedly granted on April 3, 2001.  On April 3, 2001, MIPS stock was trading at $16.44.  This

15    was not only the lowest price of the month, but the lowest price of the first half of 2001.

16    (c)    Bourgoin received an option grant for 50,000 shares of MIPS stock

17    purportedly granted on September 17, 2004.  On September 17, 2004, MIPS stock was trading at

18    $5.01, the second lowest price of the month (the lowest was just $0.01 lower), and the lowest price

19    for the remainder or the calendar year.

20    112.    These grants from 2000-2004 are consistent with the circumstantial evidence which

21    the Special Committee found compelling indications of backdating.  Specifically, grants which

22    "coincided with a weekly or monthly low in our stock price."

23    113.    Such option grant manipulation practices were directly contrary to MIPS' stated

24    compensation philosophy.  Rather than aligning management's interests with shareholder interests,

25    defendants' deceptive and undisclosed options malfeasance ensured that MIPS executives and

26    employees profited from options grants regardless of whether MIPS shareholders received any

27    returns whatsoever.

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - C-06-06699-RMW                                                                    - 33 -

**MANIPULATED OPTIONS GRANTS DURING THE RELEVANT PERIOD**

114.    MIPS admits that options were routinely backdated during the Relevant Period.  The MIPS Special Committee cited a pattern of options which bore a strike price of the lowest day in a given week or month.  MIPS backdated or manipulated many other grants to both rank-and-file and senior employees during this period.  The following charts show a pattern on backdating at MIPS from 1994 until 2004.

115.    The grants shown below all evidence a pattern of backdating consistent with the Special Committee's findings.

116.    Defendant Knowles received a grant for 20,000 shares of MIPS stock purportedly granted on January 5, 1999.  On this date, MIPS stock was trading at $28.25.  This was the lowest price of the month.



117.    Defendant Kato received a grant for 11,000 shares of MIPS stock purportedly granted on May 26, 1999.  On this date, MIPS stock was trading at $25.50.  This was the lowest price of the month.



1    118.    Defendants Meyer, Lev, Eichler, Creighton and Bourgoin received option grants for

2    50,000, 75,000, 55,000, 55,000 and 150,000 shares of MIPS stock respectively, purportedly on

3    August 6, 1999.  On this date, MIPS stock was trading at $34.31.  This was the lowest price of the

4    month.



1

119.    Defendant Kato received option grants for 21,000 shares of MIPS stock purportedly

2   on May 26, 2000.  On this date, MIPS stock was trading at $18.38.  This was the third lowest price

3   of the month, and the lowest price of the remainder of the calendar year.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18



19

20

21

22

23

24

25

26

27

28

1    120.    Defendants Creighton, Eichler, Meyer and Lev all received options grants for 70,000

2    shares of MIPS stock purportedly dated on July 11, 2000.  Bourgoin received a grant for 200,000

3    shares of MIPS stock purportedly on the same date.  On this date, MIPS stock was trading at $36.50.

4    This was the lowest price of the month.

**MIPS Technologies, Inc.**
**June 9, 2000 to August 11, 2000**

1    121.   Defendant Kato received an option grant for 90,000 shares of MIPS stock purportedly

2    dated on April 3, 2001.  On this date, MIPS stock was trading at $16.44.  This was the lowest price

3    of the month, and the lowest price of the year until June 15, 2001.



**MIPS Technologies, Inc.**
March 2, 2001 to May 3, 2001

122.    Defendant Bourgoin received an option grant for 50,000 shares of MIPS stock purportedly granted on September 17, 2004.  On September 17, 2004, MIPS stock was trading at $5.01, the second lowest price of the month (the lowest was just $0.01 lower), and the lowest price for the remainder of the calendar year.

**MIPS Technologies, Inc.**
**August 17, 2004 to October 18, 2004**



**MIPS Sought and Received Shareholder Approval Through the Issuance of False and Misleading Proxy Statements**

123.    Throughout the Relevant Period, MIPS filed proxy statements with the SEC that contained false and misleading statements about the Company's stock option plans.

124.    At the time that the following proxy statements were filed, the members of the Board, and particularly the members of the Stock Administration Committee and the Compensation Committee, knew or should have known that the disclosures in the proxy statements regarding stock option compensation and practices were false and misleading as they failed to disclose the systematic manipulation of the Company's shareholder approved stock option plans.

1    125.    Further, in many instances, the MIPS Board solicited shareholder approval of

2    amendments to the Company's stock option plans without disclosing that the terms of the plans were

3    routinely evaded and manipulated.

4    126.    MIPS filed their 1999 Proxy Statement on September 20, 1999.  In the proxy

5    statement, they solicited approval for the elimination of several restrictions of options grants, while

6    stating that the "per share exercise price of such stock options may not be less than 100% of the fair

7    market value of the common stock on the date of grant."

8    127.    MIPS filed their 2000 Proxy Statement on September 25, 2000.  The proxy statement

9    assured investors that "[t]he Option Administration Committee determines the number of shares that

10   will be subject to stock option grants based on our business plans, the executive's level of

11   responsibility, individual performance, historical award data and competitive practice of comparable

12   positions in similar high technology companies.  ***All options to date have been granted at not less***

13   ***than the fair market value of the underlying shares on the date of grant***."  Further, the 2000 Proxy

14   Statement stated that:

15           The Option Administration Committee approved an additional set of option
16           grants in July 2000, after the close of the fiscal year, including a grant of 200,000
             stock options for Mr. Bourgoin.  These grants do not begin vesting for three years,
             after which they vest in twelve monthly installments during the fourth year.  The
17           main purpose of this vesting schedule is to maximize executive retention by
             commencing vesting only after the executives' 1998 and 1999 option grants have
18           become fully vested.

19   128.    MIPS filed their 2001 Proxy Statement on September 24, 2001.  The proxy statement

20   assured investors that "[t]he Compensation Committee determines the number of shares that will be

21   subject to stock option grants based on our business plans, the executive's level of responsibility,

22   individual performance, historical award data and competitive practice of comparable positions in

23   similar high technology companies.  ***All options to date have been granted at not less than the fair***

24   ***market value of the underlying shares on the date of grant***."

25   129.    MIPS filed their 2002 Proxy Statement on September 24, 2002.  The proxy statement

26   assured investors that "[t]he Compensation Committee determines the number of shares that will be

27   subject to stock option grants based on our business plans, the executive's level of responsibility,

28   individual performance, historical award data and competitive practice of comparable positions in

1    similar high technology companies. ***All options to date have been granted at not less than the fair***

2    ***market value of the underlying shares on the date of grant***."

3        130.    MIPS filed their 2003 Proxy Statement on September 29, 2003. The proxy statement

4    assured investors that "[t]he Compensation and Nominating Committee determines the number of

5    shares that will be subject to stock option grants based on our business plans, the executive's level of

6    responsibility, individual performance, historical award data and competitive practice of comparable

7    positions in similar high technology companies. ***All options to date have been granted at not less***

8    ***than the fair market value of the underlying shares on the date of grant***."

9        131.    MIPS filed their 2004 Proxy Statement on September 22, 2004. The proxy statement

10    assured investors that "[t]he Compensation and Nominating Committee determines the number of

11    shares that will be subject to stock option grants based on our business plans, the executive's level of

12    responsibility, individual performance, historical award data and competitive practice of comparable

13    positions in similar high technology companies. ***All options to date have been granted at not less***

14    ***than the fair market value of the underlying shares on the date of grant***."

15        132.    MIPS filed their 2005 Proxy Statement on September 22, 2005. The proxy statement

16    assured investors that "[t]he Compensation and Nominating Committee determines the number of

17    shares that will be subject to stock option grants based on our business plans, the executive's level of

18    responsibility, individual performance, historical award data and competitive practice of comparable

19    positions in similar high technology companies. ***All options to date have been granted at not less***

20    ***than the fair market value of the underlying shares on the date of grant***."

21        **MIPS' FALSE FINANCIAL REPORTING IN VIOLATION OF GAAP**

22        133.    As a result of defendants' improper backdating of stock options, defendants caused

23    MIPS to violate GAAP, SEC regulations and IRS rules and regulations.

24        134.    MIPS' financial results for 1998-2006 were included in reports filed with the SEC

25    and in other shareholder reports. In these reports, defendants represented that MIPS' financial

26    results were presented in a fair manner and in accordance with GAAP.

27        135.    Defendants' representations were false and misleading as to the financial information

28    reported, as such financial information was not prepared in conformity with GAAP, nor was the

1    financial information "a fair presentation" of the Company's financial condition and operations,

2    causing the financial results to be presented in violation of GAAP and SEC rules.

3         136.    GAAP consists of those principles recognized by the accounting profession as the

4    conventions, rules, and procedures necessary to define accepted accounting practice at the particular

5    time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17

6    C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared

7    in compliance with GAAP, are presumed to be misleading and inaccurate.

8    **Violations of GAAP**

9         137.    During the Relevant Period, defendants caused the Company to understate its

10    compensation expense by not properly accounting for its stock options under GAAP and thus

11    overstated the Company's net earnings.

12         138.    Under well-settled accounting principles in effect throughout the Relevant Period,

13    MIPS did not need to record an expense for options granted to employees at the then-current market

14    price ("at the money"). The Company was, however, required to record an expense in its financial

15    statements for any options granted below the then-current market price ("in the money"). In order to

16    provide MIPS' executives and employees with far more lucrative "in the money" options, while

17    avoiding having to inform shareholders about millions of dollars incurred by the Company in

18    compensation expenses (and without paying the IRS millions of dollars in employment taxes),

19    defendants systematically falsified Company records to create the false appearance that options had

20    been granted at the market price on an earlier date.

21         139.    Throughout the Relevant Period, MIPS accounted for stock options using the intrinsic

22    method described in APB Opinion No. 25, "Accounting for Stock Issued to Employees." Under

23    APB Opinion No. 25, employers were required to record as an expense on their financial statements

24    the "intrinsic value" of a fixed stock option on its "measurement date." An option that is "in the

25    money" on the measurement date has intrinsic value, and the difference between its exercise price

26    and the quoted market price must be recorded as compensation expense to be recognized over the

27    vesting period of the option. Options that are "at the money" or "out of the money" on the

28    measurement date need not be expensed. Excluding non-employee directors, APB Opinion No. 25

1  required employers to record compensation expenses on options granted to non-employees

2  irrespective of whether they were "in the money" or not on the date of grant.

3  **MIPS' GAAP Violations Were Material**

4       140.    The false and misleading statements and omissions defendants caused MIPS to make

5  during the Relevant Period regarding its accounting were material, particularly in light of SEC

6  guidance on materiality.  SEC Staff Accounting Bulletin ("SAB") Topic 1M, "Materiality,"

7  summarizes GAAP definitions of materiality.  Among other items, SAB Topic 1M says: "A matter

8  is 'material' if there is a substantial likelihood that a reasonable person would consider it important."

9  It also stresses that materiality requires qualitative, as well as quantitative considerations.  For

10  example, if a known misstatement would cause a significant market reaction that reaction should be

11  taken into account in determining the materiality of the misstatement.

12  **SAB Topic 1M further states:**

13       Among the considerations that may well render material a quantitatively
14  small misstatement of a financial statement item are –

        *      *      *

15
16  •    whether the misstatement masks a change in earnings or other trends

17  •    whether the misstatement hides a failure to meet analysts' consensus expectations for
the enterprise

18          *      *      *

19  •    whether the misstatement concerns a segment or other portion of the registrant's
20  business that has been identified as playing a significant role in the registrant's
operations or profitability.

21       141.    SAB Topic 1M also says that an intentional misstatement of even immaterial items

22  may be illegal and constitute fraudulent financial reporting.

23  **MIPS' Financial Statements Violated Fundamental Concepts of GAAP**

24       142.    Due to these accounting improprieties, the Company presented its financial results

25  and statements in a manner that violated GAAP, which are described by the following statements:

26       (a)    The principle that interim financial reporting should be based upon the same

27  accounting principles and practices used to prepare annual financial statements (APB Opinion

28  No. 28, ¶10);

1       (b)    the principle that financial reporting should provide information that is useful

2   to existing and potential investors and creditors and other users in making rational investment, credit

3   and similar decisions (Financial Accounting Standards Board ("FASB") Statement of Concepts

4   No. 1, ¶34);

5       (c)    the principle that financial reporting should provide information about the

6   economic resources of an enterprise, the claims to those resources, and the effects of transactions,

7   events and circumstances that change resources and claims to those resources (FASB Statement of

8   Concepts No. 1, ¶40);

9       (d)    the principle that financial reporting should provide information about how

10  management of an enterprise has discharged its stewardship responsibility to stockholders for the use

11  of enterprise resources entrusted to it.   To the extent that management offers securities of the

12  enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective

13  investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

14      (e)    the principle that financial reporting should be reliable in that it represents

15  what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

16      (f)    the principle of completeness, which means that nothing material is left out of

17  the information that may be necessary to insure that it validly represents underlying events and

18  conditions (FASB Statement of Concepts No. 2, ¶79); and

19      (g)    the principle that conservatism be used as a prudent reaction to uncertainty to

20  try to ensure that uncertainties and risks inherent in business situations are adequately considered

21  (FASB Statement of Concepts No. 2, ¶¶95, 97).

22      143.    Further, the undisclosed adverse information concealed by defendants during the

23  Relevant Period is the type of information which, because of SEC regulations, regulations of the

24  national stock exchanges and customary business practice, is expected by investors and securities

25  analysts to be disclosed, and is known by corporate officials and their legal and financial advisors to

26  be the type of information which is expected to be and must be disclosed.

27

28

1    **Violations of the SEC Regulations**

2        144.    During the Relevant Period, defendants caused MIPS to violate SEC regulations by

3    failing to disclose that the Company's senior executives had been granted backdated stock options.

4        145.    Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer

5    must furnish information required by Item 402 of Regulation S-K [17 C.F.R. §229.402].   Item

6    402(b) and (c) require a company to provide both a Summary Compensation Table and an

7    Option/SAR Grants Table identifying the compensation of the named executive officers – the

8    company's CEO and its next four most highly paid executives.   Item 402 requires particularized

9    disclosures involving a company's stock option grants in the last fiscal year.   In the Summary

10   Compensation Table, the issuer must identify in a column "other annual compensation" received by

11   the named executives that is not properly categorized as salary or bonus, including any "[a]bove

12   market or preferential earnings on restricted stock, options, SARs or deferred compensation" paid to

13   the officer during the period.   Item 402(b)(2)(iii)(C)(2).   In the option grant table, the issuer must

14   identify in a column "[t]he per-share exercise or base price of the options . . . .   If such exercise or

15   base price is less than the market price of the underlying security on the date of grant, a separate,

16   adjoining column shall be added showing market price on the date of grant."   Item 402(c)(2)(iv).

17       146.    Defendants caused MIPS to violate SEC regulations by failing to disclose that the

18   Company's named executive officers had been granted options with exercise prices below the

19   market value on the date the Board or Compensation Committee approved the grant.

20   **Violations of IRS Rules and Regulations**

21       147.    During the Relevant Period, defendants further caused MIPS to violate IRS rules and

22   regulations due to its improper accounting for the backdated stock options.   As a result, the

23   Company's tax liabilities were understated exposing MIPS to potential amounts owed for back taxes,

24   penalties and interest to the IRS for improperly reporting compensation.

25       148.    Defendants caused the Company to violate IRS Code §162(m) which generally limits

26   a publicly traded company's tax deductions for compensation paid to each of its named executive

27   officers to $1 million unless the pay is determined to be "performance-based."   In order for

28   compensation to be performance-based, the Compensation Committee must have set pre-established

1   and objective performance goals.  The goals must then be approved by the shareholders.  Section

2   162(m) defines stock options as performance-based provided they are issued at an exercise price that

3   is no less than the fair market value of the stock on the date of the grant.  Accordingly, properly

4   issued stock options do not have to be taken into account in calculating whether an executive's

5   compensation has exceeded the $1 million compensation cap.

6       149.    Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top

7   executives' soaring pay packages more closely to a company's performance.  This change in the tax

8   law turned compensation practices for a company's top executives away from straight salary-based

9   compensation to performance-based compensation, including stock options.  According to former

10  SEC Chairman Harvey Pitt: "What [162(m)] did was create incentives to find other forms of

11  compensation so people could get over the $1 million threshold without running afoul of the code."

12  (Alteration in original.)

13      150.    Defendants caused MIPS to violate IRS Code §162(m) by providing backdated

14  options to the Company's named executive officers which were granted with exercise prices that

15  were less than the fair market value of the stock on the date of the grant.  As a result all of the

16  income resulting from the exercise of the options must be included for purposes of calculating

17  whether the named executive's compensation exceeds the $1 million cap for federal tax purposes.

18      151.    Defendants further caused the Company to violate IRS rules and regulations in order

19  to avoid having to withhold income and FICA tax from its executives and employees upon the

20  exercise of MIPS' stock options by improperly accounting for its Non-Qualified Stock Options

21  ("NQSOs") as Incentive Stock Options ("ISOs").

22      152.    ISOs are a form of equity compensation that may be provided to a company's

23  employees.  ISOs are required to be granted at an exercise price that is no less than the fair market

24  value of the stock on the date of the grant and are entitled to preferential tax treatment as they are not

25  subject to income tax upon exercise of the options but only upon sale of the stock (except for the

26  possible imposition of alternative minimum tax on the option spread at the time of exercise).  Stock

27  options that do not qualify as ISOs are considered to be NQSOs.  NQSOs are not entitled to

28  preferential treatment as they are subject to income tax and FICA withholding upon exercise.  As a

result, a company that fails to withhold income tax and/or FICA upon the exercise of NQSOs by its employees would be liable for the amount of the income tax and FICA that the company failed to withhold upon exercise of the options, in addition to interest and penalties.

153.    By improperly treating their backdated options as ISOs, defendants failed to provide proper income tax and FICA withholdings upon the exercise of their options by their executives and employees in violation of IRS rules and regulations.

154.    The chart below illustrates MIPS' false and misleading fiscal year financial results which materially understated its compensation expenses and thus overstated its earnings due to improper backdating of stock options:

**MIPS Technologies, Inc**
**Impact of Restatement Adjustments**
(in thousands of $ except EPS)

| | FY1999 | FY2000 | FY2001 | FY2002 | FY2003 | FY2004 | FY2005 |
|---|---|---|---|---|---|---|---|
| *As Originally Reported* | | | | | | | |
| **Operating Income** | 36,155 | 42,850 | 25,917 | (13,332) | (26,966) | 326 | 13,897 |
| **Net Income** | 22,661 | 27,113 | 19,062 | (9,390) | (28,907) | (1,531) | 14,909 |
| **Diluted EPS** | 0.58 | 0.68 | 0.47 | (0.24) | (0.73) | (0.04) | 0.33 |
| **Shares used in calculation of Diluted EPS** | 38,762 | 39,912 | 40,309 | 39,013 | 39,505 | 40,434 | 44,533 |
| *Adjustments* | | | | | | | |
| **Revised stock option measurement dates (pre-tax)** | (1,304) | (6,079) | (19,105) | (18,028) | (1,377) | (317) | (149) |
| **Income tax adjustment** | 0 | 2,137 | 5,767 | 7,001 | (698) | 0 | 0 |
| **Net increase/ (decrease) in net income** | (1,304) | (3,942) | (13,338) | (11,027) | (2,075) | (317) | (149) |
| **Effect on Diluted EPS** | (0.03) | (0.10) | (0.33) | (0.28) | (0.05) | (0.01) | (0.00) |
| *As Restated* | | | | | | | |
| **Operating Income** | 34,851 | 36,771 | 6,812 | (31,360) | (28,343) | 9 | 13,748 |
| **Net Income** | 21,357 | 23,171 | 5,724 | (20,417) | (30,982) | (1,848) | 14,760 |
| **Diluted EPS** | 0.55 | 0.58 | 0.14 | (0.52) | (0.78) | (0.05) | 0.33 |
| **Impact of Restatement** | | | | | | | |
| **Overstatement in Operating Income or (Understatement in Operating Loss)** | 3.7% | 16.5% | 280.5% | 57.5% | 4.9% | 3522.2% | 1.1% |
| **Overstatement in Net Income or (Understatement in Net Loss)** | 6.1% | 17.0% | 233.0% | 54.0% | 6.7% | 17.2% | 1.0% |

1    **MIPS' Reports on Form 10-K for the Relevant Period Were False and Misleading**

2    155.    Throughout the Relevant Period, the members of the MIPS Board either knew, or

3    should have known, that MIPS was filing false and misleading Forms 10-K with the SEC.  The

4    Forms 10-K included false financial statements and misrepresented the options granting practices at

5    MIPS.

6    **The 1999 Form 10-K**

7    156.    On or about September 21, 1999, the Company filed its 1999 Form 10-K with the

8    SEC.  The 1999 Form 10-K was simultaneously distributed to shareholders and the public.  The

9    1999 Form 10-K included MIPS' 1999 financial statements which were materially false and

10   misleading and presented in violation of GAAP, due to improper accounting for the backdated stock

11   options.  The Company also stated that it accounts for its stock option plans and its employee stock

12   purchase plan in accordance with provisions of APB Opinion No. 25.   As a result, MIPS'

13   compensation expense was understated and its net earnings were overstated.

14   157.    The 1999 Form 10-K made the following false and misleading statement: "Stock

15   options are granted at an exercise price of not less than the fair value on the date of grant."

16   158.    The 1999 Form 10-K was signed by Bourgoin, Eichler, Akeley, Coleman, Gibbons,

17   Holbrook, Kelly and Sekimoto.

18   **The 2000 Form 10-K**

19   159.    On or about September 22, 2000, the Company filed its 2000 Form 10-K with the

20   SEC.  The 2000 Form 10-K was signed by Bourgoin, Eichler, Coleman, Gibbons, Holbrook and

21   Kelly.  The 2000 Form 10-K was simultaneously distributed to shareholders and the public.  The

22   2000 Form 10-K included MIPS' 2000 financial statements which were materially false and

23   misleading and presented in violation of GAAP, due to improper accounting for the backdated stock

24   options.  The Company also stated that it accounts for its stock option plans and its employee stock

25   purchase plan in accordance with provisions of APB Opinion No. 25.   As a result, MIPS'

26   compensation expense was understated and its net earnings were overstated.

27

28

160.    The 2000 Form 10-K also clearly showed that defendants understood the accounting rules for granting stock options whose exercise price is below the fair market value of the Company's stock on the grant date.  The 2000 Form 10-K stated:

> We have elected to follow APB 25 in accounting for our employee stock options to purchase both Silicon Graphics and MIPS' common stock.  Under APB 25, no compensation expense is recognized in our financial statements except in connection with the granting of restricted stock for nominal consideration and unless the exercise price of the employee stock options is less than the market price of the underlying stock on the date of grant.  Total compensation expense recognized in our financial statements for stock-based awards under APB 25 was $90,000 in fiscal 2000, $898,000 in fiscal 1999, and $1.0 million in fiscal 1998.

**The 2001 Form 10-K**

161.    On or about September 24, 2001, the Company filed its 2001 Form 10-K with the SEC.  The 2001 Form 10-K was simultaneously distributed to shareholders and the public.  The 2001 Form 10-K included MIPS' 2001 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  The Company also stated that it accounts for its stock option plans and its employee stock purchase plan in accordance with provisions of APB Opinion No. 25 and that "[s]tock options are granted at an exercise price of not less than the fair value on the date of grant."  As a result, MIPS' compensation expense was understated and its net earnings were overstated.  The Form 10-K was signed by Bourgoin, Eichler, Coleman, Gibbons, Holbrook and Kelly.

**The 2002 Form 10-K**

162.    On or about September 25, 2002, the Company filed its 2002 Form 10-K with the SEC.  The 2002 Form 10-K was signed by Bourgoin, Eichler, Coleman, Gibbons, Holbrook, Horowitz and Kelly.  The 2002 Form 10-K was simultaneously distributed to shareholders and the public.  The 2002 Form 10-K included MIPS' 2002 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, MIPS' compensation expense was understated and its net earnings were overstated.

163.    The 2002 Form 10-K made the following false and misleading statements: "Stock options are granted at an exercise price of not less than the fair value on the date of grant."

**The 2003 Form 10-K**

164.    On or about September 24, 2003, the Company filed its 2003 Form 10-K with the SEC.  The 2003 Form 10-K was simultaneously distributed to shareholders and the public.  The 2003 Form 10-K included MIPS' 2003 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  The Company also stated that it accounts for its stock option plans and its employee stock purchase plan in accordance with provisions of APB Opinion No. 25.  As a result, MIPS' compensation expense was understated and its net losses were understated.

165.    The 2003 Form 10-K made the following false and misleading statements: "Stock options are granted at an exercise price of not less than the fair value on the date of grant."

166.    The 2003 Form 10-K was signed by Bourgoin, Eichler, Coleman, Gibbons, Holbrook, Horowitz and Kelly.

**The 2004 Form 10-K**

167.    On or about September 8, 2004, the Company filed its 2004 Form 10-K with the SEC.  The 2004 Form 10-K was signed by Bourgoin, Eichler, Coleman, Gibbons, Holbrook, Horowitz and Kelly.  The 2004 Form 10-K was simultaneously distributed to shareholders and the public.  The 2004 Form 10-K included MIPS' 2004 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, MIPS' compensation expense was understated and its net earnings were overstated.

168.    The 2004 Form 10-K again made clear that defendants understood the accounting implications of granting stock options with a fair market value below the price of the Company's stock on the grant date:

> As allowed by SFAS No. 123, we account for stock-based employee compensation arrangements under the intrinsic value method prescribed by Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees* (APB 25).  As a result, no expense was recognized for options to purchase our common stock that were granted with an exercise price equal to fair market value at the date of grants and no expense was recognized in connection with purchases under our employee stock purchase plan.  For restricted common stock issued at discounted prices, we recognize compensation expense over the vesting period for the difference between the exercise or purchase price and the fair market value on the measurement date.

1
2

Total compensation expense recognized in our financial statements for stock-based awards under APB 25 was $642,000 in fiscal 2004, $588,000 in fiscal 2003, and $1,000 in fiscal 2002.

3

**The 2005 Form 10-K**

4

169.    On or about September 9, 2005 the Company filed its 2005 Form 10-K with the SEC.

5

The 2005 Form 10-K was signed by Bourgoin, Eichler, Coleman, Gibbons, Herb, Holbrook,

6

Horowitz and Kelly.  The 2005 Form 10-K was simultaneously distributed to shareholders and the

7

public.  The 2005 Form 10-K included MIPS' 2005 financial statements which were materially false

8

and misleading and presented in violation of GAAP, due to improper accounting for the backdated

9

stock options.  As a result, MIPS' compensation expense was understated and its net earnings were

10

overstated.

11

170.    The 2005 Form 10-K made the following false and misleading statements: "Stock

12

options are granted at an exercise price of not less than the fair value on the date of grant."

13

171.    In addition to the false financials and other false statements in MIPS Forms 10-K,

14

MIPS' CEO and CFO, defendants Bourgoin and Eichler, also signed Sarbanes-Oxley §302

15

certifications falsely stating that MIPS' fiscal year 2003-2005 Forms 10-K did not contain any

16

material misstatements or omit material information and that the reports fairly presented in all

17

material respects MIPS' financial condition and results of operations.  These statements were untrue

18

at the time they were made due to the unlawful stock option backdating particularized herein.

19

172.    During the Relevant Period, defendants caused MIPS' shares to trade at artificially

20

inflated levels by issuing a series of materially false and misleading statements regarding the

21

Company's financial statements, business and prospects.  Specifically, defendants caused or allowed

22

MIPS to issue statements that failed to disclose or misstated the following: (i) that the Company had

23

problems with its internal controls that prevented it from issuing accurate financial reports and

24

projections; (ii) that because of improperly recorded stock-based compensation expenses the

25

Company's financial results violated GAAP; and (iii) that the Company's public disclosures

26

presented an inflated view of MIPS' earnings and restated earnings.

27

28

**TOLLING OF THE STATUTE OF LIMITATIONS**

173.    The Counts alleged herein are timely.  As an initial matter, defendants wrongfully concealed their manipulation of the stock option plans, through strategic timing and fraudulent backdating, by issuing false and misleading proxy statements, by falsely reassuring MIPS' public investors that MIPS' option grants were being administered by a committee of independent directors, and by failing to disclose that backdated options were, in fact, actually issued on dates other than those disclosed, and that strategically timed option grants were issued based on the manipulation of insider information that ensured that the true fair market value of the Company's stock was, in fact, higher than the publicly traded price on the date of the option grant.

174.    MIPS' public investors had no reason to know of defendants' breaches of their fiduciary duties until at least August 2006, when MIPS announced that it was investigating its historical options granting practices.

175.    Finally, as fiduciaries of MIPS and its public shareholders, defendants cannot rely on any limitations defense where they withheld from MIPS' public shareholders the facts that give rise to the claims asserted herein, *i.e.*, that the MIPS Board had abdicated its fiduciary responsibilities to oversee the Company's executive compensation practices, and that the option grant dates had been manipulated to maximize the profit for the grant recipients and, accordingly, to divert assets away from the Company.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

176.    Plaintiffs bring this action derivatively in the right and for the benefit of MIPS to redress injuries suffered and to be suffered by MIPS as a direct result of defendants' violations of state and federal law, breaches of fiduciary duty, abuse of control, gross mismanagement, corporate waste and unjust enrichment, as well as the aiding and abetting thereof, by the defendants.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

177.    Plaintiffs will adequately and fairly represent the interests of MIPS and its shareholders in enforcing and prosecuting its rights.

178.    Plaintiffs are owners of MIPS stock and were owners of MIPS stock during times relevant to defendants' illegal and wrongful course of conduct alleged herein, including times when backdated and manipulated options were granted by defendants.

179.    Prior demand upon a board of directors is excused if plaintiffs allege facts that, if accepted as true, raise a reasonable doubt that: (a) the challenged transaction was the product of a valid business judgment; or (b) a majority of the directors are disinterested and independent.  If either prong of this test is satisfied, demand is excused.

180.    By reason of their corporate positions and their ability to control the business and corporate affairs of MIPS at all relevant times, the directors of MIPS owed MIPS and its stockholders fiduciary duties of candor, fidelity, trust, and loyalty, and are and were required to use their ability to control MIPS in a fair, just and equitable manner, as well as to act in furtherance of the best interests of MIPS and its stockholders.  In addition, the directors owed MIPS the fiduciary duty to exercise due care and diligence in the management and administration of the affairs of MIPS and in the use and preservation of its property and assets.  In violation of their fiduciary duties, defendants approved of and/or caused MIPS to issue improperly manipulated stock options to many of its employees and to issue false and misleading statements for a period beginning in at least 1998 and continuing until at least 2006.

**Demand Is Futile Because a Majority of MIPS' Directors Are Not Disinterested**

181.    Based upon the facts set forth throughout this Complaint, applicable law and the longstanding rule that equity does not compel a useless and futile act, a pre-filing demand upon the MIPS Board to institute this action against the officers and members of the MIPS Board is excused as futile.  Demand is excused because plaintiffs can show a reasonable doubt that the majority of directors were not disinterested at the time that this action was filed.  At the time that plaintiffs filed this action, the MIPS Board consisted of Holbrook, Bourgoin, Coleman, Gibbons, Herb, Horowitz and Kelly.

182.    Defendant Bourgoin has served as President of MIPS since September 1996, as a director of the Company since May 1999 and as CEO since February 1998.  During this period, Bourgoin is alleged to have received grants of backdated stock options.  Indeed, MIPS has admitted

1   options were backdated to Bourgoin and other MIPS executives on three occasions.  Bourgoin is not

2   disinterested because he received a personal financial benefit from the manipulation of MIPS' stock

3   options that was not equally shared by MIPS' stockholders.  MIPS' shareholders did not have the

4   benefit of receiving manipulated option grants and shares at a low-price point.  As a recipient of

5   backdated options, Bourgoin can be neither disinterested nor independent in considering a demand

6   related to backdating at MIPS.  Further, Bourgoin violated his fiduciary duties of loyalty and good

7   faith by affirmatively misleading MIPS' shareholders regarding the granting and approval of stock

8   option grants at MIPS.

9        183.    Defendant Gibbons has been a director of MIPS since 1998.  Gibbons served on the

10  Option Administration Committee from 1998 to 2000, and on the Compensation Committee from

11  1999 until the present.  Because of Gibbons' specific duties with respect to the granting and approval

12  of stock options and accounting practices within the Company, Gibbons had the authority and

13  obligation under the stock-options plans to administer the plans and to ensure compliance with them.

14  Gibbons bore ultimate responsibility for ensuring that stock options were granted at fair market

15  value on the date of the grant as well as deciding the grant dates for the options.  Gibbons violated

16  this duty by granting and approving manipulated stock option grants.  While approving manipulated

17  option grants through his service on the Options Administration Committee and Compensation

18  Committee, Gibbons also approved MIPS' falsified financial statements while serving on the Audit

19  Committee from 1999 until 2005.  Gibbons faces a substantial risk of personal liability for granting

20  and approving manipulated options.  Gibbons can be neither disinterested nor independent in

21  considering a demand related to backdating at MIPS.  Gibbons violated his fiduciary duties of

22  loyalty and good faith by affirmatively misleading MIPS' shareholders regarding the granting and

23  approval of stock option grants at MIPS.

24       184.    Defendant Holbrook has been a director of MIPS since 1998.  Holbrook served on the

25  Options Administration Committee from 1998 to 2000, and on the Compensation Committee from

26  1999 to 2002.  Holbrook bore ultimate responsibility for ensuring that stock options were granted at

27  fair market value on the date of the grant as well as deciding the grant dates for the options.  While

28  approving manipulated option grants through his service on the Options Administration Committee

1  and Compensation Committee, Holbrook also approved MIPS' falsified financial statements while

2  serving on the Audit Committee from 2000 until 2005.  Holbrook can be neither disinterested nor

3  independent in considering a demand related to backdating at MIPS.  Holbrook violated his fiduciary

4  duties of loyalty and good faith by affirmatively misleading MIPS' shareholders regarding the

5  granting and approval of stock option grants at MIPS.

6  185.    Defendant Coleman has been a director of MIPS since 1998.  Coleman served on the

7  Compensation Committee from 1999 to the present.  Because of Coleman's specific duties with

8  respect to the granting and approval of stock options and accounting practices within the Company,

9  Coleman had the authority and obligation under the stock-options plans to administer the plans and

10  to ensure compliance with them.  Coleman bore ultimate responsibility for ensuring that stock

11  options were granted at fair market value on the date of the grant as well as deciding the grant dates

12  for the options.  Coleman can be neither disinterested nor independent in considering a demand

13  related to backdating at MIPS.  Coleman violated his fiduciary duties of loyalty and good faith by

14  affirmatively misleading MIPS' shareholders regarding the granting and approval of stock option

15  grants at MIPS.

16  186.    Defendant Horowitz was a director of MIPS from 2001 until August 2007.  Horowitz

17  served on the Compensation Committee from 2002 until 2007.  Because of Horowitz's specific

18  duties with respect to the granting and approval of stock options and accounting practices within the

19  Company, Horowitz had the authority and obligation under the stock-options plans to administer the

20  plans and to ensure compliance with them.  Horowitz bore ultimate responsibility for ensuring that

21  stock options were granted at fair market value on the date of the grant as well as deciding the grant

22  dates for the options.  Horowitz faces a substantial risk of personal liability for granting and

23  approving manipulated options.  Having approved of manipulated option grants, Horowitz can be

24  neither disinterested nor independent in considering a demand related to backdating at MIPS.

25  Horowitz violated his fiduciary duties of loyalty and good faith by affirmatively misleading MIPS'

26  shareholders regarding the granting and approval of stock option grants at MIPS.

27  187.    Defendant Kelly has been a director of MIPS since 1998.  Kelly served on the Audit

28  Committee from 1999 until the present.  Because of Kelly's specific duties with respect to the

1  accounting practices within the Company, Kelly had the authority and obligation to ensure that

2  MIPS' financial statements accurately accounted for stock-based compensation expenses under APB

3  Opinion No. 25.  Kelly faces a substantial risk of personal liability for approving false financials

4  statements through his service on the MIPS Audit Committee.  Having approved of manipulated

5  option grants, Kelly can be neither disinterested nor independent in considering a demand related to

6  backdating at MIPS.  Kelly violated his fiduciary duties of loyalty and good faith by affirmatively

7  misleading MIPS' shareholders regarding the granting and approval of stock option grants at MIPS.

8  **Demand Is Futile Because Options Backdating and/or Manipulation Is Not the Product of a**
   **Valid Business Judgment, Is *Ultra Vires*, Illegal, and Is Contrary to the Stated Purpose of**
9  **the Stock Option Plans**

10      188.    The practice of backdating stock option grants is not protected by the business

11  judgment rule because it is *ultra vires*.  The various incentive stock option plans under which these

12  options were purportedly given, and the proxy statements disclosing grants to senior executives and

13  directors during this time period, all represented that incentive stock grants be priced based on the

14  fair market value of MIPS' stock on the day of the grant.

15      189.    Further, dating stock options via spring-loading or bullet-dodging, without explicit

16  authorization from shareholders, also constitutes deceptive conduct.  A director's duty of loyalty

17  includes the duty to deal fairly and honestly with the shareholders for whom he is a fiduciary.  It is

18  inconsistent with such a duty for a board of directors to ask for shareholder approval of an incentive

19  stock option plan and then later to distribute shares to managers in such a way as to undermine the

20  very objectives approved by shareholders.  This remains true even if the board complies with the

21  strict letter of a shareholder-approved plan as it relates to strike prices or issue dates.

22      190.    Contrary to the limited authority given to the Board by MIPS' stock option plans, and

23  contrary to MIPS' representations in their proxy filings, many of MIPS' option grants between 1998

24  and 2006 were made more valuable via backdating, spring-loading, and/or bullet-dodging.  Because

25  granting options in such a way is not permitted by the stock option plans, this conduct is *ultra vires*

26  and void on its face.  *Ultra vires* acts are not protected by the business judgment rule, and thus

27  demand is excused.

28

191.    Additionally, defendants' conduct caused MIPS to issue materially false financial reports and proxy statements for the entirety of the period in question, in violation of numerous provisions of the federal securities laws.  Each director defendant violated §14(a) of the Exchange Act, as well as their fiduciary duties, by issuing false and misleading proxy statements from 1998 to 2006.  Each director defendant violated §20(a) of the Exchange Act by being controlling persons of MIPS.  Demand is excused because these are illegal acts that are not protected by the business judgment rule.

192.    Even if stock option backdating was not illegal, *ultra vires*, and void, there would be no plausible argument that the manipulation of stock options was a valid exercise of business judgment.  As represented in MIPS' proxy statements, the stated purpose of MIPS' incentive stock option plans is to encourage the productivity of MIPS' employees by providing compensation that is proportional to gains in MIPS' stock price.  However, by granting options with manipulated strike prices, defendants undermined the purpose of the stock option plans by awarding employees compensation that had intrinsic value regardless of gains in MIPS' stock price.

193.    Defendants could have achieved the stated purpose of attracting and retaining qualified employees by granting those employees additional options under their incentive plans, or by granting options at a price less than the fair market value on the day of the grant and simply disclosing and expensing these grants.  Instead, defendants failed to report these grants in their financial disclosures in order to improve their bottom line.

194.    Further, the practice of backdating stock options could not have been a valid exercise of business judgment because it has subjected MIPS to potentially massive liability.  The Company will likely suffer tax liabilities for the additional compensation they will have to expense, and they have tarnished their reputation in the investment community through this misconduct.

**Demand Is Futile Because a Majority of the MIPS Board Is Not Independent**

195.    The MIPS Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are dependent upon other defendants who also did.

1    196.    The MIPS Board and senior management participated in, approved and/or permitted

2    the wrongs alleged herein to have occurred and participated in the omission of these facts from

3    MIPS' public disclosures and/or recklessly disregarded the wrongs complained of herein, and are

4    therefore not disinterested parties.  As a result of their access to and review of internal corporate

5    documents, or conversations and connections with other corporate officers, employees, and directors

6    and attendance at management and/or Board meetings, each of the defendants knew the adverse non-

7    public information regarding the improper stock option grants and financial reporting.  Defendants

8    breached the fiduciary duties that they owed to MIPS and its shareholders in that they failed to

9    prevent and correct the improper stock option granting and financial reporting.

10    197.    During the Relevant Period, defendants authorized the filing of proxy statements, in

11    support of their nomination as directors, which failed to disclose that certain directors' stock options

12    had been backdated.  They also authorized the filing of shareholder approved stock option plans,

13    which misrepresented that the options carry the stock price of the day of the award.  Any suit by

14    defendants to remedy the wrongs complained of herein could also expose them to suit for proxy

15    violations and other violations of law; thus, they are hopelessly conflicted in making any supposedly

16    independent determination of a demand.

17    198.    All of the defendants signed one or more of the Company's annual reports during the

18    Relevant Period containing the Company's financial statements and failed to account for the

19    backdated stock options as compensation and an expense of the Company.  As a result, those

20    financial statements of the Company may have overstated its profits and may need to be restated.

21    Any suit by defendants to remedy the wrongs complained of herein could also expose them to suit

22    for securities fraud; thus, they are hopelessly conflicted in making any supposedly independent

23    determination of a demand.

24    199.    The acts complained of constitute violations of the fiduciary duties owed by MIPS'

25    officers and directors and these acts are incapable of ratification.

26    200.    The members of the MIPS Board have benefited, and will continue to benefit, from

27    the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of

28

1   control and the perquisites derived thereof, and are incapable of exercising independent objective

2   judgment in deciding whether to bring this action.

3       201.    Any suit by the current directors of MIPS to remedy these wrongs would likely

4   further expose the liability of defendants under the federal securities laws, which could result in

5   additional civil and/or criminal actions being filed against one or more of the defendants, thus, they

6   are hopelessly conflicted in making any supposedly independent determination whether to sue

7   themselves.

8       202.    MIPS has been and will continue to be exposed to significant losses due to the

9   wrongdoing complained of herein, yet the current Board has not filed any lawsuits against itself or

10  others who were responsible for that wrongful conduct to attempt to recover for MIPS any part of the

11  damages MIPS suffered and will suffer thereby.

12      203.    In order to properly prosecute this lawsuit, it would be necessary for the directors to

13  sue themselves and the other defendants, requiring them to expose themselves and their comrades to

14  millions of dollars in potential civil liability and criminal sanctions, or IRS penalties.  This they will

15  not do.

16      204.    MIPS' current and past officers and directors are protected against personal liability

17  for their acts of mismanagement, waste and breach of fiduciary duty alleged in this Complaint by

18  directors' and officers' liability insurance which they caused the Company to purchase for their

19  protection with corporate funds, *i.e.*, monies belonging to the stockholders of MIPS.  However, due

20  to certain changes in the language of directors' and officers' liability insurance policies in the past

21  few years, the directors' and officers' liability insurance policies covering the defendants in this case

22  contain provisions which eliminate coverage for any action brought directly by MIPS against these

23  defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these

24  directors were to sue themselves or certain of the officers of MIPS, there would be no directors' and

25  officers' insurance protection and thus, this is a further reason why they will not bring such a suit.

26  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance

27  coverage exists and will provide a basis for the Company to effectuate a recovery.

28

205.    In order to bring this action for breaching their fiduciary duties, the members of the MIPS Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

206.    Because of these financial and personal inter-relationships, the entire MIPS Board cannot be independent with respect to the transactions complained of herein, and demand is futile.

207.    Plaintiffs have not made any demand on shareholders of MIPS to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    MIPS is a publicly traded company with approximately 43 million shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

**Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**
**Against Bourgoin and Eichler**

208.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

209.    Throughout the Relevant Period, Bourgoin and Eichler, individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct which allowed certain of the Company's officers, directors, and rank-and-file employees, including some of the defendants, to receive improper option grants and make no recompense to the Company.

210.    Bourgoin and Eichler employed devices, schemes and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading

1 statements of material facts and/or omitting to state material facts necessary in order to make the

2 statements made about MIPS not misleading.

3      211.    Bourgoin, as CEO, and Eichler, as CFO, are liable as direct participants in the wrongs

4 complained of herein.  Through their positions of control and authority, as CEO and CFO of MIPS,

5 Bourgoin and Eichler were able to and did control the conduct complained of herein and the content

6 of the public statements disseminated by MIPS.

7      212.    Bourgoin and Eichler acted with scienter throughout the Relevant Period, in that they

8 either had actual knowledge of the misrepresentations and/or omissions of material facts set forth

9 herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the

10 true facts, even though such facts were available to them.  Defendants were CEO and CFO of the

11 Company, and were therefore directly responsible for the false and misleading statements and/or

12 omissions disseminated to the public through press releases, news reports and filings with the SEC.

13      213.    Bourgoin and Eichler participated in a scheme to defraud with the purpose and effect

14 of defrauding MIPS.

15      214.    By virtue of the foregoing, Bourgoin and Eichler have violated §10(b) of the

16 Exchange Act, and Rule 10b-5 promulgated thereunder, and caused MIPS to sustain damages as

17 alleged hereunder.

**COUNT II**

**Violations of Section 14(a) of the Exchange Act**
**Against All Defendants**

215.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

above, as though fully set forth herein.

216.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no

proxy statement shall contain "any statement which, at the time and in the light of the circumstances

under which it is made, is false or misleading with respect to any material fact, or which omits to

state any material fact necessary in order to make the statements therein not false or misleading."  17

C.F.R. §240.14a-9.

217.    The 1999-2006 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that defendants were causing MIPS to engage in an option backdating and manipulation.

218.    In the exercise of reasonable care, defendants should have known that the proxy statements were materially false and misleading.

219.    The misrepresentations and omissions in the proxy statements were material to plaintiffs in voting on each proxy statement.  The proxy statements were an essential link in the accomplishment of the continuation of defendants' unlawful stock option manipulation practices, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

220.    The Company was damaged as a result of the material misrepresentations and omissions in the proxy statements.

**COUNT III**

**Violations of Section 20(a) of the Exchange Act**
**Against All Defendants**

221.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

222.    Defendants, by virtue of their positions with MIPS and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of MIPS within the meaning of §20(a) of the Exchange Act.  They had the power and influence and exercised the same to cause MIPS to engage in the illegal conduct and practices complained of herein.

**COUNT IV**

**Accounting**
**Against All Defendants**

223.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

224.    At all relevant times, defendants, as directors and/or officers of MIPS, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

225.    In breach of their fiduciary duties owed to MIPS and its shareholders, defendants caused MIPS, among other things, to grant backdated stock options to themselves and/or certain other officers and directors of MIPS.  By this wrongdoing, defendants breached their fiduciary duties owed to MIPS and its shareholders.

226.    Defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to the defendants.

227.    As a result of defendants' misconduct, MIPS has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

228.    Plaintiffs demand an accounting be made of all stock option grants made to defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to the defendants, as well as the disposition of any proceeds received by defendants via sale or other exercise of backdated stock option grants received by the defendants.

## COUNT V

### Breach of Fiduciary Duty and/or Aiding and Abetting
### Against All Defendants

229.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

230.    Each of the defendants agreed to and did participate with Bourgoin and the other defendants and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of fiduciary duties defendants owed to the Company.

231.    Defendants have violated fiduciary duties of care, loyalty, candor and independence owed to MIPS and its public shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of MIPS and its shareholders.

232.     As demonstrated by the allegations above, defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to MIPS and its public shareholders, and they failed to disclose material information and/or made material misrepresentations to shareholders regarding defendants' option backdating and manipulation.

233.     By reason of the foregoing acts, practices and course of conduct, the defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward MIPS and its public shareholders.

234.     As a proximate result of defendants' conduct, in concert with Bourgoin, MIPS has been injured and is entitled to damages.

**COUNT VI**

**Abuse of Control**
**Against All Defendants**

235.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

236.     Defendants employed the alleged scheme for the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at, and control over, MIPS, and to continue to receive the substantial benefits, salaries and emoluments associated with their positions at MIPS.  As a part of this scheme, defendants actively made and/or participated in the making of or aided and abetted the making of, misrepresentations regarding MIPS.

237.     Defendants' conduct constituted an abuse of their ability to control and influence MIPS.

238.     By reason of the foregoing, MIPS has been damaged.

**COUNT VII**

**Gross Mismanagement**
**Against All Defendants**

239.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

240. Defendants had a duty to MIPS and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of MIPS.

241. Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of MIPS in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, defendants breached their duties of due care, diligence and candor in the management and administration of MIPS' affairs and in the use and preservation of MIPS' assets.

242. During the course of the discharge of their duties, defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet defendants caused MIPS to engage in the wrongful conduct complained of herein which they knew had an unreasonable risk of damage to MIPS, thus breaching their duties to the Company. As a result, defendants grossly mismanaged MIPS.

243. By reason of the foregoing, MIPS has been damaged.

## COUNT VIII

### Corporate Waste
### Against All Defendants

244. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

245. By failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision, and by giving away millions of dollars to defendants via the option backdating abuses alleged herein, defendants have caused MIPS to waste valuable corporate assets.

246. As a result of defendants' corporate waste, they are liable to the Company.

1

**COUNT IX**

2

**Unjust Enrichment**
**Against All Defendants**

3

4

247.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

above, as though fully set forth herein.

5

6

248.    As a result of the conduct described above, defendants will be and have been unjustly

7

enriched at the expense of MIPS, in the form of unjustified salaries, benefits, bonuses, stock option

grants and other emoluments of office.

8

9

249.    All the payments and benefits provided to the defendants were at the expense of

10

MIPS.  The Company received no benefit from these payments.  MIPS was damaged by such

payments.

11

12

250.    Certain of the defendants sold MIPS' stock for a profit during the period of deception,

13

misusing confidential non-public corporate information.  These defendants should be required to

disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of MIPS.  A

14

constructive trust for the benefit of the Company should be imposed thereon.

15

**COUNT X**

16

**Against All Defendants**
**for Rescission**

17

18

251.    Plaintiffs incorporate by reference and reallege each and every allegation contained

19

above as though fully set forth herein.

20

252.    As a result of the acts alleged herein, the stock option contracts between the officer

21

defendants and MIPS entered into during the Relevant Period were obtained through defendants'

22

fraud, deceit and abuse of control.  Further, the backdated stock options were illegal grants and thus

23

invalid as they were not authorized in accordance with the terms of the publicly filed contracts

24

regarding the officer defendants' employment agreements and the Company's stock option plan

25

which was also approved by MIPS' shareholders and filed with the SEC.

26

253.    All contracts which provide for stock option grants between the officer defendants

27

and MIPS and were entered into during the Relevant Period should, therefore, be rescinded, with all

28

sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

### COUNT XI

**Against the Insider Selling Defendants**
**for Violation of California Corporations Code Sections 25402 and 25502.5**

254.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

255.    At the time that the insider selling defendants sold their MIPS common stock as set forth herein, by reason of their executive and/or directorial positions with MIPS, each of the insider selling defendants was an officer, director or controlling person of MIPS whose relationship to MIPS gave him access, directly or indirectly, to material information about MIPS not generally available to the public.  Each of the insider selling defendants purchased and/or sold MIPS securities at a time when he knew material information about MIPS gained from such relationship which information would significantly affect the market price of that security and which is not generally available to the public, and which he knew was not intended to be so available.

256.    The insider selling defendants, and each of them, had actual knowledge of material, adverse non-public information and thus sold their MIPS common stock in California in violation of Cal. Corp. Code §25402.

257.    Pursuant to Cal. Corp. Code §25502.5, the insider selling defendants, and each of them, are liable to MIPS for damages in an amount up to three times the difference between the price at which MIPS common stock was sold by these defendants, and each of them, and the market value which MIPS common stock would have had at the time of the sale if the information known to these defendants, and each of them, had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

**COUNT XII**

**Against the Insider Selling Defendants**
**for Breach of Fiduciary Duties, Insider Selling**
**and Misappropriation of Information**

258.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

259.   At the time of the stock sales set forth herein, the insider selling defendants were aware of the information described above, and sold MIPS common stock on the basis of such information.

260.   The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.   It was a proprietary asset belonging to the Company, which the insider selling defendants used for their own benefit when they sold MIPS common stock.

261.   At the time of their stock sales, the insider selling defendants were aware that the Company's revenues were materially overstated.   The insider selling defendants' sales of MIPS common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

262.   Since the use of the Company's proprietary information for their own gain constitutes a breach of the insider selling defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the insider selling defendants obtained thereby.

**COUNT XIII**

**Violation of California Corporations Code Sections 25400 and 25500**
**Against All Defendants**

263.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

264.   For the purpose of inducing the purchase of MIPS stock by others, each of the defendants acting individually and pursuant to a common plan willfully participated in the making of statements which were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts and/or omitted material facts necessary to make the

1    statements made in light of the circumstances in which they were made not misleading and

2    defendants knew or had reasonable grounds to believe that such statements and/or omissions were

3    false or misleading.  In particular, these false statements were made directly in SEC filings and

4    public statements as set forth above.

5        265.    Defendants, as top executive officers and directors of the Company, are liable as

6    direct participants in the wrongs complained of herein.  Through their positions of control and

7    authority as officers of the Company, each of the defendants was able to and did control the conduct

8    complained of herein and the content of the public statements disseminated by MIPS.

9        266.    By reason of the foregoing, defendants violated Cal. Corp. Code §25400, thereby

10    entitling plaintiffs to recover damages pursuant to Cal. Corp. Code §25500.

11                            **PRAYER FOR RELIEF**

12        WHEREFORE, plaintiffs demands judgment as follows:

13        A.    Awarding money damages against all defendants, jointly and severally, for all losses

14    and damages suffered as a result of the acts and transactions complained of herein, together with pre-

15    judgment interest, to ensure defendants do not participate therein or benefit thereby;

16        B.    Directing all defendants to account for all damages caused by them and all profits and

17    special benefits and unjust enrichment they have obtained as a result of their unlawful conduct,

18    including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and

19    imposing a constructive trust thereon; and

20        C.    Directing MIPS to take all necessary actions to reform and improve its corporate

21    governance and internal control procedures to comply with applicable law, including, but not limited

22    to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or

23    Articles of Incorporation and taking such other action as may be necessary to place before

24    shareholders for a vote adoption of the following Corporate Governance policies:

25            (i)    A proposal requiring that the office of CEO of MIPS and Chairman of

26    the MIPS Board be permanently held by separate individuals and that the Chairman of the MIPS

27    Board meets rigorous "independent" standards;

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - C-06-06699-RMW                                                          - 70 -

1          (ii)          a proposal to strengthen the MIPS Board's supervision of operations

2    and develop and implement procedures for greater shareholder input into the policies and guidelines

3    of the Board;

4          (iii)          appropriately test and then strengthen the internal audit and control

5    function;

6          (iv)          cause MIPS to rotate its outside audit firm every five years;

7          (v)          control and limit insider stock selling and the terms and timing of

8    stock option grants;

9          (vi)          reform executive compensation;

10          (vii)          Order the imposition of a constructive trust over defendants' stock

11    options and any proceeds derived therefrom;

12          (viii)          Award punitive damages;

13          (ix)          Award costs and disbursements of this action, including reasonable

14    attorneys', accountants', and experts' fees; and

15          (x)          Grant such other and further relief, including injunctive and other

16    equitable relief, as this Court may deem just and proper.

17                                    **JURY DEMAND**

18          Plaintiffs demand a trial by jury.

19    DATED:  February 20, 2008              COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
20                                           JOHN K. GRANT
                                              SHAWN A. WILLIAMS
21                                           AELISH M. BAIG
                                              CHRISTOPHER M. WOOD
22

23                                              _____/s/_____
24                                                   JOHN K. GRANT

25                                           100 Pine Street, Suite 2600
                                              San Francisco, CA  94111
26                                           Telephone:  415/288-4545
                                              415/288-4534 (fax)
27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP
TRAVIS E. DOWNS III
KATHLEEN A. HERKENHOFF
BENNY C. GOODMAN III
MARY LYNNE CALKINS
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

T:\CasesSF\MIPS Derivative\Cpt MIPS 1st Amd Cons Derv.doc

## MIPS TECHNOLOGIES, INC. CONSOLIDATED AMENDED VERIFICATION

I, Timmy Rollins, hereby verify that I am familiar with the allegations in the Amended Consolidated Complaint, and that I have authorized the filing of the Amended Consolidated Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

DATE: 2-19-08                    *Timmy Rollins*

**TIMMY ROLLINS**

1

<u>VERIFICATION</u>

2

I, JOHN K. GRANT, hereby declare as follows:

3

1.      I am a member of the law firm of Coughlin Stoia Geller Rudman & Robbins LLP,

4

one of the counsel of record for plaintiffs in the above-entitled action.  I have read the foregoing

5

complaint and know the contents thereof.  I am informed and believe the matters therein are true and

6

on that ground allege that the matters stated therein are true.

7

2.      I make this Verification because plaintiff Joseph Carco is absent from the County of

8

San Francisco where I maintain this office.

9

Executed this 20th day of February, 2008, at San Francisco, California.

10

_____
                                /s/

11

JOHN K. GRANT

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on February 20, 2008, I electronically filed the foregoing with the Clerk

3

of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6

participants indicated on the attached Manual Notice List.

7

I certify under penalty of perjury under the laws of the United States of America that the

8

foregoing is true and correct.  Executed on February 20, 2008.

9

10

/s/
JOHN K. GRANT

11

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP

12

100 Pine Street, 26th Floor

13

San Francisco, CA  94111
Telephone:  415/288-4545

14

415/288-4534 (fax)
E-mail:johng@csgrr.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 5:06-cv-06699-RMW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Robert Bramson**
  rbramson@bramsonplutzik.com

- **Bradley A. Dirks**
  bdirks@sbtklaw.com

- **Travis E. Downs , III**
  travisd@csgrr.com,e_file_sd@csgrr.com

- **Lawrence Timothy Fisher**
  ltfisher@bramsonplutzik.com,moldenburg@bramsonplutzik.com

- **John K. Grant**
  johnkg@csgrr.com,JDecena@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,cv

- **Tara Puhua Kao**
  tkao@sbtklaw.com,der_filings@sbtklaw.com

- **Felix Shih-Young Lee**
  flee@fenwick.com

- **William S. Lerach**
  e_file_sf@lerachlaw.com

- **Kalama M. Lui-Kwan**
  klui-kwan@fenwick.com,cgalvin@fenwick.com

- **Gaurav Mathur**
  gmathur@fenwick.com

- **Kevin Peter Muck**
  kmuck@fenwick.com,cprocida@fenwick.com

- **Susan Samuels Muck**
  smuck@fenwick.com,cgalvin@fenwick.com

- **Alan R Plutzik**
  aplutzik@bramsonplutzik.com

- **Alan Roth Plutzik**
  aplutzik@bramsonplutzik.com

- **Jay L. Pomerantz**
  jpomerantz@fenwick.com,slim@fenwick.com

- **Kathryn Anne Schofield**
  kschofield@bramsonplutzik.com,moldenburg@bramsonplutzik.com

- **Christopher James Steskal**
  csteskal@fenwick.com,cgalvin@fenwick.com

- **Michael C. Wagner**
  mwagner@sbtklaw.com,der_filings@sbtklaw.com

- **Shawn A. Williams**
  shawnw@csgrr.com,khuang@csgrr.com,moniquew@csgrr.com,e_file_sf@csgrr.com

- **Eric L. Zagar**
  ezagar@sbtklaw.com,kpopovich@sbtklaw.com,der_filings@sbtklaw.com,rwinchest

# Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**L Timothy Fisher**
Schiffrin Barroway Topaz & Kessler LLP
2125 Oak Grove Road
Suite 102
Walnut Creek, Ca 94598

**Eric Lechtzin**
Schiffrin & Barroway LLP
280 King of Prussia Road
Radnor, PA 19087

**Darren Jay Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900

San Diego, CA 92101

**Lee D. Rudy**
Schiffrin Barroway Topaz &Kessler, LLP
280 King of Prussia Road
Radnor, PA 19087